**<u>EXHIBIT 2</u>**

**Rough Deposition Transcript Excerpts of
Damian Giangiacomo**

100713.txt

1   CAUTIONS IN USING A REALTIME PARTIALLY EDITED
2   TRANSCRIPT.
3
4       In a realtime partially edited transcript, you may
5   see the reporter's raw shorthand notes.  Consequently,
6   you may see errors in capitalization and punctuation,
7   misspellings, small words missing (such as "the," "it,"
8   "a"), transposed words, double words, contextual hearing
9   mistakes, hearing mistakes of sound-alike words,
10  possible incorrect speaker identification, and at times
11  steno outlines that have not been translated.
12      Be assured that in the final edited version of the
13  transcript, all errors are corrected.  An unedited or
14  partially edited transcript represents a first draft and
15  should be used accordingly.
16      Therefore, it is not recommended you rely on the
17  unedited version as you would a final evidentiary
18  certified transcript.  Although an unedited or partially
19  edited transcript will be very readable and mostly
20  accurate, it should be used with great care.
21
22
23
24
25

1

1           THE VIDEOGRAPHER:  Good morning.  This is
                            Page 1

100713.txt

15    A.  In what sense?

16    Q.  You had -- well, if you look at the overview, mid

17  first paragraph, it says "We own 42.1 million or

18  10 percent of the bank debt at an average cost of 71.

19  We are the second largest holder behind Bank One, who

20  holds 71 million or 16 percent of the class and also

21  serves as administrative agent."

22        Do you see that?

23    A.  Yes.

24    Q.  Okay.  And my question is do you recall that at

25  the time you drafted the memo, the purpose was to make a

                                                    17

1  determination of whether Apollo would make an additional

2  investment beyond that they had already made in the

3  Venture credit?

4    A.  I don't recall it being the purpose of the memo,

5  no.

6    Q.  Was the purpose of the credit simply to track

7  your investment that had been made?

8    A.  I can tell from the conclusion section what the

9  purpose I don't recall looking at the front of the memo.

10    Q.  Do you have an independent memory of what the

11  purpose of the memo was?

12    A.  No.

13    Q.  Okay.  Are you looking at the conclusion section?

14    A.  Yes.

15    Q.  Did you review that?

16    A.  Okay.

17    Q.  Okay.  Does that refresh your memory of what the

100713.txt

18   purpose was?

19       A.  It looks like it was just an update memo to the

20   group.

21       Q.  And when you a update memo that that means it

22   just updates the status of your investment?

23       A.  The status of the investment and the status of --

24   yeah, the status of the investment, the status of the

25   company.

                                                              18

1        Q.  Do you recall at this time whether, if you know,

2    Apollo was involved in other syndicated credit deals?

3        A.  What do you mean?

4        Q.  Well, do you understand that the Venture --

5    Venture credit was a syndicated credit that was held by

6    publicly traded by a number of lenders?

7        A.  Yes.

8        Q.  And was Apollo involved at the -- at the time of

9    this memo in other credits similar to the Venture

10   credit?

11       A.  Did Apollo management own bank debt in other

12   companies?

13       Q.  You got it.

14       A.  Yes.

15       Q.  Okay.  And at the level were there many at the

16   level of your investment in the Venture credit?

17       A.  I -- I don't know.

18            MS. SHAMONKI:  Give me a second sometimes to

19   object --

20            THE WITNESS:  Okay.

                        Page 17

100713.txt

23    memorandum or does this refresh your memory that the

24    exposure of South Africa and Australia were limited to

25    50 million?

                                                                30

1        A.  Does it does this refresh, like, an independent

2    memory from 2002, no.

3        Q.  Yes, yes, but that's what this would --

4        A.  That's what it says, yes.

5            MR. PECORARO:  Can you just read back the

6    question.

7            (The reporter read the record as requested.)

8    BY MR. HUBBARD:

9        Q.  Now, this says the South Africa and Australia

10   offer the final piece of support to the bank debt via

11   28.9 and 50 million of additional collateral support do

12   you see that?

