# Exhibit P

# Excerpts from Linda Thompson's Deposition

```
     0001

 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF MICHIGAN

 3                       SOUTHERN DIVISION

 4       JPMORGAN CHASE BANK, N.A., )

 5                 Plaintiff,       )

 6            vs.                   ) No. 2:08-CV-13845

 7       LARRY J. WINGET and the    )

 8       LARRY J. WINGET LIVING     )

 9       TRUST,                     )

10                 Defendants.      )

11            The videotaped deposition of LINDA M.

12       THOMPSON, called for examination pursuant to the

13       Rules of Civil Procedure for the United States

14       District Courts pertaining to the taking of

15       depositions, taken before BRENDA S. TANNEHILL, a

16       notary public within and for the County of Kane

17       and State of Illinois, at One South Dearborn

18       Street, Suite 3800, Chicago, Illinois, on August

19       11, 2010 at the hour of 10:12 o'clock a.m.

20

21

22

23

24       REPORTED BY:  Brenda S. Tannehill, CSR, RPR, CRR

25       LICENSE NO.  084-003336
```

```
 1     APPEARANCES:

 2          SIDLEY AUSTIN, LLP

 3          BY MR. MELVILLE W. WASHBURN

 4          One South Dearborn Street

 5          Chicago, Illinois 60603

 6          (312) 853-2070

 7          mwashburn@sidley.com

 8               Representing the Plaintiff;

 9

10          DREW, COOPER & ANDING

11          BY MR. JOHN E. ANDING and

12          MR. THOMAS V. HUBBARD

13          Ledyard Building, Suite 300

14          125 Ottawa Avenue, N.W.

15          Grand Rapids, Michigan 49503

16          (616) 454-8300

17          janding@dcadvocate.com

18          thubbard@dcadvocate.com

19               Representing the Defendants.

20

21     Also Present:  Mr. Nick Harvey, Videographer

22

23

24

25
```

1       A.   I believe that we asked Winget to -- we
2   asked him repeatedly to please explain his
3   corporate structure, who owned what, how it was
4   owned, and I think we kept getting information
5   that was partial, missing information, lacking
6   in detail.
7            I don't think I have -- I would say
8   even though these words are here, I would say I
9   just didn't have a lot of confidence in anything
10  I was seeing because the story kept changing.
11      Q.   Ms. Babcock (sic), my question is:  If
12  the bank's consultant knew in June of 2002 that
13  the Larry J. Winget Trust was in existence, why
14  didn't it ask for a list of the assets owned by
15  that trust?
16      A.   I don't know if -- I don't know if they
17  didn't.  I don't know -- I don't know whether or
18  not they asked or didn't ask.  I don't know if
19  they did ask.  I just don't know.
20      Q.   Can you say with certainty that the
21  bank, in fact, asked Mr. Winget to provide a
22  financial statement for the Larry J. Winget
23  Trust?
24      A.   I cannot say that, but we did ask
25  repeatedly to please provide information on how

