# Exhibit Q

## Excerpts from Ralph McKee's Deposition

```
     0001

1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF MICHIGAN

3                       SOUTHERN DIVISION

4

5        JP MORGAN CHASE BANK, N.A.,

6              Plaintiff,

7                                        Civil Action

8           -vs-                         No. 08-13845

9                                        Hon. Avern Cohn

10       LARRY WINGET and the LARRY      Volume I

11       WINGET LIVING TRUST,

12             Defendants.

13       _____/

14

15       PAGE 1 TO 170

16

17            The Deposition of RALPH MCKEE,

18            Taken at 500 Woodward Avenue,

19            Suite 4000,

20            Detroit, Michigan,

21            Commencing at 9:30 a.m.,

22            Wednesday, September 8, 2010,

23            Before Jennifer L. Ward, CSR-3717.

24
```

```
 1        APPEARANCES:

 2

 3        MELVILLE W. WASHBURN, ESQ.

 4        Sidley Austin LLP

 5        One South Dearborn

 6        Chicago, Illinois 60603

 7        (312) 853-2070

 8        mwashburn@sidley.com

 9               Appearing on behalf of Plaintiff.

10

11        JOHN ANDING (P30356)

12        Drew Cooper & Anding

13        Ledyard Building

14        Suite 300

15        125 Ottawa Avenue N.W.

16        Grand Rapids, Michigan 49503

17        (616) 454-8300

18        janding@dcadvocate.com

19               Appearing on behalf of Defendants.

20

21

22

23        (Appearances continued on Page 3.)

24
```

1    discussed in connection with the security for the --

2        A.    I don't recall that one way or the other.

3        Q.    Were you told whether Mr. Winget personally

4    held title to any assets at all outside of the Trust?

5        A.    It was unclear to me at that time from those

6    conversations what the precise ownership structure was

7    as to any of those assets.

8        Q.    Were you aware that Mr. Winget had certain

9    business interests that were not connected to the auto

10   industry in any way?

11       A.    Yes, I knew that.

12       Q.    What did you know about the nature of those

13   assets?

14       A.    I was aware that there was a golf course, I

15   was aware that he might have accounts at financial

16   institutions, and that he had two residences that I was

17   aware of and various cars.

18       Q.    Did you know whether those assets, the golf

19   course, certain accounts at financial institutions, the

20   two residences, the various cars, were held by the

21   Living Trust or held directly by Mr. Winget?

22       A.    I don't recall knowing the particulars of

23   any of that then.

24       Q.    And by then, you mean during October and

```
 1          Q.    Okay.  117 is a document that covers an
 2    e-mail from Bill Shield to -- this is the only
 3    document.  It's a one-page document, Exhibit 117.  It's
 4    an e-mail from Bill Shield dated October 14, 2002 to
 5    Mr. Butler, Mr. Peash, Mr. Pierce at Dykema, you
 6    Mr. McKee, Mr. MacKenzie, with copies to a bunch of
 7    people.
 8                      The subject is the Larry Winget
 9    pledge, and Mr. Shield says, "Please provide the exact
10    ownership structure of each of the Affiliate Guarantors
11    so we can finalize the pledge and the appropriate
12    pledgors."  Now, October 14th is approximately a week
13    before the planned closing date, correct?
14          A.    Yes.
15          Q.    And at that point Mr. Shield is asking for
16    the exact ownership structure of the Affiliate
17    Guarantor companies.  Prior to that point what had you
18    told Mr. Shield about the ownership of the
19    Venture-related entities?
20          A.    I don't think anything.
21          Q.    To your knowledge had Mr. Bradley told
22    Mr. Shield anything about the ownership structure of
23    the Affiliate Guarantors?
24          A.    I don't know.  As I sit here today, I
```

1   couldn't tell you.

2       Q.   And that would include -- were you present
3   at any phone call where Mr. Bradley described the
4   ownership structure to Mr. Shield or others at
5   Dickinson Wright?

6       A.   It's possible, but I don't remember that.

7       Q.   Let me ask you to look at Exhibit 79.

8       A.   Yes.

9       Q.   Exhibit 79 is an e-mail chain.  It's two
10  pages long, and you read them from back to front, so
11  let me ask you to start reading at the top of the
12  second page, which has the Bates number 95, and then
13  read through to the top of the next page.

14      A.   Yes.

15      Q.   Now, you'll notice that the e-mail chain
16  begins with the e-mail from Mr. Shield that we just
17  looked at just a minute ago where he's asking for the
18  exact ownership structure, and from that, you forward
19  that, it looks to me -- it looks as if you forward that
20  request from Mr. Shield to Barbara Kaye with a copy to
21  Deb Fish and say is your group following up.  Do you
22  see that?

23      A.   Yes.

24      Q.   Okay.  Do you recall actually doing this at

```
 1   the time?
 2        A.   I recall asking my secretary to send that,
 3   yes.
 4        Q.   And why is it that you asked Barbara Kaye
 5   about that?
 6        A.   Because Dykema had worked with a lot of the
 7   affiliates in the past and had a lot of knowledge, and
 8   so did Jim Butler, who she was working with regularly
 9   then.
10        Q.   And then it appears that she in turn
11   forwards this chain to Liza Larky?
12        A.   Yes.
13        Q.   Who was Liza Larky?
14        A.   An associate at Dykema.
15        Q.   And then Liza Larky replies to you saying,
16   "Ralph, we are working with Tim Bradley to get this
17   information, and I will forward it to you as soon as I
18   have it."  Now, this suggests to me that at least as of
19   the date that you sent this e-mail chain off to
20   Ms. Kaye you had not heard Mr. Bradley describe the
21   exact ownership because you didn't just ask him, you
22   asked Ms. Kaye instead.  Does that seem right?
23        A.   I don't -- I don't think you can suggest one
24   thing or the other on that.
```

```
1       Q.    Okay.  Let me back up.  Isn't it true that
2   you had been working directly with Mr. Bradley drafting
3   a number of the ancillary documents to the Eighth
4   Amendment?
5       A.    Not at this point.
6       Q.    By October 15th?
7       A.    There were very few drafts out by then,
8   maybe one thing, two things maybe.
9       Q.    So whether you had been working with him a
10  lot or not at all, you apparently at this point had not
11  heard Mr. Bradley express any expertise of his own on
12  the ownership structure of the Affiliate Guarantors; is
13  that fair?
14      A.    I don't -- I don't remember whether he had
15  or he hadn't at that point.  The -- he had -- he did
16  have that information as it turned out.  I thought at
17  the time that there was -- there was already
18  institutional knowledge at Dykema about some of those
19  things.
20      Q.    Was this the first inquiry that you had made
21  regarding the ownership structure of the Affiliate
22  Guarantors?
23      A.    That was recorded in an e-mail, I believe
24  so.  Whether I had asked about it before, I don't
```