UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JP MORGAN CHASE BANK, NA

    Plaintiff,

v.                                                                                                          Case No. 08-13845

LARRY WINGET and the LARRY WINGET                                       HON. AVERN COHN
LIVING TRUST,

    Defendants.

_____/

## MEMORANDUM DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT I AND ON DEFENDANTS' COUNTERCLAIM (Doc. 191)[1]

### I. Introduction

This is a commercial finance dispute. The background and nature of the case is described below. Briefly, plaintiff-counter defendant JPMorgan Chase Bank, N.A. (Agent) is the Administrative Agent for a group of lenders (Lenders) that extended credit to Venture Holdings Company, LLC (Venture) under a Credit Agreement.[2] The Agent is suing defendants-counter plaintiffs Larry Winget (Winget) and the Larry Winget Living Trust (Winget Trust) to enforce a Guaranty and two Pledge Agreements entered into by Winget and the Winget Trust in 2002 which guaranteed the obligations of Venture, a company owned and controlled by Winget and/or the Winget Trust.

Pending before the Court is the Agent's Motion for Summary Judgment on Count

---

[1] On December 8, 2011, the Court entered an order denying plaintiff's motion. (Doc. 211). This memorandum sets forth the reasons for the decision.

[2] Bank One, NA, initially was the Administrative Agent for the lenders. It merged with JP Morgan in 2004 to form JP Morgan Chase Bank, N.A.

I and on Defendants' Counterclaim. (Doc. 191).[3] As will be explained, the Agent seeks a judgment to enforce the Guaranty against the Winget Trust as an unlimited Guaranty. The Agent also seeks a judgment that defendants' counterclaim, asserting a claim for reformation of the unlimited nature of the Guaranty against the Winget Trust on the grounds of mutual mistake, has no merit. The Agent contends that the evidence fails to show a genuine issue of material fact as to mutual mistake. The Agent is wrong. There is sufficient evidence of mutual mistake such that reformation of the Guaranty and Pledge Agreements against the Winget Trust may be appropriate.[4] Accordingly, for the reasons that follow, the Agent's motion is DENIED.

## II. Background

### A. Prior Lawsuits

The parties' dispute relating to the Guaranty and Pledge Agreements began in 2005 when the Agent sued Winget and the Winget Trust seeking specific performance and declaratory relief, essentially in the form of directing Winget and the Winget Trust to allow the Agent to inspect their books and records as provided under the Guaranty. JPMorgan v. Winget, 05-74141. The Court granted the Agent the requested relief. The Court of Appeals for the Sixth Circuit affirmed. JPMorgan v. Winget, 510 F.3d 577 (6th Cir. 2007).

Meanwhile, in 2006, Winget and the Winget Trust sued the Agent and others

---

[3] Defendants, a short time before the Agent filed its summary judgment motion, filed a motion for summary judgment on the counterclaim (Doc. 186). However, defendants have withdrawn the motion. (Doc. 212).

[4] Whether the evidence is sufficient to carry the day and allow for reformation must await trial.

claiming breach of the Guaranty and Pledge Agreements and requested a declaratory judgment. Winget v. JPMorgan, 06-13490. The Court dismissed the complaint, holding that Winget's claims were barred by res judicata, and premature to the extent that they were claims regarding future attempts to repossess collateral. Without seeking leave, Winget filed an amended complaint, which the Court struck. After filing, and losing, a motion for reconsideration, Winget appealed. The Sixth Circuit affirmed. Winget v. JPMorgan, 537 F.3d 565 (6th Cir. 2008). In that decision, the court of appeals set forth a detailed description of the relevant background facts, which are repeated here:

