UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JP MORGAN CHASE BANK, N.A.,

      Plaintiff/Counter-Defendant,

v.                                        Case No. 08-13845
                                                   HON. AVERN COHN

LARRY WINGET and the LARRY WINGET
LIVING TRUST,

      Defendants/Counter-Plaintiffs.

_____/


**DECISION ON REFORMATION**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JP MORGAN CHASE BANK, N.A.,

       Plaintiff/Counter-Defendant,

v.                                                      Case No. 08-13845
                                                        HON. AVERN COHN
LARRY WINGET and the LARRY WINGET
LIVING TRUST,

       Defendants/Counter-Plaintiffs.

_____/

## DECISION ON REFORMATION

### I.  Introduction

This is a commercial finance dispute.  Plaintiff, JP Morgan Chase Bank, N.A. (Chase, hereafter Agent)[1] is the Administrative Agent for a group of lenders which includes the Agent, that initially extended credit to Venture Holdings Company, LLC (Venture) in 1999 under a Credit Agreement.  Venture defaulted on the Credit Agreement and eventually went into bankruptcy.  Currently, over 400 Million Dollars is unpaid under the Credit Agreement.  The Agent is suing defendants, Larry Winget

---

[1]Initially, the Administrative Agent was First National Bank of Chicago; JP Morgan Chase Bank, N.A. is the successor, by merger, to First National Bank of Chicago.  In its papers, the Agent has referred to itself as Chase, at the Court's direction.  For purposes of this decision, the Court prefers to use the term Agent, rather than Chase.

(Winget) and The Larry Winget Living Trust (Winget Trust)[2] to enforce a Guaranty and two (2) Pledge Agreements entered into by Winget and signed by Winget and the Winget Trust in 2002, guaranteeing the obligations of Venture.  The Guaranty and Pledge Agreements are part of the Eighth Amendment To Credit Agreement. Particularly, the Agent makes three (3) claims:

Count I          Enforcement of Guaranty Against the Winget Trust

Count II         Enforcement of Guaranty Against Winget

Count III        Enforcement of Pledge Agreements Against Winget and
                 The Winget Trust

As to Count I, the Agent takes the position that while the Guaranty is limited to $50 million dollars as to Winget, it is unlimited as to the Winget Trust.  Winget has filed a counterclaim seeking reformation of the Guaranty as to the Winget Trust to limit its obligations to the same as that of Winget.

As will be explained below, the reformation issue relates to Section 3 of the Guaranty, which reads in relevant part:

> SECTION 3.  The Guaranty.  Subject to the last paragraph of this Section 3, the Guarantor hereby and unconditionally guarantees, as primary obligor and not as surety, the full and punctual payment. . .of the Guaranteed Obligations. . .
>
> . . .Notwithstanding anything herein or elsewhere to the contrary, *no action will be brought for the repayment of the Guaranteed Obligations* under this Guaranty and no judgment therefore will be obtained or enforced *against Larry Winget other than with respect to the Pledged Stock* in accordance with the

---

[2]Winget and the Winget Trust will sometimes be referred to collectively as Winget.

provisions of the related pledge agreements[.]

The Agent says that the Guaranty is only limited as to Winget, not the Winget Trust because Section 3 states only "Larry Winget" and not "Larry Winget and the Winget Trust." Winget disagrees, contending that the failure to state "and the Winget Trust" in Section 3 was a mistake.

The Court bifurcated the counterclaim and set it down for separate trial. For eight (8) days in August, 2012, the issue of reformation was tried to the Court. For the reasons which follow, see Parts IV. and VI., which constitute the findings of fact and the conclusions of law required by Fed. R. Civ. P. 52(a), the Court finds that reformation of the Guaranty limiting the scope of the liability of the Winget Trust to the scope of the liability of Winget is appropriate.

## II. Background Decisions

The following decisions describe the background of the reformation issue:

- JP Morgan Chase Bank, NA v. Winget and the Winget Living Trust, 510 F.3d 577 (6th Cir. 2007)
  (Decision affirming the Court's grant of the Agent's specific performance of inspection rights).

- Winget and Winget Living Trust v. JP Morgan Chase Bank, NA, et al., 537 F.3d 565 (6th Cir. 2008)
  (Decision affirms the Court's dismissal on *res judicata* grounds Winget's suit that Agent and lenders engaged in a scheme to coerce him into contributing certain assets to a collateral pool).

- Memorandum and Order Granting Defendants' Motion for Leave to Amend Answer (Doc. 40)
  (The Court gave Winget and the Winget Trust leave to "amend their answer to allege additional affirmative defenses of mistake, *res judicata* and estoppel (equitable and judicial) and a counterclaim seeking reformation of the Guaranty on grounds of mistake." This followed the Court's denial of the Winget Trust's motion seeking a ruling that the language of the Guaranty limited the liability of both

4

Winget and the Winget Trust to the pledged stock (Doc. 29)).

• Memorandum Denying Plaintiff's Motion for Summary Judgment on Count I and on Defendants' Counterclaim (Doc. 191) (Doc. 214), 2011 WL 6181438 (E.D. Mich. Dec. 13, 2011) (The Court explained the reasons why "there is sufficient evidence of mutual mistake such that reformation of the Guaranty and Pledge Agreements against the Winget Trust may be appropriate").

