UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JP MORGAN CHASE BANK, N.A.,

      Plaintiff/Counter-Defendant,

v.                                                                    Case No. 08-13845
                                                                      HON. AVERN COHN

LARRY WINGET and the LARRY WINGET
LIVING TRUST,

      Defendants/Counter-Plaintiffs.

_____/

**MEMORANDUM AND ORDER GRANTING CHASE'S MOTION FOR SUMMARY JUDGMENT ON WINGET'S ENFORCEABILITY AND DELAY DEFENSES (Doc. 391)**[1]

### I. Introduction

This is a commercial finance dispute.  Plaintiff/Counter-Defendant JPMorgan Chase Bank, N.A. (Chase) is the Administrative Agent for a group of lenders that extended credit to Venture Holdings Company, LLC (Venture) under a Credit Agreement.[2]  Chase is suing defendants/counter-plaintiffs Larry Winget and the Larry Winget Living Trust (collectively Winget) to enforce a guaranty and two pledge agreements entered into by Winget and the Winget Trust in 2002 in which they guaranteed the obligations of Venture, a company owned and controlled by Winget and/or the Winget Trust.  Chase makes three claims, as follows:

      Count I          Enforcement of Guaranty Against the Winget Trust

---

[1]The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

[2]Bank One, NA, was the Administrative Agent for the lenders.  It merged with JP Morgan in 2004 to form JP Morgan Chase Bank, N.A.

Count II        Enforcement of Guaranty Against Winget

Count III       Enforcement of Pledge Agreements Against Winget and the Winget

                Trust

On October 2012, the Court entered a decision on reformation as to Count I

(Doc. 365).  Count I (as reformed) and Count II are effectively the same.  The parties

have engaged in extended and contentious discovery and disagree over the issues for

trial on Chase's complaint.  All of this culminated in Chase filing a motion for summary

judgment on Winget's enforceability and delay defenses.  (Doc. 391).  For the reasons

that follow, the motion will be granted.

## II.  General Background and Motion Papers[3]

The motion has had a long and contentious history.  Following the decision on

reformation, on October 31, 2012, the Court held a status conference on the record to

set the case on a course for trial.  Following the conference, the Court entered an

Amended Scheduling Order outlining the issues for trial as follows:

> 1. The enforceability of the Pledge Agreements relating to P.I.M. Management
> Company and Venco #1, L.L.C., in light of the pledge of shares in Venture
> Holdings, B.V. and the pledge of shares in Venture Asia Pacific, (Pty) Ltd. (a/k/a
> the "enforceability" defense)
>
> 2. Reasonableness of the efforts by Chase to sell the collateral remaining
> subsequent to the sale of Venture's assets in the bankruptcy court (implicated in
> this issue is Winget's "delay" defense, which has also incorporated a "going
> concern" and "Hydundai" defense)
>
> 3. The text of the judgment to be entered in favor of Chase should it prevail
> at trial.

---

[3]Factual background relevant to the instant motion appears in the Analysis
section, Part IV.B., infra.

(Doc. 384).

Following the resolution of multiple discovery disputes, Chase filed a motion for summary judgment on Winget's enforceability and delay defenses.  (Doc. 391).  The motion is accompanied by a statement of undisputed facts and exhibits  (Doc. 392) and is the motion before the Court for decision.

On December 17, 2012, Winget filed its first motion to defer consideration on the summary judgment motion with exhibits.  (Doc. 393).  On December 18, 2012, following a phone conference on the record, the Court directed Winget to file a response to Chase's summary judgment motion.  The Court also entered an order denying Winget's motion to defer consideration without prejudice "to Winget's right to raise the lack of discovery as a defense to the [summary judgment] motion.  (Doc. 390).

On January 9, 2013, Winget filed a comprehensive response to Chase's motion, with exhibits (Doc. 401).  Winget also filed a response to Chase's statement of undisputed facts which included additional facts.  (Doc. 402).  Winget also separately filed on that date a renewed motion to defer consideration of Chase's motion, with exhibits, again contending that discovery was necessary to fully respond to Chase's motion.  (Doc. 403).

On January 28, 2013, Chase filed a reply (Doc. 410) and a response to Winget's additional facts, with exhibits (Doc. 411) to its motion.  Chase also filed on that date a response to Winget's renewed motion to defer consideration.  (Doc. 412).  Winget later filed a reply to its motion to defer consideration.  (Doc. 413).

