UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



JP MORGAN CHASE BANK, NA.,

      Plaintiff/Counter-Defendant,

-vs-

LARRY J. WINGET and the
LARRY J. WINGET LIVING TRUST,

      Defendants/Counter-Plaintiffs.

_____/

Case No. 08-13845
HON. AVERN COHN

## MEMORANDUM AND ORDER DENYING WINGET'S MOTION FOR COSTS AND ATTORNEY FEES (Doc. 524)

### I. Introduction

This case involves a commercial dispute. J. P. Morgan Chase (Chase) is the administrative agent for a group of lenders that extended $400,000,000 to Venture Holdings Company, LLC (Venture) under a credit agreement. In the complaint (Doc. 1), Chase sued Larry J. Winget (Winget) and the Larry J. Winget Living Trust (Winget Trust) to enforce a Guaranty and two (2) Pledge Agreements entered into by Winget and signed by Winget and the Winget Trust in 2002, guaranteeing the obligations of Venture. As will be explained, the Court entered a judgment in favor of Chase that enforced the Guaranty and Pledge Agreements against Winget and the Winget Trust, as co-extensive.

Before the Court is Winget's motion for attorney fees and costs under Rule 37(c)(2) on the grounds that Chase's responses to Winget's requests for admission

related to the liability of the Winget Trust are sanctionable.[1]  For the reasons that follow,

the motion is DENIED.

## II.  Background

### A.

The Guaranty and Pledge Agreements were part of the Eighth Amendment To

Credit Agreement.  Particularly, the Agent made three (3) claims:

| | |
|---|---|
| Count I | Enforcement of Guaranty Against the Winget Trust |
| Count II | Enforcement of Guaranty Against Winget |
| Count III | Enforcement of Pledge Agreements Against Winget and The Winget Trust |

As to Count I, Chase took the position that while the Guaranty was limited to $50

Million Dollars as to Winget, it was unlimited as to the Winget Trust.

The reformation issue related to Section 3 of the Guaranty, which reads in

relevant part:

> SECTION 3.  The Guaranty.  Subject to the last paragraph of this Section 3, the Guarantor hereby and unconditionally guarantees, as primary obligor and not as surety, the full and punctual payment. . .of the Guaranteed Obligations. . .
>
> . . .Notwithstanding anything herein or elsewhere to the contrary, *no action will be brought for the repayment of the Guaranteed Obligations* under this Guaranty and no judgment therefore will be obtained or enforced *against Larry Winget other than with*

---

[1]Also before the Court is Chase's motion for attorney fees (Doc. 533).  At the hearing on both Winget and Chase's motions, the Court directed Chase to file a supplemental paper in support of its motion, to which Winget may file a reply.  Following receipt of the supplemental filings, the Court will issue a separate decision on Chase's motion.

*respect to the Pledged Stock* in accordance with the
provisions of the related pledge agreements[.]

Winget filed a motion for judgment on the pleadings, contending that the Winget

Trust was not separately liable.  Chase responded, contending that the unambiguous

language of Section 3 established that only Winget's liability, not the Winget Trust's,

was limited to $50 Million Dollars.  The Court agreed with Chase and denied Winget's

motion.  (Doc. 29).

Thereafter, Winget filed a counterclaim seeking reformation of Section 3 of the

Guaranty.  The Court bifurcated the counterclaim and set it down for separate trial.  For

eight days in August, 2012, the issue of reformation was tried to the Court.  Ultimately,

the Court ruled in favor of Winget and reformed Section 3 to limit the Trust's liability to

that of Winget's.  (Doc. 365).  As a result, Count I (as reformed) and Count II called for

effectively the same liability.

B.

Following the decision on reformation, Winget twice tried to recoup its attorney

fees and costs associated with litigating the reformation issue.  Winget filed a motion for

sanctions under § 1927 against William Burgess and a motion for Rule 11 sanctions.