13       A.  Yes.

14       Q.  Followed by the conclusion section?

15       A.  Yes.

16       Q.  Do you recall whether this was an analysis

17   complete analysis of the collateral support for the

18   forbearance agreement?

19       A.  No.

20       Q.  You don't remember that?

21       A.  I don't recall it being a complete analysis of

22   anything.

23       Q.  So you just don't know one way or another?

24       A.  No.

25       Q.  Okay.  In this type of memorandum and update

100713.txt

31

1    memorandum would it be normal for you to do a full
2    collateral -- analysis of the collateralization of the
3    loan?
4        A.  No.
5        Q.  It would not?
6        A.  No.
7        Q.  You would leave certain sections of sources of
8    repayment off of this -- this type of memo?
9        A.  I don't think collateralization was necessarily a
10   standard approach to any of our memos.
11       Q.  Okay.  So let me make sure I understand your
12   answer.  Review of the sources of repayment of -- of the
13   loan in which you had investment wouldn't be a part of
14   these memos?
15       A.  Not necessarily, no.
16       Q.  Would review of the sources of repayment for the
17   loan in which you had been invested have been something
18   that Apollo would view as important?
19              MS. SHAMONKI:  Can you repeat the question.
20              (The reporter read the record as requested.)
21              MS. SHAMONKI:  Objection.  Calls for
22   speculation.
23   BY MR. HUBBARD:
24       Q.  In your experience?
25       A.  Is collateral important to a bank loan?

32

100713.txt

12     Q.  Do you recall any discussions other than with

13  counsel the nature of the Winget trust guarantee being

14  nonrecourse?

15     A.  No.

16     Q.  Do you recall any discussions with anyone other

17  than counsel about the Winget trust guarantee being

18  unlimited?

19     A.  No.

20     Q.  Now, this paragraph talks about the fact that

21  Mr. Winget had a 33 million dollar guarantee that was

22  becoming nonrecourse under the forbearance agreement; is

23  that correct?

24     A.  That's what it says.

25     Q.  Okay.  And it says "This change effectively gives

37

1  the bank group -- keeps the bank group from going after

2  any of his nonautomotive assets comma which include some

3  golf courses and other property period.

4        Do you see that?

5     A.  I see that, yes.

6     Q.  Do you recall where you got that information?

7     A.  No.

8     Q.  Do you recall where anyone at Apollo got that

9  information?

10     A.  No.

11     Q.  Do you recall reviewing a personal financial

12  statement of Mr. Winget?

13     A.  No.

14     Q.  The last sentence says while we would have

Page 34

100713.txt

15   preferred to keep the guarantee as originally drafted

16   comma the banks were forced to give this point in

17   exchange for the contribution of new collateral which on

18   the whole we view as a worthwhile trade.

19           You see that?

20   A.  Yes.

21   Q.  And do you recall being involved in drafting this

22   section?  I'll just ask you that.

23   A.  No.

24   Q.  Do you recall any discussions with regard to

25   attempting to keep Mr. Winget's personal guarantee from

                                                              38

1    being nonrecourse?

2    A.  No.

3    Q.  Do you recall any of these concessions that are

4    listed in one two or three of these bullet points?

5    A.  No.

6    Q.  No independent memory of these?

7    A.  No.

8    Q.  Do you have any memory of where you got the

9    information that's listed in subbullet 3 on page 4 of

10   this document?

11   A.  No.

12   Q.  Now, do you do you recall reviewing any financial

13   statements from any of the unlimited guarantee companies

14   under the forbearance agreement?

15   A.  No.

16   Q.  Would it be Appolo's normal course to review

17   financial statements of unlimited guarantors?

100713.txt

18   A.  I don't know.

19   Q.  You don't know?

20   A.  (Inaudible response.)

21   Q.  If -- if on holds bank debt for which an entity

22  has provided an unlimited guarantee, based on your

23  experience, would Apollo review the financial statements

24  of those unlimited guarantors?