1   this organization and this entity was
2   structured, who owned who, how it was
3   structured.  We asked repeatedly for that
4   information.
5       Q.   My question is a different one.
6            Can you say with certainty that the
7   bank asked Larry Winget to provide the bank with
8   a financial statement of the Larry J. Winget
9   Trust?
10           MR. WASHBURN:  Objection, asked and
11  answered.
12           You can answer again if you want.
13           THE WITNESS:  Again, we asked
14  repeatedly to get information on how this entire
15  organization was structured and who owned what,
16  and we kept getting information that was
17  incomplete, sometimes inaccurate, certainly not
18  what we would have thought to be full disclosure
19  about the structure.
20  BY MR. ANDING:
21      Q.   Did the bank -- can you say with
22  certainty that the bank specifically asked
23  Mr. Winget to provide a financial statement for
24  the Larry J. Winget Trust?
25      A.   I cannot say that, but we did ask.

```
 1    Again, if he owned things through this, this
 2    would have been included in the question of how
 3    was this all owned.  If, in fact, he owned
 4    things through the Larry J. Winget Trust, the
 5    question as to how are all these assets owned
 6    would have been comprehended in that question in
 7    my mind.
 8         Q.   So asking for a financial statement is
 9    the same thing as asking what companies are
10    owned by the trust; is that the idea?
11              MR. WASHBURN:  Objection, foundation
12    and misrepresents the witness' prior testimony.
13    BY MR. ANDING:
14         Q.   Is that your testimony?
15         A.   No.  My testimony was that we asked for
16    how are these owned.  That is not the same as a
17    financial statement.  We did ask for financial
18    statements, but we also asked for please tell us
19    the corporate structure.
20         Q.   Specifically, you asked for how the
21    companies set forth in the term sheet were
22    owned?
23         A.   We asked for how everything was owned.
24         Q.   What's everything?
25         A.   I mean, there were many other assets
```

```
1    that were -- that somehow -- there were golf
2    courses, there were all sorts of assets.  We
3    wanted to understand how all of it fit together
4    and how those assets had left our borrower.
5         Q.   Are you telling me that the bank
6    specifically sought information about the
7    ownership of every company owned by Mr. Winget
8    directly or indirectly?
9         A.   I think we asked a very broad please
10   explain how this thing is structured.
11        Q.   When?
12        A.   In our -- I don't recall exactly when,
13   but it was an ongoing effort to try to
14   understand the structure.
15        Q.   Who asked the question?
16        A.   I think -- I don't recall exactly who
17   asked, but I know that it was asked by probably
18   Mr. Babcock.  I think all of us wanted to
19   understand this structure.
20        Q.   What's "this thing"?
21        A.   Venture and all of its various
22   tentacles and Mr. Winget and all the tentacles
23   as to how these entities all related to each
24   other.
25        Q.   Why did you want to know?
```

1      A.   Because we suspected that assets that
2    should have been in our borrower had left our
3    borrower in ways that we didn't think were
4    appropriate.
5      Q.   Is that the only reason?
6      A.   That was the primary reason because we
7    wanted to be able to collect our own loan, and
8    if our assets that we had lent on had left the
9    entity, we felt we were entitled to understand,
10   you know, how they left and to understand
11   better, you know, how we could try to collect.
12     Q.   So until the bank understood what
13   assets were owned by what entities, the bank was
14   unwilling to enter into the Eighth Amendment?
15     A.   No.
16          We tried as hard as we could to
17   understand.  We had an operating company that
18   was employing people.  You know, we knew that
19   the chance that the company, that Venture, would
20   be worth more if it were alive than dead.  We
21   had to move on as best as we could, not that we
22   didn't want to understand more, but we did the
23   best we could to try to preserve this company.
24     Q.   So apparently, it wasn't important
25   enough to understand what companies were owned

```
 1    by who in all of the -- in terms of all the
 2    entities owned directly or indirectly by
 3    Mr. Winget in order to close on the Eighth
 4    Amendment, right?
 5            MR. WASHBURN:  Objection, form and
 6    foundation.
 7    BY MR. ANDING:
 8        Q.  Wasn't that important?
 9        A.  I think as I said, the most important
10    thing to us was to try to preserve our overall
11    best chance to collect, and we felt that we knew
12    that if we waited to find out every last
13    detail -- I mean, we had tried repeatedly to get
14    this information.
15            We knew we had a company that was going
16    to be out of cash.  In order to keep the company
17    alive, we had to move forward.  You know, you do
18    the best you can under the circumstances, you
19    know, and we tried to move forward, you know, in
20    good faith to get this done.
21        Q.  So if you thought Mr. Winget was
22    stealing from the bank's collateral, why didn't
23    you insist on Mr. Winget providing you with the
24    detail on all of his companies and who owned
25    them before you closed on the Eighth Amendment?
```