> **I. The Winget Companies**
> Beginning in the 1970s, Winget developed, owned, and controlled a network of companies that supplied plastic parts to automobile manufacturers. The backbone of this network was two companies, their affiliates, and subsidiaries: Venture and Deluxe Pattern Corporation ("Deluxe"). Winget personally owned, either directly or indirectly, one hundred percent of the equity of both Venture and Deluxe. Aside from Venture and Deluxe, Winget also owned P.I.M. Management Co. ("P.I.M."), a Michigan corporation, and Venco # 1, LLC ("Venco"), a Michigan limited liability company. In 1995, Winget purchased a foreign company that became Venture Asia Pacific ("Venture AP"), the stock of which P.I.M. held. At the time of this agreement, P.I.M. and Venco had a market value of approximately $250 million.
>
> **II. The Eighth Amendment, Winget Pledge, and Winget Guaranty**
> On May 27, 1999, a consortium of lenders consisting of JP Morgan, other banks, investment companies, and hedge funds (collectively, the "Lenders") provided credit to Venture pursuant to a credit agreement (the "Credit Agreement"). The parties subsequently amended the Credit Agreement eight times. The most recent, and only pertinent amendment here, was the Eighth Amendment (the "Eighth Amendment"), which was dated October 22, 2002, and executed in connection with a complex "workout" negotiation initiated as a result of the rapid financial deterioration of Venture and significant default under the Credit Agreement.
>
> **a. The Eighth Amendment**
> Pursuant to this agreement, the Lenders "agreed (1) temporarily not to exercise available rights against Venture and the collateral supporting the loans, and (2) to extend further credit to Venture." In exchange for these terms and the extension of additional credit, Winget agreed to provide additional collateral to

support the repayment of Venture's debt, and agreed to additional guaranties. Winget, P.I.M., Venco, and Deluxe all entered into separate guaranty agreements wherein each independently guaranteed certain collateral, which included stock in P.I.M. and Venco, and the collateral was pledged pursuant to pledge agreements. In some cases, these guaranties were enforceable solely through the stock from P.I.M. and Venco, as both companies pledged their respective interests in Venture AP and Venture Holdings. These guaranties were formalized in the Winget Guaranty, the Winget Pledge, and the Consortium Pledge, which were executed concurrently with the Eighth Amendment (collectively, all four documents are the "Guaranty Documents").

### b. The Winget Guaranty, Winget Pledge, and Consortium Pledge

In the Winget Guaranty, executed October 21, 2002, Winget guaranteed Venture's debt, but the document limited Winget's personal exposure, as JP Morgan's only recourse for payment on the Winget Guaranty was foreclosure on certain pledged stock, including P.I.M. and Venco's stock. JP Morgan was required to pursue any foreclosure under the Winget Guaranty pursuant to the terms of the Winget Pledges.  The Winget Guaranty limited Winget's personal exposure to approximately $30 [sic] million.

The Winget Pledge, also executed October 21, 2002, significantly increased the amount of collateral available to the Lenders by covering Winget's equity interest in nine of its companies, which were under Deluxe's corporate umbrella. That same day, Winget also executed another pledge agreement that covered Winget's interests in P.I.M. and Venco (the "Consortium Pledge").

### c. The Last Resort Conditions

As part of the Guaranty Documents, the Lenders included language that Winget refers to as the "Last Resort Conditions."  The relevant portions of the Last Resort Conditions [**which are found in Section 3 of the Guaranty**] read:

> Notwithstanding anything herein or elsewhere to the contrary, [JP Morgan] shall not exercise any rights or remedies under this Pledge Agreement until all reasonable efforts shall have been made by it to collect the Obligations from other collateral held by [JP Morgan] ... it being intended that the Collateral provided by this Pledge Agreement shall be realized upon by [JP Morgan] only as a last resort.
>
> **Notwithstanding anything herein or elsewhere to the contrary, no action will be brought for the repayment of the Guaranteed Obligations under this Guaranty and no judgment therefore will be obtained or enforced against Larry Winget other than with respect to the Pledged Stock** in accordance with the provisions of the related Pledge Agreements, provided that the Guarantor shall be fully and

> personally liable for any damages arising from any violations of any of the agreements of the Guarantor herein in favor of the Lenders.
>
> [N]otwithstanding any other provision in this Pledge Agreement or elsewhere, in the event (I) that [JP Morgan] receives for application on the Obligations an amount of not less than $50,000,000 from the sale or financing of [Venture AP] or [Venture Holdings] operations or from one or more outsider sources ... the obligations of the Pledgor hereunder shall be deemed satisfied and the pledge created hereby shall be terminated.

Aside from these three provisions, the Guaranty Documents also allegedly limited Winget's ability to operate Venco, P.I.M., and their subsidiaries through the use of affirmative and negative covenants. The result of the provisions was that the Guaranty Documents were only enforceable from the proceeds of the sale of the interests in the pledged companies, namely Deluxe, P.I.M., Venco, and their subsidiaries (collectively, the "Pledged Companies"), and the Lenders could not attempt to enforce the Guaranty Documents until they had made all reasonable efforts to exhaust the collateral aside from the interests in the Pledged Companies. At any time, Winget could terminate the Guaranty Documents by tendering $50 million to JP Morgan for the benefit of the Lenders.