### III.  The Trial

### A.  Witnesses

### 1.  Winget and Winget Trust

Witnesses called by Winget and the Winget Trust in person or by deposition at trial were:

• Roy Gallagher (Gallagher) - a former Vice President of Ernst & Young Corporate Finance (EYCF), who did financial studies of Venture for Chase and Dickinson Wright, LLC (Dickinson), the law firm which represented Chase

• Richard Babcock (Babcock) - an officer of the Agent who negotiated the Term Sheet on behalf of the Agent

• Linda Thompson (Thompson) - an officer of the Agent who negotiated the Term Sheet on behalf of the Agent

• Ralph R. McKee (McKee) - Winget's principal lawyer

• Winget - Defendant and Counter-Plaintiff

• James Butler (Butler) - a Finance Manager at Venture who was involved in negotiating the Term Sheet and the language of the Eighth Amendment and related documents on behalf of Venture

• J.T. Atkins (Atkins) - a financial analyst and advisor to Winget in the Venture bankruptcy

• Daniel Terpsma (Terpsma) - a banker and commercial lender who expressed an expert opinion that based on his examination of the record, the Agent did not rely on the guarantee of the Winget Trust

5

to enhance the lenders' collateral position

- William Burgess (Burgess) - a lawyer with Dickinson who represented the Agent in the drafting of the Eighth Amendment and related documents, and in the Venture bankruptcy
- Larry Nyhan (Nyhan) - a lawyer who represented the Agent in the Venture bankruptcy
- David Potrykus (Potrykus) - a Black Diamond Capital Management, LLC representative.  Black Diamond was a lender.
- 

## 2.  The Agent

Witnesses called by the Agent in person or by deposition at trial were:

- Babcock (see above)

- Jonathan Bell (Bell) - a lawyer for Venture in the Venture bankruptcy

- Timothy Bradley (Bradley) - a lawyer for Winget in the drafting of the language of the Eighth Amendment and supporting documents

- Burgess (see above)

- Nyhan (see above)

- Potrykus (see above)

- Edward R. Renwick (Renwick) - a Yucaipa Companies, LLC (Yucaipa) representative.  Yucaipa was a lender

- William P. Shield (Shield) - a lawyer with Dickinson who drafted the Term Sheet

- Dawn Faxon-Singer (Faxon-Singer) - a lawyer with Dickinson who drafted the language of the Eighth Amendment and its related documents

- Thompson (see above)

- Matthew Clemente (Clemente) - a lawyer for the Agent in the Venture bankruptcy

## 3.  Commentary

6

Several comments are in order regarding the testimony of the witnesses:

- There is a distinction between the negotiations regarding the terms of the Eighth Amendment and negotiations regarding the language of the Eighth Amendment and the related documents.  Babcock and Thompson negotiated the terms of the Eighth Amendment with Winget.  The lawyers for the Agent and the lawyers for Winget negotiated the language of the Eighth Amendment and the related documents.

- Burgess had the responsibility for drafting the language of the Eighth Amendment and the related documents.  Faxon-Singer did the actual drafting of the language of the Eighth Amendment and the related documents.

- Shield had the responsibility for drafting the Term Sheet which described the business deal which was memorialized by the Eighth Amendment and the related documents.

- As explained below in Part IV., neither Burgess nor Shields were credible witnesses.

### B.  Exhibits

### 1.  Generally

Numerous exhibits were admitted in evidence at the trial.  Post-trial, the parties filed lists of the exhibits as follows:

Common Exhibits - 13 (Doc. 338)

Winget Exhibits - 70 (Doc. 340)

7

Chase Exhibits - 34 (Doc. 339)

The exhibits included drafts of the Term Sheet, drafts of the Eighth Amendment, the Pledges and the Guaranty e-mails, the Agent's Problem Credit Reports, Intralink postings (the Intralink was the mechanism by which the Agent communicated with the lenders); the Agent's Credit Approval Summaries; transcripts of hearings and depositions, and the like.

## 2. Significant Exhibits

The significant exhibits are:

| Description | Exhibit |
|---|---|
| • Larry J. Winget Living Trust (July 01, 1999) | C 1 |
| • Venture Holdings Trust Credit Agreement (May 27, 1999) | C 10 |
| • Venture Holdings Company, LLC Proposed Forbearance Agreement Summary Term Sheet (October 09, 2002) | C 2 |
| • Draft of Pledge Agreement (October 20, 2002) | W 19 |
| • Draft of Pledge Agreement (October 21, 2002) | C 5 |
| • Draft of Guaranty (October 18, 2002) | C 3 |
| • Draft of Guaranty (October 22, 2002) | C 6 |
| • Eighth Amendment and related documents (October 21, 2002)[3] | C 11 |
| • Guaranty (October 21 2002) | C 11 Tab 5 |
| • Pledge Agreements | |

_____

[3]The majority of the Eighth Amendment and related documents, including the Guaranty, were executed on or about October 28, 2002, but dated effective October 21, 2002.

       (October 21, 2002)                                           C 11
           PIM Management Company                Tab 11
           Venco #1 , LLC                           Tab 12

- E-mail to lenders (October 21, 2002)        W 21

- Apollo Management, LP Memorandum re:Venture
  (October 21, 2002)                                       W 26

- Credit Approval Summary (April 4, 2004)      W 54

- Winget's Personal Financial Statement
  (October 21, 2002)                                       W 20

- Schedule of Liens                              W 58

- E-mail - posting of Term Sheet on Intralink
  (October 9, 2002)                                       W 15

- Court of Appeals for the Sixth Circuit Brief (excerpt)
  (May 7, 2007)                                         W 84

- EYCF Summary of Papers                        W 6, W 14

- Eighth Amendment Summary of Correspondence     W 78
  (October 18, 2002 - October 28, 2002)

- The Complaint For Specific Performance And Declaratory
  Judgment filed by the Agent in the 2005 case         W 92

- The Agent's Reply Brief in the 2005 case (Doc. 29)    W 82

- Credit File                                   W 80

- Complaint                                    Doc. 1

### 3. Commentary

Like the witnesses, some commentary is called for with respect to the exhibits.

- The only copy of the Winget Trust instrument in evidence came

  from Winget.  The Agent did not have a copy of the Winget Trust

  instrument in its files.

9

- No financial statement of the Winget Trust was admitted in evidence. The only financial statement in evidence was that of Winget.

- The first document making any mention of the unlimited liability of the Winget Trust was a footnote reference in the brief filed by the Agent in the Court of Appeals for the Sixth Circuit in Winget's appeal of the dismissal of his case charging that the Agent was involved in a scheme to coerce him (the 2007 case). The brief was filed May 7, 2007.