Following resolution of pending discovery disputes, on June 3, 2013, Winget filed the following:

3

1.      A second comprehensive response to Chase's motion for summary judgment, with exhibits.  (Doc. 439).

2.      A supplemental statement of material facts.  (Doc. 443).

3.      A supplemental brief regarding its renewed motion to defer consideration, with an exhibit.  (Doc. 444)

On June 17, 2013, Chase filed the following:

1.      A supplemental reply to its summary judgment motion (Doc. 446)

2.      A response to Winget's supplemental statement of material facts.  (Doc. 447).

3.      A supplemental response to Winget's supplemental brief on the renewed motion to defer consideration (Doc. 448).

On July 1, 2013, the Court denied Winget's renewed motion to defer consideration of Chase's summary judgment motion.  (Doc. 449)  No further papers regarding Chase's summary judgment motion have been filed.  As outlined above, the record is fully complete as to the parties' positions.

### III.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Revised Rule 56 expressly provides that:

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

4

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support a fact.

Fed. R. Civ. P. 56(c)(1).

Chase's arguments as to why Winget's defenses fail present questions of contract interpretation and res judicata which are matters for the court and therefore appropriate for summary judgment.  See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 544 (6th Cir. 2007) (contract interpretation is a legal question under Michigan law); Knox Cnty. Educ. Ass'n v. Knox Cnty. Bd. of Educ., 158 F.3d 361, 370 (6th Cir. 1998) (res judicata is a legal question under federal law); see also Fed. R. Civ. P. 56(a) (providing for summary judgment on defenses, or parts of defenses).

## IV.  Analysis

### A.  Overview

Chase seeks summary judgment on two of Winget's defenses.  First, Winget says that his pledge of P.I.M. Management Company ("PIM") is not enforceable because PIM executed a pledge of Venture Holdings, B.V. ("BV").  This is referred to as the "Enforceability Defense."  Second, Winget's says that Chase forfeited its rights under Winget's Pledge of PIM by delaying in liquidating other collateral.  This is referred to as the "Delay Defense".  As will be explained, both defenses fail as a matter of law. The Enforceability Defense fails because it conflicts with the plain language of the

5

pledge.  The Delay Defense fails essentially because it is based on a misreading of the Last Resort Provision and is barred by res judicata.

In short, after months of discovery and multiple filings, the only issue for trial, as the Court previously stated, is whether Chase has satisfied the Last Resort Provision. The only factual question raised by that issue is "whether there is any more 'other collateral' that Chase has not yet made reasonable efforts to collect on which remains unliquidated."  (Doc. 321 at p. 7).

### B.  Factual Background

Chase, through its predecessors, was the Administrative Agent for a group of lenders that extended credit to Venture under a Credit Agreement dated May 27, 1999. As part of the October 2002 Eighth Amendment to the Credit Agreement, Winget executed a Guaranty of the Venture debt.  Winget pledged certain stock as collateral to support the Guaranty, including the stock of PIM.  The Eighth Amendment also included a separate guaranty of the Venture debt by PIM, which was supported by pledges of stock, including that of BV.

Venture defaulted on the loan in 2003 when it filed a Chapter 11 bankruptcy petition.  Deluxe filed a Chapter 11 bankruptcy petition in 2004.  Both Venture's and Deluxe's bankruptcy cases were subsequently converted to Chapter 7 proceedings, and bankruptcy trustees were appointed.  The Venture and Deluxe bankruptcy proceedings have largely been wound down.  See In re NM Holdings Co., LLC, No. 03-48939 (E.D. Mich. Bankr.; In re Deluxe Pattern Corp., No. 04-54977 (E.D. Mich. Bankr.).  As of August 31, 2012, more than $425,113,115.59 in principal remains on the Venture debt after accounting for distributions from the bankruptcy proceedings.

6

To recover the debt, Chase seeks to enforce Winget's Guaranty and Pledges, including the Winget-PIM Pledge and therefore filed this action.[4]  In order to do so, Chase must satisfy the Last Resort Provision in the Winget-PIM Pledge.  The provision states in relevant part:

> Notwithstanding anything herein or elsewhere to the contrary, the Agent shall not exercise any rights or remedies under this Pledge Agreement until all reasonable efforts shall have been made by it to collect the Obligations from other collateral held by the Agent (other than the stock of [P.I.M. Management Company], Venture Asia Pacific (Pty) Ltd., Venture Holdings B.V. or Venco #1, L.L.C.), it being intended that the Collateral provided by this Pledge Agreement [ . . . ] shall be realized upon by the Agent only as a last resort.