(Docs. 380, 356).  The gravaman of both motions was that once discovery on

reformation was complete, and the case ready for trial, Chase should have seen the

futility of going forward and should have conceded reformation, limiting the Winget

Trust's liability to $50 Million Dollars, and that Chase's failure to so acknowledge was

sanctionable conduct.  The Court denied both motions, finding them lacking in merit

because the record showed the issue of reformation was fact intensive and that

3

Chase's position, although ultimately not successful, was not sanctionable. (Docs. 477, 478).

C.

Meanwhile, the parties were moving the case towards entry of a final judgment on Chase's claims. To that end, the parties engaged in extended and contentious discovery and disagreed over the issues for trial on the complaint. This culminated in Chase filing a motion for summary judgment on Winget's enforceability and delay defenses. (Doc. 391). The Court granted the motion. (Doc. 450). Chase contended that the decision on reformation and the elimination of Winget's defenses resolved all outstanding issues of fact and law and as a consequence filed a motion for entry of judgment. (Doc. 454). The Court agreed and granted Chase's motion. (Doc. 470). That left open the matter as to the form of judgment. The Court gave Winget an opportunity to propose changes to the text but not the substance of Chase's proposed judgment. Winget filed objections and proposed "corrections" to the proposed judgment. (Doc. 474). Chase responded. (Doc. 480). Winget replied. (Doc. 484). The Court eventually entered a Final Judgment in the form requested by Chase. (Doc. 487) and a Memorandum stating the reasons for entry of the judgment. (Doc. 488). Chase appealed the reformation decision. (Doc. 489). Winget cross appealed the Final Judgment as well as several orders, including the order denying Rule 11 and § 1927 sanctions. (Doc. 505). The appeals are pending in the Sixth Circuit.

III. The Motion

Now before the Court is Winget's third attempt at obtaining its costs and attorney fees related to the reformation issue. Winget moves under Fed. R. Civ. P. 37(c)(2) and

4

seeks attorney fees and expenses in the amount of $742,980.32.  Winget says that

Chase's refusal to admit any of Winget's Request for Admission pertaining to

reformation constitutes sanctionable discovery conduct meriting an award of attorney

fees under Rule 37(c)(2).  As Winget puts it:

> Chase's denials necessarily and needlessly increased the costs and fees
> associated with proving the denied propositions ultimately at the heart of the
> Court's Decision on Reformation, which found, as Winget asked Chase to admit,
> there was "no evidence" beyond the language of the Guaranty itself that the
> parties intended the Trust provide an unlimited guaranty.  Under such
> circumstances, attorney fees incurred in proving up the denied propositions must
> be awarded under Rule 37(c)(2).

(Doc. 524 at p. 2-3).

> Chase, for its part, says that

> In their September 2012 Rule 11 motion, Defendants Larry J. Winget and the
> Larry J. Winget Living Trust (collectively, per the court's request, "Winget")
> sought to recover the costs of extensive discovery, trial preparation, and a two
> week trial on the theory that Chase should have admitted at the outset of the
> case that "the allegations set forth in Defendants' Counterclaim could not be
> legitimately denied." (Dkt. 355 at 3.)  That motion was denied as frivolous and
> poorly taken. (Dkt. 469 at 10.)  Yet Winget now seeks to recover a substantial
> portion of the same costs and fees, this time based on an even more fanciful
> assertion — that months of discovery and trial preparation, and even the trial
> itself, could have been avoided if Chase had only conceded a handful of
> Requests for Admission.  But for those failures to admit, Winget asserts, this
> case would have been resolved at summary judgment and with substantially
> reduced discovery.

(Doc. 527 at p. 1).

While admittedly the standards for sanctions under Rule 11 and § 1927 are more

stringent than Rule 37,[2] Winget's third attempt must suffer the same fate as its prior

---

[2]As Winget points out, Rule 37(c)(2) and Rule 11 have distinct purposes and
different burdens of proof.  Simply because the Court denied Rule 11 sanctions does
not necessarily preclude an award of attorney fees under Rule 37(c)(2).

attempts.  There is no basis under Rule 37 to award attorney fees and costs associated with litigating the reformation issue.  Even with the benefit of hindsight, the Court cannot say that Chase's discovery responses were so out of line as to merit sanctions.