25   A.  I don't know.

39

1   Q.  You don't know?

2   A.  (Inaudible response.)

3   Q.  If the unlimited guarantors could potentially

4  payoff entirely the -- the amount that Apollo had

5  investment had invested in the bank debt would they

6  review it then?

7          MS. SHAMONKI:  Repeat the question please.

8          (The reporter read the record as requested.).

9   Q.  Would they review the financial statements of

10  those unlimited guarantors if those unlimited guarantors

11  had the ability to repay Apollo in whole?

12   A.  I don't know.

13   Q.  Wouldn't be a normal course thing to do?

14          MS. SHAMONKI:  Objection.  Calls for

15  speculation.  You can answer, if you know.

16          THE WITNESS:  I don't know if it would be

17  normal course.

18   Q.  You don't?

19   A.  (Inaudible response.)

20   Q.  Does Apollo have internal policies with regard to

Page 36

100713.txt

24     Q.  In preparation for this deposition, have you

25  reviewed any documents that would reflect that the

                                                             41

1  Winget trust was an unlimited guarantee under the --

2  under -- the unlimited guarantor under the forbearance

3  agreement and eighth amended credit agreement?

4     A.  No.

5     Q.  Looking back at page 7, under South Africa and

6  Australia 78.9 million collateral support.

7        You see that?

8     A.  Um-hmm.

9     Q.  It says "South Africa and Australia offer the

10  final piece the support to the bank debt via

11  28.9 million intercompany loan and 50 million of

12  additional collateral support."

13        You see that?

14     A.  Yes.

15     Q.  Now, would you agree with me that the statement

16  the final piece of support to the bank debt would

17  indicate that this analysis incorporates all of the

18  support for the bank debt?

19     A.  Can you say that again.

20     Q.  Sure.  This memorandum says South Africa and

21  Australia offer the final piece of support fought bank

22  debt and my question is would you agree that that

23  statement indicates that this analysis holds all of the

24  pieces of support to the bank debt?

25     A.  I don't know.

                                                             42

100713.txt

1    Q.   Well, would you agree with me that that would --
2    that's what it indicates?
3    A.   I don't -- I wouldn't agree with that
4    necessarily, no.
5    Q.   What else would "final piece of support" mean?
6    A.   Might just be the final piece of this list.
7    Q.   The final piece of this list?
8    A.   This list in this memo I think this lays out some
9    collateral support and might just be the final piece
10   within this list so I don't know if it's the final piece
11   of every piece of collateral possible.
12   Q.   Do you think you if there were additional
13   significant material sources of repayment in support for
14   this bank debt they would have been listed in this
15   memorandum?
16          MS. SHAMONKI:   Objection.   Calls for
17   speculation.
18   Q.   Based on your experience?
19   A.   I don't know.
20   Q.   You don't know?
21   A.   (Inaudible response.)
22   Q.   Now based on your experience in drafting these
23   memorandums, don't you think it's fair to assume that,
24   if there were a piece of support for the bank debt that
25   could offer a material repayment of the obligation, that

43

1    it would be listed in a memorandum of this sort?

100713.txt

2          MS. SHAMONKI:  Objection.  Calls for
3  speculation.
4  BY MR. HUBBARD:
5     Q.  Do you understand my question?
6     A.  No.
7     Q.  Okay.  What I'm saying is, if there was a
8  significant piece of support to the bank debt, don't you
9  think wouldn't it be unusual to leave it off an analysis
10  such as this?
11     A.  I don't know, I mean, you used the word
12  significant material and those were all relatives to
13  situations that I don't recall on this one or other.
14     Q.  Sure.  But you've said that, if it were material
15  you would want to know about it right in your prior
16  testimony?
17     A.  Material.
18     Q.  When we talked about collateralization or sources
19  of repayment you said if it were material you would want
20  to know about it?
21          MS. SHAMONKI:  Objection mischaracterizes
22  his testimony.
23          You can answer.
24  BY MR. HUBBARD:
25     Q.  Is that a fair statement?