Id. at 568-69 (emphasis added).

B. This Lawsuit

After Venture went into default, the Agent attempted to enforce the Guaranty against Winget and the Winget Trust. To this end, on September 8, 2008, the Agent sued Winget and the Winget Trust. Count I of the complaint seeks enforcement of the Guaranty against the Winget Trust.[5] On November 7, 2008, the Winget Trust filed an amended motion for judgment on the pleadings as to Count I, arguing that the above quoted language from Section 3, i.e. the "last resort conditions," which limits recourse "against Larry Winget" to the Pledge Agreements, also applies to the Winget Trust.

---

[5]Count II seeks enforcement of the Guaranty against Winget. Count III seeks enforcement of the Pledge Agreements against the Winget Trust and Winget. Proceedings on Counts II and III were stayed (Doc. 19) pending resolution of Count I. The stay has been vacated. (Doc. 213).

5

(Doc. 12). On January 7, 2009, the Court issued a memorandum and order denying the Winget Trust's amended motion for judgment on the pleadings as to Count I. The Court stated:

> The Agent contends that Section 3 only limits recourse against Larry Winget to the Pledged Stock and does not so limit recourse against the Winget Trust. The Court agrees. . . . The "last paragraph" of Section 3 is unambiguous. It names Winget, and Winget alone, in connection with limiting liability under the Guarantee to the Pledged Stock. It does not apply to the Winget Trust. It carves out an exception to the unconditional guarantee assumed by both Winget and the Winget Trust by limiting actions against Winget to only the Pledged Stock. There is no exception for actions against the Winget Trust.

(Doc. 29.)

On January 27, 2009, the Winget Trust filed a motion for leave to amend the Answer to assert additional affirmative defenses, including mistake, and to assert a counterclaim for reformation of the Guaranty and Pledge Agreements. (Doc. 21) The Court permitted Defendants to amend the answer and to assert the counterclaim. The Court also ordered that discovery proceed as to the agreement of the parties on the Guaranty, particularly as to the liability of the Winget Trust. (Doc. 40.).

### C. Scope of Dispute

Discovery proceeded for more than two years. The Agent contends that the discovery has failed to produce any evidence that the parties agreed to limit the Winget's Trust's liability the same as Winget's. Defendants contend that there is a plethora of evidence which shows that the Winget Trust and Winget were treated as one in the same. Therefore, the omission of the Winget Trust from the "last resort conditions," under Section 3 was a mutual mistake requiring reformation of the Guaranty

6

to include the Winget Trust in Section 3.

As noted above, Section 3, states in relevant part that "no action will be brought for the repayment of the Guaranteed Obligations under this Guaranty and no judgment therefor [sic] will be obtained or enforced **against Larry Winget** other than with respect to the Pledged Stock in accordance with the provisions of the related Pledge Agreements." (emphasis added). It is undisputed that this provision limits Winget's liability to **$50 million**. The fact that the Winget Trust is not included in this provision has caused the present dispute which can be phrased as follows: Does the Guaranty accurately reflect the agreement of the parties, particularly as to the liability of the Winget Trust?

As part of discovery, defendants obtained expert reports from Stephen Carl Arch, a professor, George F. Bearup, a lawyer, Robert D. Mollhagen, a lawyer, and Daniel W. Terpsma, a former bank executive. Defendants also included in their papers the affidavit of J.T. Atkins, a former financial analysis and advisor to Larry Winget. The Agent filed a motion to strike the reports. (Doc. 200). The Court granted in part and denied in part the motion, holding that it will consider only the opinion of Terpsma and Atkins' affidavit. (Doc. 207).

### III.  Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see Anderson, 477 U.S. at 249–50.

IV. Analysis

A. The Counterclaim

The counterclaim (Doc. 41) reads as follows:

> COUNT I – MISTAKE, REFORMATION AND UNJUST ENRICHMENT
> 26. Plaintiff restates and realleges the allegations set forth in Paragraphs 1 through 25 above, as if set out in full herein.
>
> 27. The construction of the Guaranty alleged by Chase in Count I of the Complaint, namely, that the Winget Trust agreed to undertake unlimited and unconditional guarantor liability for the obligations of Venture under the Credit Agreement, is not an accurate statement of the agreement of the parties or an accurate expression of the parties' mutual intent.
>
> 28. Chase, Winget and the Trust intended that (I) the written terms of the Guaranty and the Pledge Agreements would be read together with the other documents actually required by and executed in connection with the Eighth Amendment to impose only limited and conditional liability on Winget and the Trust and (ii) the obligations of the Trust to Chase would be no greater in any respect than the obligations of Winget to Chase.