- The second document making any mention of the unlimited liability of the Winget Trust was the complaint filed in this case on September 8, 2008.

- There was no reference to the unlimited liability of the Winget Trust in any Credit Approval Summary or Problem Credit Report in the files of the Agent.

- None of the correspondence between the Agent and the lenders contain any reference to the unlimited liability of the Winget Trust.

- There was no mention of the unlimited liability of the Winget Trust in the Venture bankruptcy.

- There was no mention of the unlimited liability of the Winget Trust in any document prepared by EYCF.

### IV. Findings of Fact

The following are the factual findings required by Fed. R. Civ. P. 52. The findings are based on an assessment of the credibility of the witnesses, weighing the testimony

10

of the witnesses and the exhibits, and drawing such inferences from the evidence as is appropriate, all with due consideration of the pretrial findings of fact proffered by the parties.[4]

Regarding the credibility of the witnesses, given that the Winget Trust was added as a party to the Guaranty shortly before the Eighth Amendment and related documents were signed, and there is no suggestion in the evidence that the Agent looked to this inclusion as enhancing the lenders' collateral position, substantially more weight has been given to the testimony of witnesses called by Winget, particularly Winget and Terpsma, than the testimony of witnesses called by the Agent.

1.     Between 1999 and 2002, the Agent acted on behalf of a group of lenders, including the Agent, that advanced credit to Venture. Venture was owned by Winget.

2.     Winget created a living trust in 1987. The Winget Trust held most, if not all, of Winget's assets. The instrument in evidence appears to be a restatement. See C 1.

3.     There was no mention ever made of a distinction between Winget personally and the Winget Trust in the course of dealings between the Agent, Venture and Winget at any relevant time.

4.     In October of 2002, the Agent and Winget entered into the Eighth Amendment To Credit Agreement. In October, 2002, Venture was in severe financial condition as a consequence of the bankruptcy of some of its European subsidiaries.

---

[4]These factual findings include by reference the Joint Narrative Statement Of Facts For Count I And Defendants' Counterclaim (Doc. 291) to the extent such findings supplement the factual findings below.

11

The purpose of the Eighth Amendment was to extend forbearance for a time by the Agent in exercising its rights as a creditor of Venture under the Credit Agreement for the default of Venture.

5.      Aside from the forbearance by the Agent for a time, a primary purpose of the Eighth Amendment was to enhance the Agent's collateral position to the extent it had deteriorated since the Seventh Amendment To Credit Agreement.

6.      From the onset of the negotiations for the Eighth Amendment, Winget insisted that any additional support by him would be limited to the pledge of certain identified assets, and among those assets was his ownership of certain assets he owned in South Africa and Australia, PIM Management Company (PIM), a Michigan corporation, and Venco #1, LLC (Venco), a Michigan limited liability company.  As to these assets, Winget's liability was limited to a cap of $50 Million Dollars.

8.      Winget explained his position regarding his guaranty as follows:

> I understood and the bank agreed that this new collateral for the Eighth Amendment -- the pledges and guaranty of South Africa and Australia -- would be released upon payment of $50 million regardless of what else happened.  My personal assets outside of South Africa and Australia were to be totally excluded.  That was the business deal and that was what I agreed to.  I understand that eventually this agreement was reflected in part in a document which is entitled "Guaranty," but I did not consider the bank to be asking for a personal guaranty in the normal sense of the word, because I was not agreeing to take on responsibility for Venture's debt to the lenders, but only to pledge certain company shares in support of that debt.  I do not remember anyone ever telling me that the bank was asking for an unlimited guaranty by either myself or my Trust, and I would never have agreed to any personal guaranty of the debt that had unlimited access to my personal assets, including those held by my Trust.  In fact, one of the things I specifically demanded of the bank as a condition of reaching agreement

on the Eighth Amendment was that I would have no personal
liability and my assets, other than those I had specifically
agreed to put up as collateral, could not be pulled in.  I
discussed this with Ms. Thompson and Mr. Babcock during
our meeting at Venture and I made clear to Mr. McKee as
my representative, as well as the legal and financial teams
working for me and Venture, that my personal assets were
not to be placed at risk.  In fact, the bank and I agreed that
the prior guaranty I signed in connection with the Sixth
Amendment, which had maximum potential liability to myself
and the guarantor companies of a combined $33 million, was
to be released in connection with the Eighth Amendment.  I
made it perfectly clear to the bank on repeated occasions
that my personal assets, other than those directly tied to
Venture's operations and the $50 million guaranty of South
Africa and Australia, were off the table.

9.      The business terms of the Eighth Amendment were reflected in a

document labeled Term Sheet.  It was negotiated primarily between Babcock and

Thompson on behalf of the Agent and Winget on his own behalf.  Shield drafted the

Term Sheet.  C 2.

10.     Various drafts of the Term Sheet were circulated in early October.  None

of the drafts mentioned the unlimited liability of the Winget Trust.

11.     Winget had a personal meeting with Babcock and Thompson before

agreeing to the Term Sheet.  There was no discussion among them as to the Winget

Trust being a party to the Guaranty or the Pledges.  Babcock and Thompson have no

recollection of ever discussing the Winget Trust during the course of negotiating the

Eighth Amendment.  When asked why the Winget Trust was added as a party to the

Guaranty and Pledges, both Babcock and Thompson said they could not remember a

reason.

12.     Babcock testified as follows:

Q.      Okay.  The underlying question is you don't have any memory of discussing with Ms. Thompson whether the Guaranty was a limited or unlimited Guaranty in any respect, right?

A.      Correct.

Q.      And my question to you is if it made a $200 million difference to this Bank wouldn't you agree that that would be important enough for you to remember?

A.      Yes.

Q.      If it made a $100 million difference to the Bank, that would be important enough to remember, right?

A.      That's a material amount.

Q.      So the answer is yes?

A.      Yes.

13.      Thompson similarly testified:

Q.      Can you say with certainty that in 2002, 2003, and 2004 you described a Guaranty provided in connection with the Venture Holdings financing arrangement as a Larry Winget Living Trust Guaranty?