All of the other Collateral were assets of Venture and Deluxe, and were therefore subject to the Venture and Deluxe bankruptcy proceedings.  In spring 2005, the Venture and Deluxe debtors-in-possession sold their operating assets as  going concern (the "Operating Assets Sale").  The Operating Assets Sale was carried out under an Asset Purchase Agreement, and the buyer acquired all of Venture's and Deluxe's assets except for those specifically excluded under the Agreement (the "Excluded Assets").  The bankruptcy court approved the sale; it closed on May 2, 2005.

_____

[4]As noted in a prior decision, see Doc. 48 at p. 2 n. 2, this is the second lawsuit filed by the Chase against Winget regarding the guaranty.  On October 28, 2005, Chase filed a two count complaint for (1) specific performance and (2) declaratory judgment. JP Morgan v. Winget, No. 05-74141.  Under Count I, Chase sought to inspect Winget's financial records relating to Venture and affiliated companies, particularly PIM and Venco, pursuant to Section 11 of a Guaranty with Winget.  Chase essentially sought to monitor the value of its collateral under the Guaranty.  Under Count II, Chase asked the Court to declare the rights of the parties under two Pledge Agreements between the Agent and Winget as to PIM and Venco. The Court granted judgment to Chase on Count I and dismissed Count II.  Winget appealed.  The Court of Appeals for the Sixth Circuit affirmed.  JP Morgan v. Winget, No. 07-1096 (6th Cir. Dec. 14, 2007) .

After the Operating Assets Sale closed, the Excluded Assets were the only remaining Other Collateral for purposes of the Last Resort Provision.  The Excluded Assets of any value were:

    a. Real property located in Seabrook, New Hampshire ("Seabrook");

    b. Real property located in Portland, Indiana ("Portland");

    c. A distribution by Peguform UK Limited, a non-debtor affiliate of Venture, made in connection with its liquidation in Europe (the "Peguform Distribution");

    d. A settlement of pre-bankruptcy litigation with Valeo, a French firm (the "Valeo Settlement");

    e. A judgment against Autoliv, ASP in pre-bankruptcy litigation before this Court (the "Autoliv Judgment");

    f. Tax refunds (the "Tax Refunds");

    g. Claims against Winget and his affiliates held by Venture (the "Venture Claims");

    h. Claims against Winget individually and his affiliates held by Deluxe (the "Deluxe Claims").

Of these Excluded Assets, only Seabrook and Portland were tangible assets which could be sold; the others were cash (or cash equivalents) or contingent litigation claims.

The Excluded Assets were disposed of as follows:

    Seabrook: The Venture debtor-in-possession agreed to a sale of Seabrook, and the bankruptcy court entered an order approving the sale on May 4, 2005. Chase received a distribution of $13,882,131.17 from the proceeds.

    Portland: The Venture debtor-in-possession and the Venture trustee unsuccessfully tried to sell Portland for years. Two proposed sales of Portland, each for $250,000, were approved by the bankruptcy court, but each time the buyer refused to close.  In February 2012, the Venture trustee filed a motion to abandon Portland.  The bankruptcy court granted the motion on March 8, 2012.

    The Peguform Distribution and Valeo Settlement: On July 21, 2006, Chase filed a motion to lift the stay ad asked the bankruptcy court to order the Venture

8

trustee to release funds received from the Peguform Distribution and from the Valeo Settlement. The bankruptcy court granted the motion on September 19, 2006. Chase received a distribution of $3,452,283.58.

The Autoliv Judgment: The Autoliv Judgment was entered in Venture's favor in 2003, and after an extensive appeal process, the undersigned entered four orders from December 2007 to June 2009 authorizing the distribution of, in total, $31,676,974.80 to Chase, and of $5 million to Drew, Cooper & Anding, Winget's current counsel. Venture Indus. Corp. v. Autoliv ASP Inc., No. 99-75354, Doc. 400 (E.D. Mich.).)

The Tax Refunds: The Venture bankruptcy trustee distributed $407,557.43 from the Tax Refunds to Chase.

The Venture Claims: The Venture debtor-in-possession and bankruptcy trustee pursued claims against Winget individually and his affiliates regarding, inter alia, alleged misappropriations of funds and unpaid receivables. Winget settled these claims, and the settlement was approved by the bankruptcy court on June 23, 2011. No proceeds from the settlement were distributed to Chase.