### IV.  Legal Standard

Rule 36 provides that "[a] party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:  (A) facts, the application of law to fact, or opinions about either."  Fed. R. Civ. P. 36.  The purpose of the rule "is to require admission of matters which ought to be admitted, or which will not be disputed at the trial, so that the time, trouble and expense required to prove them may be avoided." Metro. Life Ins. Co. v. Carr, 169 F. Supp. 377, 378 (D. Md. 1959); see also United States v. Smith, 42 F.R.D. 338, 339 (W.D. Mich. 1967) ("The spirit and purpose of the Rule is that all undisputed contentions are to be admitted to limit the issues before reaching the trial stage."); Moosman v. Joseph P. Blitz, Inc., 358 F.2d 686, 688 (2d Cir. 1966) ("the purpose of Rule 36 is to expedite trial by removing uncontested issues"); T. Rowe Price Small–Cap Fund, Inc. v. Oppenheimer & Co., Inc., 174 F.R.D. 38, 42 (S.D.N.Y. 1997) ("The purpose of the rule is to reduce the costs of litigation by eliminating the necessity of proving facts that are not in substantial dispute, to narrow the scope of disputed issues, and to facilitate the presentation of cases to the trier of fact." (citing Donovan v. Carls Drug Co., Inc., 703 F.2d 650, 652 (2d Cir.1983) (Rule 36 admissions may narrow issues and speed the resolution of claims)) (additional citations omitted)).

An "answering party may assert lack of knowledge or information as a reason for failing to admit or deny" but "only if the party states that it has made reasonable inquiry

6

and that the information it knows or can readily obtain is insufficient to enable it to admit

or deny." Fed. R. Civ. P. 36. "What constitutes 'reasonable inquiry' and what material

is 'readily obtainable' is a relative matter that depends upon the facts of each case." T.

Rowe Price, 174 F.R.D. at 43. The "rule requires only that the answering party make

reasonable inquiry and secure such knowledge and information as are readily

obtainable by him." Fed. R. Civ. P. 36, Advisory Committee Notes to 1970 Amendment.

When a party does not comply with the dictates of Rule 36, Rule 37(c)(2),

provides for sanctions:

> If a party fails to admit what is requested under Rule 36 and if the requesting
> party later proves ... the matter true, the requesting party may move that the
> party who failed to admit pay the reasonable expenses, including attorney's fees,
> incurred in making that proof. The court must so order unless: (A) the request
> was held objectionable under Rule 36(a); (B) the admission sought was of no
> substantial importance; (C) **the party failing to admit had a reasonable
> ground to believe that it might prevail on the matter**; or (D) there was other
> good reason for the failure to admit.

Fed. R. Civ. P. 37 (emphasis added).

## V. Analysis

### A.

They key question is whether Chase had a good-faith basis for denying the

Requests for Admission at issue. It did. The Requests for Admission (RFA) at issue

asked Chase to admit in a broad fashion that certain documents did not exist and were

all prefaced with the following language: "Admit that no Document known to Agent,

other than a Documents listed in Appendices A and B hereto . . . . " In other words, the

RFAs themselves already accounted for the fact that Chase contended that there were

documents (listed in Appendices A and B) that it believed supported its position on the

7

liability of the Winget Trust. In broad terms, the RFAs asked Chase to admit that there was:

1. "No Document known to [the] Agent," (e.g. Requests for Admission "RFA" 10, 12, 18) that

2. "expressed any intent" (e.g., RFA 5, 13), or "expressed an understanding" (e.g., RFA 17), or "include[d] an admission, assertion or declaration" . . . (e.g., RFA 20)

3. by the Agent

4. that the Trust's obligation differed from Winget's (e.g., RFA 10), or that the Trust's obligations or liability under the Guaranty should be unlimited and with full recourse (e.g., RFA 12), or that the Agent had an unconditional, unlimited, and absolute right against the Trust under the Guaranty (e.g., RFA 20).

(Doc. 524-3.)

Chase denied each RFA.