                                                        44


1     A.  If it -- I would want to know --
2     Q.  Yes.
3     A.  -- something material as it relates to my bank
4  debt that I own, yes.
                        Page 40

100713.txt

5      Q.   Okay.  So you have an understanding of what
6    "material" means; right?
7      A.   Yes.
8      Q.   Okay.  And my question is wouldn't it be unusual
9    to leave a material source of repayment out of a memo
10   such as this?
11     A.   Would it be unusual.
12     Q.   Yes?
13     A.   Yes.
14     Q.   And there's no mention in this memorandum of an
15   unlimited guarantee given by the Winget trust as a piece
16   of support for this bank debt is there?
17     A.   I don't know if there is.
18     Q.   Do you want to review it?
19     A.   The entire memo?
20     Q.   The you can review the sections that relate to
21   the collateral analysis or you can review the whole
22   thing.  Have you seen anything in there that mentions an
23   unlimited guarantee of the Winget trust?
24     A.   I don't know no I have not seen  one, but I
25   haven't read it word-for-word.  I don't I would

                                                   45


1    necessarily recognize it if I saw it.  I don't know if
2    the word "Winget trust" is in this memo.
3      Q.   Now, you've said you don't recall whether Apollo
4    as on the steering committee in October November 2002 of
5    the venture credit?
6      A.   No, I don't recall for that date, no.
7      Q.   You recall that at some point they were on the
                        Page 41

100713.txt

11   BY MR. HUBBARD:

12       Q.  You've testified that they were -- that Apollo

13   was on the steering committee at -- at certain points --

14       A.  Apollo was, yes.

15       Q.  Apollo was.  And -- and you've now testified that

16   the role of the steering committee was to negotiate on

17   behalf of the lending group; is that right?

18       A.  It was to negotiate on behalf of the lending

19   group, yes.

20       Q.  And my question is who would the steering group

21   negotiate with would it negotiate directly with the

22   debtor?

23       A.  No, steering group would meet as a group discuss

24   things and somebody from the agent would go negotiate.

25       Q.  So the agent would be part of those discussions

                                                    47

1    of the steering committee?

2        A.  I think also they were, yeah.

3        Q.  Do you recall whether Ernst and Young was a part

4    of those discussions?

5        A.  I think they were, I mean, they were on

6    conference calls I don't know if they were part of

7    steering committee discussions, you know, separate from

8    that, though.

9        Q.  What was the role as you saw it of Chase as the

10   agent in the Venture credit?

11       A.  what do you mean.

12       Q.  What was their role what was their responsibility

13   as the agent for the lending group?
                        Page 43

100713.txt

14      A.  Well, as it relates to our interaction with Chase

15      their role was to organize the steering committee and

16      interact with the debtor on our behalf.

17      Q.  And negotiate with the debtor on your behalf?

18      A.  Yes.

19      Q.  And and then after those negotiations the agent

20      would come back and report to you on status?

21      A.  The agent yeah they would report back to us based

22      on the negotiations or the discussions with counsel or

23      the debtor.

24      Q.  Um-hmm.  And did you review did you have access

25      to documents on interlink system do you recall that?

                                                        48


1       A.  Yes.

2       Q.  In Venture credit?

3       A.  I remember there being an interlink system, yes.

4       Q.  And the documents that were posted on that

5       interlink system do you recall whether they were posted

6       thereby the agent?

7       A.  I don't recall who posted them there.

8       Q.  You don't know who -- who was putting those up?

9       A.  No.

10      Q.  So what you're saying is -- I just want to make

11      sure I'm clear the steering committee did not negotiate

12      directly with the debtor?

13      A.  No, not that I recall.

14      Q.  The agent would do that?

15      A.  That's what I would that's what I recall, yes.

16      Q.  And?

                        Page 44

100713.txt

9    A.  No.

10   Q.  Do you recall marathon fund being on the steering

11   committee?

12   A.  Now that I see this e-mail I do, but independent

13   of that, no.

14   Q.  LNyhan?  Do you see that?

15   A.  Yes.

16   Q.  Okay.  Do you recall that name?

17   A.  Vaguely.  I mean, I don't know what L. is, but I

18   remember a Nyhan.