8

29. Chase was aware that Winget and the Trust executed and delivered the Guaranty and the Pledge Agreements with the intent and under the belief that written terms of the Guaranty and the Pledge Agreements imposed only conditional and limited liability on Winget and the Trust, that it was being tendered solely to assure Chase's limited right to recourse against the Deluxe Companies, VSA and VIA and that the obligations of the Trust to Chase would be no greater in any respect than the obligations of Winget to Chase.

30. If it was Chase's intent and understanding at the time the parties entered into the Guaranty that the written terms of the Guaranty impose unconditional and unlimited liability on the Trust, as urged in Count I of this matter, Chase did not disclose that intent or understanding to Winget or the Trust.

31. After the closing of the Eighth Amendment, Chase and Winget engaged in negotiations and litigation involving Chase's rights under the Guaranty and Pledge Agreements.  Those negotiations related to, among other things, adversary proceedings in which Chase pressed contribution of VSA and VIA to Chase's collateral pool.

32. At no time in connection with those negotiations or litigation did Chase take the position that, notwithstanding the results of the negotiations and adversary proceedings, it had the unconditional and unlimited right to all the assets of the Trust, including P.I.M. and Venco (VSA and VIA), by operation of the unconditional guaranty of the Winget Trust.

33. In fact, Chase's course of performance after the closing of the Eighth Amendment and up through the filing of the Complaint in this action was inconsistent with the position it is now taking in Count I of the Complaint.

34. If the written terms Guaranty were to be construed to impose unconditional liability on the Trust, the Eighth Amendment, the Guaranty and the Pledge Agreements would not reflect or animate the true intent of the parties or the agreements they made.

35. It would be inequitable for the Guaranty to be enforced to impose unlimited and unconditional liability on either Winget or the Trust.

WHEREFORE, Winget and the Trust request:
    (I) Reformation of the Guaranty to reflect the actual intent of the parties that the liability of Winget and the Trust, if any, under the Guaranty and the Pledge Agreements is limited to recourse against the stock pledged under the Pledge Agreements and that Chase has no rights against the Winget or the Trust under the Guaranty until it has complied with the "reasonable efforts" and "last resort" conditions of the Pledge Agreements;

>    (ii) a determination that the construction of the Guaranty as related to the Trust under Count I would unjustly enrich Plaintiff in a manner inconsistent
>    with the ends of justice; and
>    (iii) such other relief as is just.

### B.  Reformation

Under Michigan law, a court of equity has the authority to reform a contract to make the contract conform to the agreement actually made by the contracting parties. Casey v. Auto–Owners Ins Co, 273 Mich. App 388, 398; 729 N.W.2d 277 (2006). Thus, when a written instrument fails to express the intention of the parties because of a mutual mistake, the court may enforce the equitable remedy of reformation. Scott v. Grow, 301 Mich. 226, 237; 3 N.W.2d 254 (1942).

To obtain reformation, a party must establish by clear and satisfactory evidence of a mutual mistake. Lee State Bank v. McElheny, 227 Mich. 322, 327; 198 N.W. 928 (1924).  A "mutual mistake of fact" is " 'an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction.' " Briggs Tax Service, LLC v. Detroit Pub Schools, 485 Mich. 69, 77; 780 N.W.2d 753 (2010), quoting Ford Motor Co v. City of Woodhaven, 475 Mich. 425, 442; 716 N.W.2d 247 (2006).  A mutual mistake must relate to a fact in existence when the contract was executed. Lenawee Co Bd of Health v. Messerly, 417 Mich. 17, 24; 331 N.W.2d 203 (1982).  Parol evidence can be used to determine whether reformation is warranted on the basis of mistake. Scott, 301 Mich. at 239.