A.      I don't recall making that distinction.  I don't remember.

Q.      You don't recall making a distinction between Larry Winget and the Larry Winget Trust?

A.      I don't remember discussing, I don't remember discussion the Larry Winget Living Trust.

14.      Gallagher likewise testified that he had no recollection of an unlimited Guaranty but rather only a 50 million Guaranty.

Q.      Do you have a memory of an unlimited guaranty of the Winget Trust being on the table at any time?

A.      I do not.

14

Q.     Do you have a memory of ever doing any collateral analysis involving the assets of the Larry J Winget Living Trust?

A.     I do not.

Q.     Do you remember an unlimited guaranty of the Larry J. Winget Living Trust being part of the Eighth Amendment in any way?

A.     I do not.

Q.     And during these negotiations do you ever recall anyone saying that South Africa and Australia were already in the collateral pool to an unlimited extent?

A.     That's not something I recall, no.

Q.     Your memory was, your memory was that they were collateralized up to 50 million under the Eighth Amendment.

A.     Yes.


15.     Relevant portions of the Term Sheet, C 2,  read as follows:

        1.     Larry Winget to provide unlimited secured guaranties of Venture Heavy Machinery, Venture Equipment Acquisition Company, Venture Real Estate Acquisition Company, Realven Corporation, Deluxe Pattern Corporation, Venture Real Estate Inc., Venture Automotive Corp., Farm and County Real Estate Company, Patent Holding Company, Sales and Engineering (management agreement only), and the Australia and South Africa operations (the "Venture/Peguform Affiliates"), to the maximum extent permitted by law and existing agreements, and Larry Winget to pledge 100% of the ownership interest in the Venture/Peguform Affiliates.  The guaranties of the Australia and South Africa operations and the guaranty supporting the pledge of the stock of the Australia and South Africa operations would be guaranties of collection and non-recourse to Larry Winget personally other than the stock pledged (such guaranties and pledges defined as the "South Africa/Australia Support").

* * *

15

1.      Banks to forbear on all existing defaults until April 15, 2003.  The Borrower has voluntarily determined not to make any payments on the bonds during the forbearance period and agreed to provide notice to the Banks an adequate time prior to making any such payment, with the forbearance ending upon such notice.

2.      If the Borrower is in compliance with the forbearance, the South Africa/Australia Support would be released upon the earliest to occur of (I) payment to the Banks of at least $50,000,000 from a sale or financing of the Australia and South Africa operations or stock or from one or more other sources (excluding the Borrower, any of its subsidiaries, any of the existing or proposed guarantors (except for Larry Winget) or any of the existing or proposed collateral pledged in favor of the Banks); (ii) payment to the Banks of at least $250,000,000 from the sale of all or part of the Peguform platform (which includes South Africa and all foreign subsidiaries of Venture other than Canada); or (iii) any other transaction acceptable to the Required Banks.

C 2.

16.      A multitude of related documents constituted the Eighth Amendment. Negotiating the language of the Eighth Amendment and the related documents were handled by the lawyers for the parties.  C 11.  Burgess acted on behalf of the Agent; Lieberman and McKee acted on behalf of Venture and Winget.  Faxon-Singer did the actual drafting.  At no time during the course of the drafting was the unlimited liability of the Winget Trust discussed, much less mentioned.

17.      Prior to October 22, 2002, the Agent counsel generated "versions" 1, 2, 3, 4, and 5 of the Guaranty.  C 3, 4, 5.  All of these versions defined "Guarantor" to include only Winget.

18.      On October 22, 2002, the Agent's counsel, Faxon-Singer, circulated to Bradley and McKee "version 6" of the Guaranty, which shows changes made from

16

"version 4" to "version 6."  C 6.

19.     The "version 6" black line shows, in bold, underlined text that the definition of 'Guarantor" was changed to, "collectively," "Larry Winget and the Larry J. Winget Living Trust."  C 6.

20.     The "version 6" black line shows no changes to Section 3.  C 6

21.     From October 24 through October 28, the Agent's counsel circulated "versions" 7, 8, 9, 10, 11, 14, and 15 of the Guaranty.  See W 78.

22.     Faxon-Singer's testimony and McKee's testimony is consistent as to the reason for the addition of the Winget Trust to the Guaranty.  McKee explained it best in stating "[the Agent] wanted the Trust added to these [Eighth Amendment and related] documents in order to make sure the pledges were being provided by the actual technical owner of the stock because [the Agent's] counsel had expressed uncertainty as to whether Mr. Winget or his revocable Living Trust owned particular assets."

23.     Prior to the signing of the Eighth Amendment, the Agent never expressed or manifested the intention that the Winget Trust, or Winget, would have unlimited liability to the Agent as a guarantor of Venture's indebtedness under the Credit Agreement in contrast to Winget's limited liability.

24.     As noted above, the first draft of the Guaranty was circulated on October 18, 2002.  The operative language of Recital B in the draft reads as follows:

> It is a condition precedent to the Administrative Agent and the Lenders to the Eighth Amendment to the Credit Agreement that the Guarantor execute and deliver this Guaranty whereby the Guarantor shall guarantee the Guaranteed Obligations on a non-recourse basis, as defined below.

17

The operative language of the second paragraph of Section 3 reads in part as follows:

> Notwithstanding anything herein or elsewhere to the contrary, no action will be brought for the repayment of the Guaranteed Obligations under this Guaranty and no judgment therefor will be obtained or enforced against Larry Winget other than with respect to the Pledged Stock in accordance with the provisions of the related pledge agreements, provided that the Guarantor shall be fully and personally liable for any damages arising from any violations of any of the agreements of the Guarantor herein in favor of the Lenders.

This language carried through to the final draft of the Guaranty.