The Deluxe Claims: The Deluxe debtor-in-possession and bankruptcy trustee, too, pursued claims against Winget individually and his affiliates regarding, inter alia, alleged misappropriations of funds and unpaid receivables. Chase loaned up to $1 million to the Deluxe trustee to fund the prosecution of this litigation. However, on January 24, 2012, counsel for the Deluxe trustee advised Chase that the trustee was no longer pursuing these claims for a variety of reasons.

### C. Winget's Defenses

### 1. The Enforceability Defense

Winget argues that the Winget-PIM Pledge became unenforceable once the PIM-BV Pledge was executed. Winget has variously stated that the Winget-PIM Pledge was "discharged", "satisfied", and "replaced" by the PIM-BV Pledge. Winget has also said the Winget-PIM Pledge was a temporary "placeholder" until the PIM-BV Pledge was executed and otherwise contended that the Winget-PIM Pledge was "functus officio." Winget has presented two versions of this defense, arguing both that the Pledge unambiguously provides for this result, and that the Pledge is ambiguous and

9

this result was the parties' intent

The enforceability of the Winget-PIM Pledge is a legal question of contract

interpretation.  See Whitesell Corp. v. Whirlpool Corp., 2012 WL 3631491 at *2 (6th Cir.

Aug. 23, 2012).  As explained, below, the Winget-PIM Pledge is enforceable.

First, there is no language in the Winget-PIM Pledge which provides for, or could

reasonably be construed to provide for, the Pledge to become unenforceable once the

PIM-BV Pledge was executed. Rather, the Winget-PIM Pledge is unambiguously

enforceable.  Section 2 of the Winget-PIM Pledge states:

> The Pledgor [Winget] grants to the Agent [Chase] a security
> interest in the Collateral [the stock of PIM] to secure payment of
> the Obligations [Venture's debt]. The Collateral . . . shall be
> delivered to the Agent together with appropriate stock powers duly
> executed in blank.

This language creates a pledge of PIM's stock in support of Winget's Guaranty.  The

effectiveness of the pledge is subject only to the other provisions of the Pledge

Agreement.  Section 3.2, states that "this Pledge Agreement . . . creates a security

interest which is enforceable against the Pledgor in all of the Collateral . . . strictly

subject to the limitations and restrictions described below".  Thus, the viability of

Winget's Enforceability Defense is dependent on finding a provision of the Winget-PIM

Pledge which says that the Pledge becomes unenforceable once the PIM-BV Pledge

was executed.  There is no such provision either in words or phrases or by implication.

The Winget-PIM Pledge explicitly addresses the circumstances under which it can

become, in Winget's words, "discharged."  Section 7.14, titled "Termination," states:

> This Pledge Agreement shall continue in effect (notwithstanding
> the fact that from time to time there may be no Obligations or
> commitments therefor outstanding) until no Obligations or

10

commitments by the Agent which could give rise to Obligations
ding, except as provided in Section 10.

Section 10, in turn, states in relevant part:

> [I]n the event that (I) the Agent receives for application on the
> Obligations an amount of not less than $50,000,000 from the sale
> or financing of the Pledgor's Australia or South Africa operations
> or from one more outside sources . . . the obligations of the Pledgor
> hereunder shall be deemed satisfied and the pledge created hereby
> shall be terminated.

A reading of these sections leads to the conclusion that the Winget-PIM Pledge
is effective and enforceable unless Winget pays Chase $50 million. This section makes
no allowance for any type of unenforceability upon execution of the PIM-BV Pledge.
Winget's argument is inconsistent with these provisions, and there is no ambiguity that
could reasonably allow the result he seeks. The Eighth Amendment itself confirms the
plain language of the Winget-PIM Pledge. The Eighth Amendment explicitly states that
Chase's collateral includes both the stock of PIM and the stock of BV. It states, that the
collateral includes "a pledge of 100% of the Capital Stock of each Affiliate Guarantor
[defined to include PIM]" and "a pledge of 65% of the Capital Stock of Venture Holdings
B.V.").) The Last Resort Provision also lists the stock of PIM and of BV as Chase's
collateral.