Attached as Exhibit A is a chart Winget presented at the hearing on its motion. The chart sets forth the RFAs, broken down into categories of "documents," "communications," and "disclosures." The chart links the RFAs to statements from the Court's reformation decision in which it found that there were no documents, communications, or disclosures that could be said to have expressed and intent or shown that the Winget Trust had unlimited liability. Winget says that because the Court found no such documents, communications or disclosures existed, Chase acted wrongfully in denying that such documents existed.

8

B.

To understand the issue, some background discussion is in order. Early in discovery, Chase pointed Winget to a large number of documents that fit these descriptions: the documentation of the Trust's Guaranty supporting the Black Diamond Debtor In Possession ("DIP") loan, which was negotiated, drafted and executed between October 2003 and January 2004. These documents tended to show that Chase believed its rights were as expressed in the language of the Guaranty which, as the Court originally found, plainly limited only Winget's liability, not the Trust's. In other words, Chase relied on the plain language of the Guaranty which stated, as the Court originally found, that the $50 Million Dollar limitation applied only to Winget and not the Winget Trust.

Moreover, and significantly, Winget asserted its position as to the Trust's liability only after being granted leave to amend its answer to assert a counterclaim for reformation. (Doc. 40). Reformation was not an original thought by Winget. Moreover, the issue of reformation depended on weighing the credibility of the witnesses and carefully examining the various drafts of the Guaranty. There is nothing in Chase's responses to the RFAs that truly touched on the heart of the reformation issue as presented to the Court. In other words, there was not a direct and clean line from Chase's RFA denials to Winget's costs and expenses incurred in connection with the reformation issue.

Winget also sought multiple depositions, prior to serving the RFAs. Winget's discovery requests were aimed at obtaining information related to the various drafts of the Guaranty. Winget understood that information related to the parties' understanding

9

and intent of the Guaranty was critical to making the case for reformation. This information is independent of the non-existence of documents in the RFAs. Indeed, it was the drafts of the documents and witness testimony regarding the drafts that was critical to resolving the reformation issue. For Winget to now say that if Chase had only admitted the RFAs that no other evidence was necessary to prevail on his claim for reformation simply proves too much.

The same is true of Winget's contention that had Chase admitted the requests at issue, he would not have withdrawn his motion for summary judgment. See Doc. 212. Winget withdrew the motion based on a belief, which the Court shared, that proceeding to trial was appropriate in light of the record presented by Winget and Chase's summary judgment motion. See Doc. 216. Thus, the expenses incurred due to Winget's decision to withdraw the summary judgment motion cannot be attributed to Chase's responses to the RFAs.

Finally, the requests at issue were not aimed at obtaining an admission that there were no documents that expressed Chase's understanding as to the Trust's liability. Rather, as Winget says, they were aimed to "seek admissions, apart from those transactions and drafting documents." (Doc. 524 at p.4). Chase knew of no other documents of the type described. Moreover, Winget did not follow up Chase's denials with an additional discovery request. While Winget contends he did follow up because the RFAs also contained interrogatories related to the RFAs, this is not sufficient. Winget did not request additional discovery after receiving the RFAs.

10

Having concluded that Winget is not entitled to relief under Rule 37, the Court finds no reason to address Chase's argument that Winget's motion is untimely nor the argument that Winget has not adequately supported the amount of attorney fees and costs refunded.

SO ORDERED.

_____
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  10/1/14
Detroit, Michigan

11

EXHIBIT A

# Requests for Admission — DENIED

**RFA's** 4, 12, 16, 20, 26

No Documents
Re: Unlimited



**DKT.** 365, p. 10

• No PCR's/CAS's
• No Correspondence
• No Mention: EYCF
• No Mention: Bankruptcy

**RFA's** 5, 9, 13, 17, 21, 24, 26

No Communications
to Others Re: Unlimited

**DKT.** 365, p. 10 and Finding
Nos. 3, 13, 23, 37, 41

• No Distinction
• No Intent: Unlimited
• All Limited to $50 MM

**RFA's** 32, 33, 34, 35

No Disclosure
to Lenders Re: Unlimited

**DKT.** 365, p. 10 and
Finding No. 42

• No Communication
• No Analysis