19   Q.  MClemente?

20   A.  I remember that name.

21   Q.  And Mr. Clemente, who did he work for?

22   A.  Sidley.

23   Q.  And what was his role?

24   A.  He was a lawyer.

25   Q.  For for the bank group for the agent?

                                                        78

1    A.  Yeah, I forget if Sidley represented the bank

2    group or the agent or both but.

3    Q.  And then JSteen?  Do you remember that name?

4    A.  No.

5    Q.  And Roy Gallagher you said you recognize that

6    name?

7    A.  Right.

8    Q.  WBurgess?

9    A.  I don't recognize that name.

10   Q.  Linda Thompson?

11   A.  I don't recognize that name.

                      Page 71

100713.txt

12   Q.  Nathan Richey?

13   A.  I don't recognize that name.

14   Q.  RRonzetti?

15   A.  I don't recognize that name.

16   Q.  Martinez and yourself and PDaugherty you see that

17  do you recognize that name?

18   A.  No.

19   Q.  Do you know what H. C. M. L. P. Stands for?

20   A.  No.

21   Q.  Do you recognize any of the other names?

22   A.  No.

23   Q.  Mr. Babcock says there appears to be a lot of

24  conclusion regarding this e-mail there has been

25  absolutely no change in the position communicated to UBS

                                                        79


1   at our meeting last week.  That position is that there

2   will be no further negotiation comma that we will not

3   retrade our deal comma and that Winget must decide to

4   take it or leave it.

5       Do you see that?

6   A.  I see that, yes.

7   Q.  Does that refresh your memory discussions related

8  to a contribution agreement?

9   A.  No.

10   Q.  Do you have a memory that the bank's position in

11  late August 2003 was that Winget could either take the

12  deal or leave it with regard to a contribution

13  agreement?

14   A.  I don't recall it that way one way or the other.

100713.txt

17      A.  No.

18      Q.  Would you say that you were the primary person at

19  Apollo working on the venture credit or?

20      A.  Primary.

21      Q.  You and Mr. Martinez together be the primary

22  people?

23      A.  Yes.

24      Q.  Did one or the other of you have more

25  responsibility with regard to the venture credit?

                                                        91


1       A.  No, we both participated alongside each other on

2   everything.

3       Q.  Do you have a memory in -- of a group of

4   companies called the deluxe companies with regard to the

5   venture credit?

6       A.  I recognize the name.

7       Q.  Do you remember what it related to?

8       A.  Not specifically, no.

9       Q.  Do you remember the -- the agent taking over the

10  deluxe companies in May of 2004?

11      A.  No, I don't recall that.

12      Q.  Do you remember the agent replacing the directors

13  of the deluxe companies with their own appointed

14  directors?

15      A.  I don't recall that.

16      Q.  You don't have any memory of discussions of that

17  taking place?

18      A.  No.

19      Q.  Now, would you agree with me based on your

100713.txt

20    experience that it's important to understand all of the
21    sources of potential sources of repayment for a bank
22    debt that Apollo would hold a piece of?
23        A.  I don't agree with that statement.
24        Q.  You don't think it's necessary to understand all
25    the sources of potential repayment for a debt?

                                                        92


 1        A.  All, no.
 2        Q.  All material sources of repayment?
 3        A.  Yes.
 4        Q.  And how would you define material?
 5        A.  Depends on the situation.
 6        Q.  If a source of repayment could potentially pay
 7    back the -- the obligation or the investment of Apollo
 8    in full would that be material?
 9        A.  Again, it depends on the situation if there's 100
10    sources that could repay it, then one individually would
11    not be material, no.
12        Q.  If there wasn't?
13        A.  If it was a singular source --
14        Q.  Um-hmm.
15        A.  -- for repayment, then that would be material.
16        Q.  If there was one singular source that was the
17    only source that could provide full repayment, that
18    would be material?
19        A.  Yes.
20        Q.  And wouldn't you agree with me that you would
21    want to find out if such a source of repayment existed?
22        A.  If it was a singular source of repayment, yes.
                              Page 84