Moreover, Michigan courts have said that while generally the mistake must be mutual, reformation may also be had where one party is aware that the other party has made a mistake and conceals it, thereby producing an inequitable result.  As explained

in <u>Retan v. Clark</u>, 200 Mich. 493, 496 (1922):

> It is a general rule that equity will not relieve by reformation unless the mistake is mutual. <u>A. E. Wood & Co. v. Standard Drug Store</u>, 192 Mich. 453, 158 N. W. 844; <u>Schlossman v. Rouse</u>, 197 Mich. 399, 163 N. W. 889; <u>Standard Oil Co. v. Murray</u>, 214 Mich. 299, 183 N. W. 55; <u>Gustin v. McKay</u>, 196 Mich. 131, 162 N. W. 996.
> But here there was mistake on the part of the plaintiffs and knowledge of the mistake and concealment thereof on the part of the defendants, both producing the inequitable result. Of a case of this class it is said in 23 R. C. L. 331, citing cases:
>> 'There is, however, still another class of cases-that where one party to an instrument has made a mistake and the other party knows it and conceals the truth from him. Such inequitable conduct accompanying a mistake is generally held to be sufficient ground for reformation of the instrument in question.'

Finally, in <u>Citibank, N.A. v. Morgan Stanley & Co.</u>, __ F. Supp. 2d ___, 2011 WL 2078211 (S.D.N.Y. May 25, 2011), the district court, in considering a claim for reformation on the grounds of mutual mistake regarding a complex commercial transaction, noted the relevance of a parties' course of performance in determining whether a mutual mistake has been made. The district court stated in relevant part:

> Procedurally, there is a " 'heavy presumption that a deliberately prepared and executed [agreement] manifest[s] the true intention[s] of the parties,' especially between counselled businessmen" and "a correspondingly high order of evidence is required to overcome that presumption." In particular, "mutual mistake must be established by clear and convincing evidence." " 'Only thus can the benefits of the written form be preserved.' " Although a "mutual mistake must exist at the time the agreement is signed," "the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties."

<u>Id</u>. (footnotes omitted).

### C. The Agent's Arguments

#### 1.

The Agent first argues that summary judgment is appropriate because the

unambiguous language of the Guaranty states that the Winget Trust is liable for Venture's unpaid debt without limitation. While the Court has said that Section 3 is unambiguous and if read as written, contains no limitation on the Winget's Trust's liability, this argument proves too much. The issue is not whether the Guaranty is ambiguous or unambiguous; the issue is whether the Guaranty should be reformed to reflect the parties' true agreement. Framed in terms of the Agent's summary judgment motion, the issue is whether defendants have put forth sufficient evidence in the record to create a genuine issue of material fact as to whether there should be reformation to reflect what defendants say encompassed the parties' agreement, i.e. that the Winget Trust's liability under the Guaranty be the same as Winget's.

2.

Before discussing the evidence obtained during discovery, the Agent makes much of the fact that the Guaranty was (1) negotiated by competent counsel, (2) all parties represented that they read and understood the terms of the Guaranty and all other agreements, (3) the Guaranty contains an integration clause, (4) this was a complex commercial dispute involving multiple parties and multiple drafts of the agreements, including the Guaranty. All of these statements are true, but they do not tell the full story and none of them mean that reformation not warranted. Rather, the Court must examine the record to determine whether defendants have raised a genuine issue of material fact as to reformation. Moreover, to the extent that the Agent argues defendants have not put forth clear and convincing evidence to permit reformation, this argument is more appropriate for consideration at trial.

3.

When the Agent finally discusses the record, it goes so far to say that there is <u>no</u> evidence, not just that defendants have failed to create a genuine issue of material fact, to support reformation. The Agent primarily relies on the deposition testimony of attorneys William Burgess and Dawn Faxon Singer, who the Agent says were responsible for drafting the Guaranty and Pledge Agreements. They both testified as to an understanding that the Guaranty did not limit recourse against the Winget Trust, i.e. the effect of the Guaranty was to create unlimited liability. As defendants' point out, however, the Agent takes this testimony too far. Burgess and Singer also testified that the reason the Winget Trust was added to the Guaranty and Pledge Agreements was to address the issue of ownership of the Pledged Stock (PIM and Venco). As will be explained, a fair inference from their testimony is that the Winget Trust was added to ensure ownership of the Pledged Stock, not to create unlimited liability. Moreover, their testimony, assuming it is admissible,[6] is subject to credibility challenges on cross-examination.