25.     Also as noted above, the Winget Trust was added as a party to the Guaranty on October 22, 2002.  This was done by including "The Larry J. Winget Living Trust" in the preamble as follows:

GUARANTY

> THIS GUARANTY (this "Guaranty") is made as of the 21st day of October, 2002, by Larry Winget and the Larry J. Winget Living Trust (collectively, the "Guarantor") in favor of Bank One, NA, a national banking association having its principal office in Chicago, as Administrative Agent (the "Administrative Agent"), for the benefit of itself and the Lenders, under the Credit Agreement referred to below

and adding the Winget Trust as a signatory.  Larry Winget signed the Guaranty on behalf of himself and on behalf of the Winget Trust.  C 11, Tab. 5.

26.     The Winget Trust was added as a party to drafts of the PIM Pledge and Venco Pledge, on October 20, 2002.  C 11, Tabs 11 and 12.

27.     Each Pledge Agreement includes the following language:

> 10.     SPECIFIC PROVISION FOR SATISFACTION OF PLEDGE AGREEMENT.

18

Notwithstanding Section 7.14 and notwithstanding any other provision in this Pledge Agreement or elsewhere, in the event that (I) the Agent receives for application on the Obligations an amount of not less than $50,000,000 from the sale or financing of the Pledgor's Australia or South Africa operations or from one more outside sources (not including the Borrower, any Subsidiary of the Borrower, any Guarantor, any Affiliate Guarantor (other than PIM, Venco #1, LLC, Venture Holdings B.V., Venture Asia Pacific (Pty) Ltd. or Venture Otto South Africa (Pty) Ltd.) or other Collateral), all as defined and described in paragraph 5.9(e) of the Eighth Amendment to the Credit Agreement) or (ii) payment to the Agent of not less than $250,000,000 from the sale of all or a part of the Peguform business or assets (which includes (x) all of the Borrower's Foreign Subsidiaries other than its Canadian Subsidiary and (y) Venture Otto South Africa (Pty) Ltd.), the obligations of the Pledgor hereunder shall be deemed satisfied and the pledge created hereby shall be terminated.

C 11, Tabs 11 and 12.

28.     There was no consciousness on the part of anyone involved in negotiating the language of Eighth Amendment and related documents existence of the Winget Trust until around October 20, 2002, when the role of the Winget Trust and Winget's financial life became a topic of discussion. This discussion was prompted by a question as to the exact ownership of Winget's assets being pledged to support the lender's collateral position.  This included PIM and Venco, which were part of the collateral pledged to the lenders.  Investigation disclosed that Winget's stock in PIM and Winget's interest in Venco were in the name of the Winget Trust.

29.     At no time before the signing of the Eighth Amendment and related documents did the Agent require or obtain a copy of the Winget Trust instrument or a balance sheet of the Winget Trust.  At no time after the signing of the Eighth Amendment and related documents did the Agent ask for or obtain a copy of the Winget

19

Trust instrument or a balance sheet of the Winget Trust.

30.    Babcock testified that federal bank regulations require that a bank secure financial statements from a guarantor.

31.    The documents related to the Eighth Amendment include a financial statement from Winget.  The facing page of the Eighth Amendment, closing list and list of related documents are attached as Exhibit A.

32.    There is no limitation in the Guaranty or the Pledge Agreements relating to Winget's right to amend or terminate the Winget Trust, transfer of assets into or out of the Winget Trust, or to the management of the Winget Trust.

33.    The reason that the Winget Trust was made a party to the Guaranty and the Pledge Agreements is simple, and stated in part above.  During the course of the drafting process there was an uncertainty as to the exact ownership of the newly pledged assets, including the stock of PIM and an interest in Venco.  No one involved in the drafting process of the Eighth Amendment and related documents has any recollection of any discussion regarding enhancing the lenders' collateral position by having the unlimited guaranty of the Winget Trust.

34.    Bradley, one of the lawyers representing Winget in the drafting of the Guaranty testified as follows:

> THE COURT: No, what was your understanding of the reason for the Trust being added to the Guaranty?
>
> * * *
>
> MR. BRADLEY: The Larry J. Winget Living Trust was the owner of all of the pledged shares.  It was added to the Pledge Agreement because it was the owner of all of the pledged shares.  It was added to the Guaranty because the

> Guaranty was in support of the pledge.  So, because Larry
> wasn't the owner of the shares, the Larry J. Winget Living
> Trust was the owner of shares, it was added to the pledge
> and added to the supporting Guaranty.

35.     The text of a draft of the Eighth Amendment not including the related
documents was circulated by the Agent via Intralink, the method the Agent used in
communicating with the lenders, on October 21, 2002, for approval and sign off.  This
was prior to the Winget Trust being added as a party to the Guaranty, and prior to the
finalization of the text of the Pledge Agreements.  No mention was made in any
transmission to the lenders of an unlimited guaranty by the Winget Trust.

36.     Neither Winget nor anyone representing him in the negotiation of the
language of the Eighth Amendment and related documents ever expressed an intention
of providing an unlimited guaranty of the Winget Trust of the Venture debt.

37.     Likewise, no one representing the Agent in the negotiation of the terms of
the documents comprising the Eighth Amendment ever expressed the intention of
obtaining an unlimited guaranty from the Winget Trust, or that the addition of the Winget
Trust as a signatory to the Guaranty and Pledge Agreements was for the purpose of
enhancing the lenders' collateral position beyond what was described in the Term
Sheet.

38.     Following the signing of the Eighth Amendment and related documents on
October 28, 2002, as of October 21, 2002:

•       The Agent has no recollection of ever describing to the lenders the
        obligation of the Winget Trust under the Guaranty as unlimited.

•       The Agent, in its interval reporting on its own behalf as a lender,

21

and in reporting to the lenders, never made any distinction between
Winget and the Winget Trust.

- Every report in the Agent's Credit File, every Problem Credit
  Report, and every report sent to the lenders described the
  Guaranty as capped at $50 Million Dollars.  See W 80

39.     Every analysis by EYCF which referenced the Guaranty, describes it as
having a value limited to $50 Million Dollars.  See W 6, W 14

40.     An unlimited guarantee of the Winget Trust would have added at least
$100 Million Dollars as a source of repayment for the Venture debt.  This would have
been a material source of repayment, and would have been disclosed by the Agent to
the lenders.