Winget, to avoid these liabilities, relies on selective portions of Section 12 of the
Winget-PIM Pledge and attempts to inject extrinsic evidence. Section 12 states in full:

> 12. NO INTERFERENCE WITH NON-PLEDGED BUSINESS
> OR ASSETS.
> The Agent acknowledges and agrees that the purpose of this
> Pledge Agreement is to allow a pledge of the Issuer's shares for the
> sole purpose of obtaining security in the shares of Venture
> Holdings B.V. and Venture Asia Pacific (Pty) Ltd. which are held
> by the Issuer. The Agent acknowledges that the Issuer owns other

11

assets and conducts other business (the "Other Assets") which the Agent has no rights in under this Pledge Agreement or otherwise except for that of Venture Holdings B.V., and Venture Asia Pacific (Pty) Ltd. Therefore, the Agent agrees to not interfere with the Issuer (i) operating its business, (ii) disposing, transferring, or encumbering its Other Assets, and (iii) to reasonably cooperate with the Pledgor and the Issuer in consummating any transaction in which the Pledgor proposes to separate the Other Assets from the assets of the Issuer. The obligations of the Agent under this Section continue even after any Default of the Pledgor and after any Default of the Borrower or any other obligor under the Credit Agreement.

Winget relies on the "sole purpose" language from this Section to argue that the Winget-PIM Pledge was intended to secure Chase's rights only until PIM executed its pledge of BV.  Section 12 does not provide for the unenforceability of the Winget-PIM Pledge.  Rather, a full reading of Section 12 leads to the conclusion that he "sole purpose" language is an explanatory preface to restrictions on Chase's actions in collecting on the Pledge; it does not limit the Pledge's duration or enforceability. Section 12 actually contemplates enforcement of the Winget-PIM Pledge by requiring that, when Chase takes control of PIM's stock, it cooperate in transactions to transfer non-BV assets from PIM.  The complete text of Section 12—in addition to the clear language of Sections 7.14 and 10, established that Winget's Enforceability Defense is not tenable.[5]  Winget's arguments to the contrary are simply not persuasive.

## 2. The Delay Defense

---

[5]Chase argues that Winget's Enforceability Defense fails on procedural grounds, contending that the Court previously rejected the defense in prior rulings and Winget failed to plead the defense.  In light of finding that the defense fails on the merits, i.e. based on the relevant language in the Pledges, it is not necessary to address these arguments.

Chase says that it is entitled to summary judgment on Winget's Delay Defense because (1) it is barred by res judicata, (2) it is inconsistent with the language of the Last Resort Provision, (3) it was waived in the Guaranty.  Each argument is addressed in turn below.

### a.  Res Judicata

Winget's Delay Defense is that Chase breached the Last Resort Provision by delaying liquidation of Venture's and Deluxe's assets—the Other Collateral—thereby lowering their value.  As stated above, every Excluded Asset was an asset of the Venture or Deluxe bankruptcy estates, and their disposition was subject to the bankruptcy process.  As described above, most of the Excluded Assets were disposed of in accordance with bankruptcy court orders, and one was disposed of by order of this Court.  At bottom, Winget's Delay Defense is a challenge to these orders, as well as an order from the Sixth Circuit.  Res judicata bars Winget from challenging their disposition.

In the 2006 case before this Court, cited below, Winget argued that Chase delayed the sale of the Operating Assets and destroyed their value.  The Court and the Sixth Circuit held that this claim was barred by the res judicata effect of the bankruptcy court order approving the sale of the Operating Assets.  The Sixth Circuit explained, "Winget's claims attacked the heart of the Sale Order:  the value of the assets. Those claims should only have been brought before the bankruptcy court issued the Sale Order."  Winget v. JPMorgan Chase Bank, N.A., 537 F.3d 565, 580 (6th Cir. 2008) (referring to Venture Bankr. Doc. 3222 (Operating Assets Sale Order)).

Again, the Court, in the August 1, 2012, order denying Winget's motion to compel , stated:  "In the 2006 case, the Court and the Sixth Circuit both held that res judicata

13

bars [Winget's delay] claim. The same result applies here. Events prior to May 2, 2005, the date the Venture bankruptcy sale [the Operating Assets Sale] closed, are not relevant to the issue which is the subject of Counts II and III." (Doc. 321 at p. 8.)

After the August 1 Order, Winget backed away from challenging the Operating Assets and asserted the Delay Defense against the Excluded Assets, i.e., those assets of the Venture and Deluxe bankruptcy estates that were not included in the Operating Assets Sale. Winget's contention does not carry the day for him. The Excluded Assets, like the Operating Assets, were disposed of as described above. Winget cannot again challenge the disposition of the Excluded Assets.