The defendants have set forth a summary of the contemporaneous evidence at the time of negotiation and execution as well as the parties' conduct which shows, at a minimum, a genuine issue of material fact as to whether the parties agreed that Winget

---

[6]Although defendants have not raised the issue, there is a real question of whether Burgess and Singer's testimony is admissible. Burgess and Singer were not involved in the negotiations which led to the Guaranty and Pledge Agreements; they simply prepared the documents. Moreover, their testimony is in the form of what they "believed" the Guaranty means as so the scope of the Winget's Trust's liability which is in the nature of opinion, not fact, testimony. This obviously undercuts the Agent's position.

and the Winget's Trust's liability be capped at $50 million, making reformation of the Guaranty a viable claim. This evidence includes the following:

- The Proposed Forbearance and Summary Term Sheet (Summary Term Sheet), also dated October 9, 2002, and signed by Larry Winget describes the nature of the guaranties as follows: "The guaranties of [PIM and Venco] operations and the guaranty supporting the pledge of the stock of the [PIM and Venco] operations would be guaranties of collection and non-recourse to Larry Winget personally other than the stock pledged . . ." It does not mention any separate obligations of the Winget Trust and contains no reference to the Winget Trust.[7]

- A Credit Approval Summary dated October 9, 2002 regarding the Eighth Amendment, which was distributed to the lenders, mentions Winget's guarantee obligations. It states that in the new guaranty will include "the additional collateral that will be pledged by Larry Winget . . ." It further says that "we would make the guarantee from Winget non-recourse except as to the guarantor companies." It also states that "a portion of the new collateral [PIM and Venco] will be subject to a release upon one of

---

[7]The Agent argues that the failure to mention the Winget Trust in the Summary Term Sheet is not material. In support, it cites the "catch all" language at the bottom of the Summary Term Sheet which reads in part that document is "an outline only and not intended to summarize all the condition, covenants, representations, warranties and other provisions which would be contained in definitive legal documentation for the agreement contemplated hereby..." This argument does not carry the day for the Agent. As Terpsma's opinion states, if the agreement was to make the Winget Trust's liability unlimited, it would have been included in a term sheet. Indeed, it seems inconceivable that such a key term would be omitted and left to simply become memorialized as part of the "catch all" language.

two situations: 1) If we are paid $50MM from proceeds of the sale or refinancing of [PIM or Venco] or from any non-collateral source . . ." It makes no mention of the Winget Trust.

- Initial drafts of the Guaranty defined the "Guarantor" as Winget alone. When the Winget Trust was added to the definition of "Guarantor," Recital B providing that "the Guarantor shall guarantee the Guaranteed Obligation on a non-recourse basis" remained unchanged. Also unchanged were the second paragraph of Section 3 of the Guaranty defining the "non-recourse nature of the Guaranty, and numerous references to the "Guarantor" with the pronoun "he." There is no language of "they" or "him and it" which would indicate a distinction between Winget as a Guarantor and the Winget Trust as a Guarantor.

- The Pledge Agreements for PIM and Venco define the "Pledgor" as Larry Winget and/or the Larry J. Winget Living Trust." The Pledge Agreements require that notice of default under the Pledge Agreements is to be given to Winget, not Winget, or his successors, in this capacity as Trustee of the Winget Trust.

- The Winget Trust did not sign the Eighth Amendment to the Guaranty, separate and apart from Winget.

- A reasonable inference can be drawn from the testimony of five witnesses, including Winget's counsel, the Agent's financial advisor, two of the Agent's attorneys, and Venture's counsel, that the addition of the Winget Trust as Guarantor was to ensure that the named owner of the Pledged

> Stock was a signatory, and therefore not intended to alter the limited nature of the Guaranty.

- The Agent's own documents, distributed to the lenders, including Problem Credit Reports, Credit Approval Summaries, and analyses by Agent's financial advisors, all describe the Guaranty as non-recourse and capped at $50 million.

- There is no evidence that the addition of the Winget Trust to the Guaranty was discussed orally or negotiated in writing other than the Winget Trust was added in the sixth draft of the Guaranty. Burgess and Singer's testimony is as close as the Agent comes, but their testimony is only as to their belief as to why the Winget Trust was added and the effect of its inclusion in Section 3. See also n. 6, supra.

Additionally, although the Court can only speculate as to the reason, the first mention of the Winget Trust having a separate obligation from Winget appears in the Agent's brief on appeal in the 2005 case in which the Agent sought to enforce its inspection rights against Winget and the Winget Trust. On page eight of the Agent's principle brief, dated May 7, 2007, the Agent states: "the Agent's recourse against Larry Winget for payment on the Winget Guaranty is limited to foreclosure on certain pledged stock–including the stock of PIM and Venco. Any such foreclosure must occur pursuant to the terms of the Pledge Agreements." The sentence ends with a footnote, number six, which states: "No such limitations apply to the Agent's right to recover on the Guaranty from the Trust."