41.     At various times after October 28, 2002, the Agent described the Guaranty
to third parties.  In each instance, the Guaranty was described as limited to $50 Million.
These statements included:

- the Second Amended Disclosure Statement filed in the Venture
  bankruptcy proceedings
- during a 22 day trial in the bankruptcy court in which Winget's
  obligations under a Contribution Agreement were an issue
- the Complaint in the 2005 case filed by the Agent asserting its
  inspection rights
- various documents filed in the 2005 case

42.     As expressed by Terpsma in his testimony:

- The Agent's actions, analysis and communications

22

are not consistent with the existence of an unlimited guaranty from the Winget Trust

• An unlimited guaranty from the Winget Trust, with a minimum value of $150 million, would have been considered a material source of repayment for the Venture debt

• If the Agent, as the administrative agent for the lenders, and as a participating lender, had believed that it held an unlimited guaranty of the Winget Trust -- whether it was secured by pledged assets or not -- it would have required specific financial information from the Winget Trust including, at a minimum, descriptions and financial records of assets held by the Winget Trust and periodic financial reporting from those entities

• If the Agent, as the administrative agent for the lenders, and as a lender itself, had believed that it held an unlimited guaranty of the Winget Trust -- whether it was secured by pledged assets or not -- it would have undertaken analysis of the collectability of the Winget Trust, and would have communicated the existence of such a guaranty and its analysis of the collectability of that guaranty to the lenders

43.   Exemplary of the manner in which the Agent viewed the singular obligation of Winget and the Winget Trust are:

• The Agent's description of the collateral it held in the form of the

Guaranty in a lien schedule it filed in the Venture bankruptcy on

May 10, 2004, as follows (W 58):

EXHIBIT 1

| COLLATERAL PLEDGED BY WINGET TO EXISTING BANK FACILITY PURSUANT TO EIGHTH AMENDMENT | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| NAME | Sub-ordination Agreement | Guaranty | Security Agreement | DESCRIPTION | Mortgage | DESCRIPTION | Pledge | DESCRIPTION | Transferred Winget Equity |
| Larry Winget & Larry Winget Living Trust | Yes | Yes Limited to pledged stock unless he violated guaranty | | | | | Yes | All stock: I-9 Capital stock: 10 Membership Interests: 11 | |

- The Credit Approval Summary requesting approval to

  foreclose on the pledges describes the Guaranty as follows

  (W 54):

  GUARANTEES/FINANCIAL CAPACITY OF GUARANTORS:

  The bank group has the guaranty of all domestic subsidiaries
  and the guaranty of all of Larry Winget's affiliated entities
  including the Australian and South African operations up to
  $50,000.

44. As further support that the Agent viewed Winget and the Winget's Trust's

liability as the same is the following allegation in the Agent's Complaint For Specific

Performance And Declaratory Judgment (W 92) in the 2005 case, which describes the

Guaranty as follows:

> 15.     Under the terms of the Guaranty (at § 3), Winget's
> obligations as guarantor can be satisfied through recourse to
> stock pledged by Winget, including stock in P.I.M. and
> Venco that was contemporaneously pledged by Winget in
> two pledge agreements dated October 21, 2002 (hereinafter,
> "Winget/P.I.M. Pledge Agreement," and "Winget/Venco
> Pledge Agreement," attached hereto as Exhibits B and C
> and hereinafter, collectively, "Pledge Agreements").

45. The Agent's reply brief in support of its motion for judgment on the

pleadings in the 2005 case (W 82) similarly described the Guaranty at p. 2, as follows:

> . . .The bargain struck by the parties in the Winget Guaranty

24

is unambiguous: the obligations of Winget are absolute and unconditional; the Agent's right to collect the guaranteed obligations is limited to the Pledged Stock. . . .

46.     The first mention in the record by the Agent of an unlimited Guaranty

against the Winget Trust appears in a brief filed in the Sixth Circuit on May 7, 2007 in

Winget's appeal in the 2005 case.  The body of the brief states in part "the Agent's

recourse against Larry Winget for *payment* on the Winget Guaranty is limited to

foreclosure on certain pledged stock – including the stock of PIM and Venco.  Any such

foreclosure must occur pursuant to the terms of the Pledge Agreement."  After this

statement there is a footnote which reads *"[n]o such limitations apply to the Agent's right

to recover on the Guaranty from the Trust*."  W 84 (emphasis added).

47.     What is not explained in the record is the lapse of time from October 2002,

when the Eighth Amendment and related documents were executed, to May 2007,

when the Agent's position with respect to the unlimited liability of the Winget Trust is first

disclosed.

48.     Recital O of the Eighth Amendment describes the obligation of "The

Principal" ("Larry J. Winget and the Larry J. Winget Trust") as follows:

O. The Principal has agreed (I) that each of Venture Heavy Machinery Limited Liability Company, a Michigan limited liability company, Venture Real Estate Acquisition Company, a Michigan corporation, Venture Equipment Acquisition Company, a Michigan corporation, Realven Corporation, a Michigan corporation, Deluxe Pattern Corporation, a Michigan corporation, Venture Real Estate, Inc., a Michigan corporation, Venture Automotive Corp., a Michigan corporation, Farm & Country Real Estate Company, a Michigan corporation, Patent Holding Company, a Michigan corporation; P.I.M Management Company, a Michigan corporation and Venco #1 LLC, a Michigan limited liability company (collectively the "Affiliate Guarantors") will execute and deliver to the Administrative Agent, for the benefit of itself and the Lenders, unlimited secured guaranties of the Secured Obligations (provided that the guaranties of P.I.M. Management Company and Venco #1 LLC, indirect owners of a majority of the stock of Venture Asia Pacific