### b. The Last Resort Provision

Chase says that Winget's Delay Defense also fails because it is premised on a misinterpretation of the Last Resort Provision. The Last Resort provision is set forth above and repeated below in pertinent part::

> Notwithstanding anything herein or elsewhere to the contrary, the Agent shall not exercise any rights or remedies under this Pledge Agreement until all reasonable efforts shall have been made by it to collect the Obligations from other collateral held by the Agent (other than the stock of [P.I.M. Management Company], Venture Asia Pacific (Pty) Ltd., Venture Holdings B.V. or Venco #1, L.L.C.), it being intended that the collateral provided by this Pledge Agreement [ . . . ] shall be realized upon by the Agent only as a last resort.

The Court has spoken on the meaning of the Last Resort Provision in its August 1 order, explaining that Chase's satisfaction of the Provision depended on "whether there is any more 'other collateral' that Chase has not yet made reasonable efforts to collect on which remains unliquidated." (Doc. 321 at p. 7.)

There is no need to deviate from this interpretation. The provision is a timing

14

requirement that ensures that Winget's pledges are the last collateral in line for collection.  This is made clear from the last clause, which states that the parties "intended that the [Pledge] shall be realized upon by the Agent only as a last resort" It is also supported by the statement that "the Agent shall not exercise any rights . . . until all reasonable efforts shall have been made by it to collect the Obligations from other collateral."  The Eighth Amendment confirms this interpretation.  Section 5.9(e) of the Eighth Amendment states in relevant part that the Pledge "shall be enforceable only following collection efforts against [Venture and the other guarantors]." The Last Resort Provision is simple:  Chase can enforce the Pledge after it has made a reasonable effort to collect on the other collateral.

Thus, Winget's contention that a delay in liquidating any of the Other Collateral—whether the Operating Assets or the Excluded Assets—is a breach that bars Chase from collecting on Winget's pledges falls flat.  Nothing in the Last Resort Provision condition Chase's rights on receiving "optimal" liquidation value—to be judged in hindsight—for every item of Other Collateral.

### c.  The Winget Guaranty

Winget's Delay Defense also fails because it was waived in the Guaranty.

Section 4 of the Guaranty states in relevant part:

> [T]he obligations of the Guarantor hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by . . . (iii) . . . any action or failure to act by the Administrative Agent . . . (vii) . . . or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge [of Winget's obligations].

Any argument about alleged delays in liquidating the Other Collateral falls within

15

this waiver, and therefore fails as a matter of law.  Cf. <u>Citizens Bank v.</u>

<u>Parnes</u>, 376 F. App'x 496, 505 (6th Cir. 2010) (applying Michigan law and concluding

that a guaranty with similar language waived the defense that the creditor's actions

devalued the collateral).

### d.  Winget's Response Regarding the Delay Defense - Hyundai

Winget argues that his Delay Defense should go forward because of Chase's

actions in regard to a different "asset"– a 2003 proposal to manufacture parts for

Hyundai, which never proceeded beyond letters of intent.  Winget says that had Chase

supported the proposed joint venture, and had the joint venture ultimately been agreed

to, and had the joint venture been successful, then Venture would have been saved.

This contention is speculative at best and lacking in merit.  Winget cannot challenge the

Hyundai proposal because it was presented to the Bankruptcy court, and any claims

Winget had about the handling of the proposal should have been raised in that forum.

In other words, res judicata prevents Winget from now challenging any aspect of the

Hyundai proposal.  Furthermore, the defense conflicts with the plain language of the

Last Resort Provision because the proposal, which never came to fruition, is not

collateral "held by the Agent… which remains unliquidated."

### V.  Conclusion

For the reasons stated above, Winget's Enforceability and Delay Defenses are

not viable.  Chase's motion for summary judgment on these defenses is GRANTED.

Chase has been in this Court since 2005 seeking to enforce Winget's guarantee

of Venture's debt.  <u>See</u> n. 4, <u>supra</u>.  The dispute has moved forward slowly, sometimes

16

stalled.  What we have seen is an enormous amount of attorney effort to get to this day. While the issue for trial has been defined as "whether there is any more 'other collateral' that Chase has not yet made reasonable efforts to collect on which remains unliquidated," the reality of what is left is unclear. What is left for the Court to deal with before a final judgment enters will be discussed at a status conference on Tuesday, September 24, 2013 at 2:00 pm.  Prior to the conference, Chase shall file a proposed judgment on the summary judgment motion as well as advising the Court in advance of the conference as to what remains before the case is closed.

SO ORDERED.


 S/Avern Cohn                                    
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  August 21, 2013


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 21, 2013, by electronic and/or ordinary mail.


 S/Sakne Chami                       
Case Manager, (313) 234-5160