As noted above, the appeal in the 2005 case concerned only the Agent's right to

inspect the books and records of Winget and the Winget Trust, not their liability on the Guaranty or Pledge Agreements. A review of the complaint in the 2005 case is telling as to the Agent's view, at least in October 2005, as to Winget and the Winget Trust. The complaint is in two counts. While the complaint names Winget and the Winget Trust separately, the complaint collectively referred to them as "Winget." Count I sought specific performance against Winget under Section 11(a) of the Guaranty which provided for inspection. Count I referenced a September 5, 2005 letter, attached as Exhibit D to the complaint, which detailed the Agent's inspection requests. Exhibit D is a six page letter addressed to Larry Winget alone. It requests inspection of Larry Winget's books and records relating to PIM and Venco. It makes no separate request to the Winget Trust or mention of any other assets of Winget or the Winget Trust. The omission appears to be an indication that the Agent believed that Winget and the Winget Trust were one in the same and lends credence to defendants' position that the parties believed that the Winget Trust had the same obligations under the Guaranty as Winget.

4.

Defendants' point regarding the Winget Trust and Winget's ability to transfer assets requires some comment. The Agent suggests that Winget could not transfer assets out of the Winget Trust because to do so would be a fraudulent transfer. In the document establishing the Winget Trust, Winget reserved the right to revoke the trust at any time. The Agent did not impose any restrictions on how the Winget Trust conducted business. There is no evidence that the Agent obtained a copy of the Winget Trust or a financial statement documenting the assets in the Winget Trust. Surely, had

the Agent intended to secure an unlimited guaranty from the Winget Trust, it seems reasonable that it would have restricted Winget's ability relative to the Winget Trust's rights. It did not. This point is made stronger by the fact bond offerings, which dealt with assets of Venture Holdings Trust expressly contained limitations on dissolution or transfer of assets.

Moreover, as defendants point out in a supplemental filing (Doc. 209-1),[8] the Winget Trust was established in 1987 as a revocable trust with Larry Winget as settlor, trustee, and beneficiary. Under common law, property in a revocable trust is property of the settlor and can be reached by creditors during the settlor's lifetime. See M.C.L. § 700.7506(1)(a). This is so because the settlor owns the assets in a revocable trust. See M.C.L. § 556.128. While the parties dispute whether a transfer from Winget to the Winget Trust would be a fraudulent transfer, the Court need not decide that question as it is not an issue, i.e. the Agent has not argued, much less put forth evidence, of a fraudulent transfer. Indeed, the Agent would be hard pressed to do so given that it appears to have no information about the Winget Trust.

5.

In the end, the Court need not weed through the entire evidentiary record which has developed in this case to resolve the Agent's motion. Rather it is enough to say that the record contains credible evidence from which a reasonable conclusion can be drawn that the parties agreed that liability of Winget and the Winget Trust was not more

---

[8]Defendants filed a motion for leave to file supplemental authority. (Doc. 209). The Agent opposes the motion, contending that defendants are wrong on the law and the motion comes too late to be considered. (Doc. 210). The motion is GRANTED.

than $50 million, i.e. Winget and the Winget Trust were viewed and treated as indistinguishable.  Because Section 3 reads otherwise, defendants have made out a case for reformation based on mutual mistake sufficient to survive summary judgment.[9]

          S/Avern Cohn
          AVERN COHN
          UNITED STATES DISTRICT JUDGE

Dated:  December 13, 2011

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 13, 2011, by electronic and/or ordinary mail.

          S/Julie Owens
          Case Manager, (313) 234-5160

---

[9]As noted at the hearing, the Agent's reasoning to exclude the assets of the Winget Trust from the non-recourse limitation of the Guaranty is reminisce of what Robert Bork once said of Baron Park, a mid-19th century English judge:
> It is said that, at a dinner given in his honor, the English jurist Baron Parke was asked what gave him the greatest pleasure in the law.  He answered that his greatest joy was to write a "strong opinion."  Asked what that might be, the baron said, "It is an opinion in which, by reasoning with strictly legal concepts, I arrive at a result no layman could conceivably have anticipated."