25

(Pty) Ltd. ("Venture Australia") and Venture Otto South Africa (Pty) Ltd. ("Venture South Africa"), shall be guaranties of collection only, including following collection efforts with respect to the Guarantors and the other Affiliate Guarantors, and provided, further, that the guaranty of P.I.M, Management Company shall be limited to assets relates to Venture Australia, Venture Holdings B.V. and Venture South Africa (collectively the. "Foreign Issuers") and grant liens and security interests in all of their respective assets (and with respect to P.I.M. Management Company and Venco #1 LLC, a pledge their stock and of 65% of the ownership interests in the Foreign Issuers, enforceable only following collection efforts against the Borrower, the Guarantors and the other Affiliate Guarantors and, as to P.I.M. Management Company, limited to the assets related to the Foreign Issuers), each to the maximum extent permitted by applicable law and to the extent not prohibited by existing contractual restrictions; (ii) that .the Principal will pledge to the Administrative Agent, for the benefit of itself and the Lenders, 100% of his ownership interest in each of the Affiliate Guarantors and any holding companies for any of such Affiliate Guarantors (such pledge to be limited to any such holding company's interest in the Affiliate Guarantors) and (iii) to cause Venture Sales & Engineering, Corp., a Michigan corporation. to execute a collateral assignment of its commission agreement with the Borrower.

49.     The Winget Trust's obligation is co-extensive with that of Winget as expressed in Recital O.

## V.  The Agent's Position

### A.  The Absence of Evidence

The Agent's position that the Winget Trust and Winget the individual are not one in the same for purposes of the Eighth Amendment and related documents does not hold water.  The factual findings detailed above make clear that the Winget Trust was added to the Guaranty solely for the purpose of capturing the ownership of the collateral in the PIM and Venco Pledges, which was held in the name of the Winget Trust.  It was not added to enhance the lenders' collateral position, much less an unlimited obligation, on the part of the Winget Trust.

The only support for the Agent's position is found in the strained testimony from the lawyers for the Agent.  All of them essentially said that because there was never

26

expressed intention that Section 3 meant anything other than what the plain language reveals, the fact that the Winget Trust was not included in Section 3 means that the Winget Trust's liability was unlimited.  The Agent says everyone who reviewed the Eighth Amendment and related documents, particularly Section 3, must have understood the plain meaning and therefore no mistake was made.  This view, which went unexpressed by the Agent for years, is not borne out by any evidence.

### B.  Burgess's Credibility

Burgess was not a credible witness.  In explaining the apparent inconsistent statements as to the liability of the Winget Trust, Burgess testified as follows.

> THE COURT:  . . .Mr. Anding. . .was about to ask you. . .how you reconcile your understanding today of the statements that were made in pleadings in this Court in 2005 and 2007 with the current claim regarding the Guaranty by the [Winget] Trust. . . .

> MR. BURGESS:  I can reconcile them.  The focus of the Agent's recovery and enforcement efforts for quite some time proceeded along the lines that we were just talking about, that the pursuit of specific, identifiable collateral or specific identifiable entities is typically much swifter, less costly, in most cases in my experience more certain than is the ultimate pursuit, as we have witnessed in this very case, of an unsecured guaranty where there are many additional steps that will need to be taken in order to ultimately recover the value of the obligation undertaken.  And the officers of the bank and legal counsel to. . .my best recollection had been focused on those items of specific collateral for quite some time, including the Contribution Agreement and our earlier efforts at enforcement.

This statement is fatuous.  At no point in his testimony did Burgess provide support for the Agent's position that the parties knew and intended that the Winget Trust's liability was unlimited.

### C.  Shield's Credibility

27

Shield likewise was not a credible witness.  In being questioned about the nature of a living trust, he testified.

> THE COURT:  Did you know that the [Winget] Trust, Witness, was characterized as the Larry Winget Living Trust?
>
> MR. SHIELD:  I don't recall exactly how the [Winget] Trust was referred to.
>
> * * *
>
> MR. SHIELD:  I'm familiar with the concept of a trust. . . .
>
> THE COURT:  I didn't say trust, Mr. Shield.
>
> * * *
>
> THE COURT: I said, are you familiar with the concept of a living trust?
>
> MR. SHIELD:  I'm not sure of the exact meaning or what it would be in this case.
>
> THE COURT:  I didn't ask you about this case, Mr. Shield. just answer my question.
>
> * * *
>
> THE COURT:  I don't know that you have ever been a witness, but you are a very good lawyer, and my question was very precise. Are you familiar with the concept of a living trust?
>
> MR. SHIELD:  No.
>
> THE COURT:  Now, the document itself was labeled Larry Winget Living Trust.  In an earlier opinion or decision in this case I explicitly defined what a living trust was.  I find it incredible that the senior partner of a major law firm which represents banks, as Mr. Shield says he does, would answer that he doesn't know anything about a living trust. . . .

### D.  Conclusion on the Agent's Position

The absence of any credible testimonial evidence from those who negotiated the

2:08-cv-13845-AC-MJH   Doc # 365   Filed 10/17/12   Pg 29 of 32   Pg ID 13837

language of the Eighth Amendment as to the liability of the Winget Trust and the absence of any documentary evidence which would support treating the obligations of the Winget Trust different from Winget cuts against the Agent.  The Agent cannot simply point to the plain language of Section 3 in order to prevail against Winget.  The issue for trial was not whether Section 3 was ambiguous or unambiguous, the issue was whether Section 3 should be reformed to reflect the parties' true and intended agreement.  The Agent has failed to persuade the Court that Section 3 should not be reformed.

## VI.  Conclusions of Law

### A.  The Law of Reformation

Under Michigan law, a court of equity has the authority to reform a contract to make the contract conform to the agreement actually made by the contracting parties. Casey v. Auto–Owners Ins Co, 273 Mich. App. 388, 398 (2006).  If a written instrument fails to express the intention of the parties because of a mutual mistake, the court may enforce the equitable remedy of reformation.  Scott v. Grow, 301 Mich. 226, 237 (1942).

To obtain reformation, a party must establish by clear and satisfactory evidence of a mutual mistake.  Lee State Bank v. McElheny, 227 Mich. 322, 327 (1924).  One Michigan court stated that the mistake must be proven "beyond cavil."  Emery v. Clark, 303 Mich. 461, 460 (1942).  A "mutual mistake of fact" is " 'an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction.' " Briggs Tax Service, LLC v. Detroit Pub Schools, 485 Mich. 69, 77; 780 N.W.2d 753 (2010), quoting Ford Motor Co v. City of Woodhaven, 475 Mich. 425, 442; 716 N.W.2d 247 (2006)).  A mutual mistake must relate to a fact in existence when the contract was executed.  Lenawee Co Bd of Health v. Messerly, 417 Mich. 17, 24

(1982).  Parol evidence can be used to determine whether reformation is warranted on

the basis of mistake.  Scott, 301 Mich. at 239.

Moreover, Michigan courts have said that while generally the mistake must be

mutual, reformation may also be had where one party is aware that the other party has

made a mistake and conceals it, thereby producing an inequitable result.  As explained

in Retan v. Clark, 200 Mich. 493, 496 (1922):

> It is a general rule that equity will not relieve by reformation unless the
> mistake is mutual.  A. E. Wood & Co. v. Standard Drug Store, 192 Mich. 453, 158
> N. W. 844; Schlossman v. Rouse, 197 Mich. 399, 163 N. W. 889; Standard Oil
> Co. v. Murray, 214 Mich. 299, 183 N. W. 55; Gustin v. McKay, 196 Mich. 131,
> 162 N. W. 996.
> But here there was mistake on the part of the plaintiffs and knowledge of
> the mistake and concealment thereof on the part of the defendants, both
> producing the inequitable result.  Of a case of this class it is said in 23 R. C. L.
> 331, citing cases:
>> 'There is, however, still another class of cases-that where
>> one party to an instrument has made a mistake and the
>> other party knows it and conceals the truth from him.  Such
>> inequitable conduct accompanying a mistake is generally
>> held to be sufficient ground for reformation of the instrument
>> in question.'

Finally, in Citibank, N.A. v. Morgan Stanley & Co., 797 F. Supp. 2d 254 (S.D.N.Y.

2011), the district court, in considering a claim for reformation on the grounds of mutual

mistake regarding a complex commercial transaction, noted the relevance of a parties'

course of performance in determining whether a mutual mistake has been made.  The

district court stated in relevant part:

> Procedurally, there is a " 'heavy presumption that a deliberately prepared and
> executed [agreement] manifest[s] the true intention[s] of the parties,' especially
> between counselled businessmen" and "a correspondingly high order of evidence
> is required to overcome that presumption."  In particular, "mutual mistake must
> be established by clear and convincing evidence."  " 'Only thus can the benefits
> of the written form be preserved.' "  Although a "mutual mistake must exist at the
> time the agreement is signed," "the parties' course of performance under the

30

contract is considered to be the most persuasive evidence of the agreed intention of the parties."

Id. at 265 (footnotes omitted).

### B.  The Law as Applied to this Case

Winget has established grounds for reformation under the standard set forth above.  While the plain language of Section 3 of the Guaranty references only Larry Winget as having limited liability, this section does not reflect the parties' intent.  Rather, Winget has proven "beyond cavil" that the Winget Trust was added solely to ensure that the pledged collateral was owned by Winget.  It was not added to expand upon or create any additional liability on the part of the Winget Trust.

The Winget Trust for purposes of this case is no different than Larry Winget individually.  A living, or inter vivos trust, is a common estate planning tool which is often used to control the distribution of assets.  See Restatement (Third) of Trusts § 25 Validity And Effect Of Revocable Inter Vivos Trust (2003).  Here, Winget was the settlor, trustee, and beneficiary of the Winget Trust.  As settlor, Winget owned the assets in the Winget Trust.  See M.C.L. § 556.128.  The Winget Trust was essentially Winget's alter ego. Winget used the Winget Trust to hold ownership of many of his assets, including the pledged stock.  It had no special significance for purposes of this case.

The Winget Trust was purposely added to the Eighth Amendment and related documents to secure ownership of the pledged stock.  It was not added to secure any additional liability.  As such, the failure to include the Winget Trust under Section 3 was a mistake.  It was a mistake that was overlooked by both parties.  It is a mistake that the Court has the power to correct.  As Justice Joseph Story put it:.

31

It is upon the same ground that Equity interferes in cases of written instruments, where there has been an innocent omission or insertion of a material stipulation, contrary to the intention of both parties, and under a mutual mistake.  To allow it to prevail in such a case, would be to work a surprise, or fraud, upon both parties and certainly upon the one who is the sufferer. . . . *A Court of Equity would be of little value, if it could suppress only positive frauds, and leave mutual mistake, innocently made, to work intolerable mischiefs, contrary to the intention of the parties*.  It would be to allow an act, originating in innocence, to operate ultimately as a fraud, by enabling the party, who receives the benefit of the mistake, to resist the claims of justice, under a shelter of a rule framed to promote it.

Joseph Story, Commentaries on Equity Jurisprudence, Chapter V. Mistake, § 155 (7th

ed. 1857) (emphasis added).

When all is said and done, the evidence at trial confirmed what the Court said of

the case in denying the Agent's motion for summary judgment:

[T]he record contains credible evidence from which a reasonable conclusion can be drawn that the parties agreed that liability of Winget and the Winget Trust was not more than $50 million, i.e. Winget and the Winget Trust were viewed and treated as indistinguishable.  Because Section 3 reads otherwise, defendants have made out of a case for reformation based on mutual mistake . . . .

An appropriate judgment will be entered in favor of Winget on its counterclaim for

reformation.


Dated:  October 17, 2012           s/Avern Cohn_____
                                   AVERN COHN
                                   UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 17, 2012, by electronic and/or ordinary mail.


                                   s/Julie Owens_____
                                   Case Manager, (313) 234-5160