UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JPMORGAN CHASE BANK, N.A.,

     Plaintiff/Counter-Defendant,                   Case No. 08-13845

v.

                                         HON. AVERN COHN

LARRY J. WINGET and the
LARRY J. WINGET LIVING TRUST,

     Defendants/Counter-Plaintiffs.

_____/

**<u>MEMORANDUM AND ORDER</u>**
**<u>STAYING PROCEEDINGS ON CHASE'S CHASE'S SUPPLEMENTAL MOTION FOR</u>**
**<u>COSTS AND EXPENSES OF COLLECTION PURSUANT TO FINAL JUDGMENT</u>**
**<u>(Doc. 709)</u>**
**<u>AND</u>**
**<u>GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. 699)</u>**
**<u>AND</u>**
**<u>GRANTING CHASE'S MOTION TO COMPEL COMPLIANCE WITH COURT ORDER</u>**
**<u>(Doc. 719)</u>**
**<u>AND</u>**
**<u>GRANTING CHASE'S MOTION TO COMPEL (Doc. 720)[1]</u>**

## I. Introduction

In the words of Judge Batchelder, [b]efore [the Court] is the latest episode in a longstanding saga that must now come to a close." <u>JPMorgan Chase v. Winget</u>, 15-1924 (6th Cir. Feb. 6, 2017). Regrettably, this commercial dispute resists closure. J. P. Morgan Chase (Chase) is the administrative agent for a group of lenders that extended credit to Venture Holdings Company, LLC (Venture) under a credit agreement. In 2008, Chase sued Larry J. Winget (Winget) and the Larry J. Winget Living Trust (Winget

---

[1]Upon review of the parties' papers, the Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(2).

Trust) to enforce a Guaranty and two (2) Pledge Agreements entered into by Winget and signed by Winget and the Winget Trust in 2002, guaranteeing the obligations of Venture. As will be explained, the Court entered a judgment in favor of Chase that enforced the Guaranty and Pledge Agreements against Winget and the Winget Trust, as separately liable. It also entered an order awarding Chase attorney fees and costs incurred in connection with enforcing the Guaranty. As will also be explained, following the revelation that Winget transferred all of the Winget Trust's assets to Winget, Chase has claimed that the transfer was fraudulent.

Before the Court are the following motions:

Chase's Supplemental Motion for Costs and Expenses of Collection Pursuant to Final Judgment (Doc. 709)

Chase's Motion for Judgment on the Pleadings (Doc. 699)

Chase's Motion to Compel Compliance with Court Order (Doc. 719)

Chase's Motion to Compel (Doc. 720)

For the reasons that follow, Chase's motion for costs and expenses will be held in abeyance pending a ruling from the Court of Appeals for the Sixth Circuit on Winget's appeals.

Chase's motion for judgment on the pleadings will be granted as to liability only on its constructive fraud claim.

Chase's motions to compel will be granted.

## II. Chase's Motion for Costs and Expenses

### A. Relevant Background

After years of litigation and multiple appeals, the Court entered an Amended

Final Judgment against Winget and the Winget Trust in the amount of $425,113,115.59 and limiting Chase's recourse as to Winget as to $50 million as provided for in the Guaranty (Doc. 568). Winget appealed the Amended Final Judgment. The Court of Appeals for the Sixth Circuit affirmed. JP Morgan Chase v. Winget, No. 15-1924 (Feb. 6, 2017).

The Court also issued an order awarding Chase $11,154,874.65 in attorney fees and expenses (Fee Order) associated with its efforts to enforce the Guaranty and Pledge Agreements through May 31, 2015. (Doc. 671). Winget and the Winget Trust have appealed the Fee Order.

Winget then moved for partial satisfaction of the Amended Final Judgment, contending that his payment of $50 million satisfied the Fee Order (Doc. 672). The Court denied the motion (Satisfaction Order). (Doc. 683). Winget and the Winget Trust have appealed the Satisfaction Order.

Winget's appeal of Fee Order and the Satisfaction Order was heard by the Court of Appeals for the Sixth Circuit on June 13, 2017.

During the pendency of these appeals, Chase has moved for the costs and expenses incurred since the issuance of the Fee Order in the amount of $2,000,316.24, which it says is the amount of costs and expenses incurred by Chase for the services of Sidley Austin LLP and Dickinson Wright PLLC between June 1, 2015 and November 30, 2016.

In response, Winget argues:

I. The Court should refrain from deciding this motion until the Sixth Circuit has decided Winget and the Trust's pending appeal of the Fee Order and Satisfaction Order

3

II. Chase should not be awarded expenses related to the prosecution of its fraudulent transfer claim

III. Chase's attorneys' hourly rates grossly exceed the prevailing market rate and should be significantly reduced

IV. Chase's attorneys' hours are excessive and reflect duplicative work and over-staffing

V. Chase's attorney and paralegal rates are excessive and inappropriate to the extent they charge professional rates for administrative tasks

VI. Chase's fees should further be reduced to exclude excessive, inappropriate or otherwise unrecoverable "expenses," including research fees, travel costs, fees associated with inappropriate collection actions taken by Chase, vague entries, redacted invoices

In reply, Chase argues:

I. There Is No Basis for a Stay Pending Resolution of Winget's Appeal of this Court's Prior Ruling on Costs and Expenses

II. Chase Is Entitled to All Costs and Expenses Incurred in Collecting the Guaranteed Obligations from the Trust

III. The Court Has Already Determined that the Rates Incurred and Paid by Chase are Reasonable

IV. Winget's Argument that Chase's Attorneys' Hours Reflect Duplicative Work and Overstaffing Is Unsupported

V. Chase Is Entitled to Recover the Time Spent by Paralegals

VI. Winget's Other Proposed Reductions Are Without Merit

## B. Discussion

Winget and the Winget Trust's argument that the Court should stay a ruling on

Chase's motion pending the outcome of the appeal has merit. In opposing a stay,

Chase says:

Winget cannot wield an appeal to delay Chase's collection of the fees and expenses he is obligated to pay. At most, the Sixth Circuit will have ruled by the

4

time the Court decides this Motion and will provide guidance, or, the Sixth Circuit will have not ruled and Winget can seek to have any appeal consolidated with an appeal from the resolution of this motion. In either case, delay is not warranted.

(Doc. 718 at p. 6).

The problem for Chase is that the Sixth Circuit has not yet ruled on the appeals but the appeals have been submitted. So, there is no guidance from the Sixth Circuit and consolidation at this point is not an option. It would not be prudent for the Court to award Chase additional costs and expenses under the circumstances. In the event of a reversal of the Fee Order and/or Satisfaction Order, Chase would have to modify its request.

That said, the Court does note that Winget and the Winget Trust's additional arguments are not likely to carry the day. As Chase notes, the Court has already found the attorney hourly rates reasonable. The Court has also already found that Chase is entitled to all of the costs of collection on the Amended Final Judgment which included prior cases. Chase's fraudulent conveyance claim which was necessarily precipitated by Winget's revocation of the Winget Trust is related to Chase's efforts to collect on the Amended Final Judgment. At best, Winget and the Winget Trust may be able to convince the Court that certain discrete entries are excessive or otherwise not recoverable. Even so, Chase's request would in all probability not be significantly reduced.

### III.  Chase's Motion for Judgment on the Pleadings

### A.  Relevant Background

After entry of the Amended Final Judgment, Chase began collection efforts under Michigan law, including issuing writs of garnishment and serving discovery on Winget

and the Winget Trust.  During these post-judgment proceedings, Chase learned that in January of 2014, Winget revoked the Winget Trust, a fact, as the Court has previously observed, Winget kept in pectore until Chase began collection efforts.

Following the revocation, in early 2015, Winget filed an action for declaratory relief, 15-13469, seeking a declaration that Chase has no further recourse against Winget, including assets that were once part of the Winget Trust.  Chase filed a counterclaim, asserting several claims which essentially boil down to the contention that Winget's revocation of the Winget Trust was a fraudulent transfer or conveyance. Because Chase's counterclaim was the functional equivalent of post-judgment proceedings in the 2008 case, the Court consolidated the 2015 and 2008 cases and directed all filings under the 2008 case.  (Doc. 686).

Chase moves for judgment on the pleadings on its counterclaim for constructive fraud only, contending that the "pleadings and certain judicial admissions" conclusively establish all of the necessary elements of a constructive fraudulent conveyance under Michigan law.

### B.  Legal Standard

A motion for judgment on the pleadings under Rule 12(c) uses the same pleading standard applicable under Rule 12(b)(6).  <u>See Wee Care Child Ctr., Inc. v. Lumpkin</u>, 680 F.3d 841, 846 (6th Cir. 2012)).  Thus, "[f]or purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  <u>Tucker v. Middleburg-Legacy Place, LLC</u>, 539 F.3d 545, 549 (6th Cir. 2008) (quoting <u>JPMorgan Chase Bank, N.A. v. Winget</u>, 510

F.3d 566, 581 (6th Cir. 2007)).  A motion under Rule 12(c) must be granted "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law."  Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 526 (6th Cir. 2006) (internal quotation marks omitted).  In evaluating a motion for judgment on the pleadings, the Court "may consider the pleadings, exhibits attached to the pleadings, matters incorporated by reference into the pleadings, and judicially-noticed facts."  Coleman v. Story, 2015 WL 4040750, at *2 (E.D. Mich. July 1, 2015).

## C.  Discussion

The Michigan Uniform Fraudulent Transfer Act (MUFTA) defines two types of fraudulent transfers.  The first are transfers made "[w]ith actual intent to hinder, delay, or defraud" a creditor and applies to transfers made either before or after the creditor's claim arose.  M.C.L. 566.34(1)(a).  Although Chase has alleged a claim of actual fraud, it has not moved for judgment on the pleadings on this claim.  Indeed, a determination of whether a debtor acted with intent is generally fraught with issues of fact.  See Dillard v. Schlussel, 308 Mich. App. 429 (2014).

The second, commonly called "fraud in law" or constructive fraud, deems certain transactions fraudulent regardless of the creditor's ability to prove the debtor's actual intent.  It applies only to transfers made after the creditor's claim arose.  It is this claim that Chase has moved for judgment on the pleadings.

The statute on constructive fraudulent transfers provides:

Sec. 5. (1) A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a

result of the transfer or obligation.

(2) A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

(3) Subject to section 2(2),1 a creditor making a claim for relief under subsection (1) or (2) has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

M.C.L. § 566.35

Under the MUFTA, a transfer of assets is constructively fraudulent if "(1) the creditor's claim arose before the transfer, (2) the debtor was insolvent or became insolvent as a result of the transfer, and (3) the debtor did not receive reasonably equivalent value in exchange for the transfer." Dillard, 308 Mich. App. at 457 (internal quotation marks omitted). The "actual intent of one who transfers assets to others without a fair consideration is unimportant where it leaves the transferor insolvent." Hudson v. Maher, 55 Mich. App. 90 (1974), citing Farrell v. Paulus, 309 Mich. 441, 15 N.W.2d 700 (1944).

Chase says Winget's revocation of the Winget Trust constituted a transfer of assets and that every element of constructive fraudulent conveyance has been satisfied based on the "pleadings and other judicial admissions." The Court agrees.

### 1. There was a Transfer from the Winget Trust to Winget

As an initial matter, the existence of a "transfer" is a prerequisite to a fraudulent conveyance claim. During these proceedings, the Winget Trust held property titled in the name of the Winget Trust. See Doc. 696-3, Ex. C to Chase's Counterclaims (stock certificates of various companies reflecting the Winget Trust's ownership of shares.)

The Trust Revocation, attached to and referenced in Chase's counterclaims, states that the Trust was revoked in January 2014. As a result of the revocation, all rights with respect to any assets held by the Winget Trust "fully vested in Larry J. Winget, individually."

In his answer, Winget does not deny the factual bases that support Chase's claim of transfer. Instead, he argues the revocation of the Winget Trust and subsequent re-titling of assets in Winget's name was not a legal "transfer" of the Winget Trust's assets to Winget because the property formerly titled in the name of the Winget Trust always belonged to Winget.

This argument is wrong as a matter of law. A revocable living trust is a distinct legal entity. See In re Lewiston, 539 B.R. 154, 159 (E.D. Mich. 2015) (citing Restatement (Third) of Trusts § 2 cmt. a) (holding that a living trust is "a distinct legal entity, consisting of the trust estate and the associated fiduciary relation between the trustee and the beneficiaries") (internal quotation marks omitted). As a separate legal entity, a living trust is capable of owning property and entering into obligations. See, e.g., Crosby v. Post, 2009 WL 3931070, at *1 (Mich. Ct. App. Nov. 19, 2009) (stating that a living trust "owns" real property); In re Wetzel, 2008 WL 681877, at *1–3 (Mich. Ct. App. Mar. 13, 2008) (evaluating whether a living trust "owned" property and employing typical property-law requirements of conveyance to determine if a settlor/trustee actually transferred her property to a revocable living trust).

Winget and the Winget Trust however have consistently argued that the Winget Trust, through its trustee (Winget), owned only "bare legal title" to the assets titled in its name, and that Winget himself was always the real owner of the property throughout the

9

course of these proceedings. As such, the argument goes, the transfer of the assets to Winget as a result of the revocation of the Winget Trust was not a "transfer"; Winget simply retained property he already owned.

Winget's argument is inconsistent with fraudulent transfer law and basic trust principles. Under Michigan law, a trustee, acting as an agent and fiduciary of a trust, has broad authority to manage the property held by a trust. M.C.L. §§ 700.7816, 700.7817. The trustee can buy, sell, encumber, and otherwise manage trust property as any other owner would. Id.; see also Lewiston, 539 B.R. at 159 ("Under Michigan law, a living trust has specific rights, duties, restrictions, consequences, and conditions related to Trust assets."). Encumbrances on trust property incurred by the trustee remain with the property held in the trust regardless of later changes to the trust itself.

Under Winget's theory, however, a settlor who causes a trust to enter into a binding contractual obligation could erase that obligation simply by revoking the trust, thereby unilaterally insulating that property from the trust's creditors. Winget has not cited any legal authority to support such a result. Instead, Winget and the Winget Trust confuse the issue by relying on authority addressing the rights of a trustee's personal creditors to pursue assets held by the trustee in trust for another. This is not the situation here, which involves the rights of a creditor of the trust itself.

Regarding the rights of a creditor to access assets held by a trustee, a trustee is a fiduciary with the power to manage the trust property on behalf of the trust's beneficiaries. See Lewiston, 539 B.R. at 159. The trustee holds no personal interest in the trust property apart from the bare legal title necessary to manage it. Because the trustee does not have a personal interest in the property, a trustee's personal creditors

10

cannot execute on trust property held on behalf of others to satisfy the trustee's own personal debts. See In re Cannon, 277 F.3d 838, 849–51 (6th Cir. 2002) (holding that property held in trust for an attorney's clients could not be used to satisfy the personal debts of the attorney); In re Dayton Title Agency, Inc., 724 F.3d 675, 679–80 (6th Cir. 2013) (holding that property held in trust could not be used to satisfy the personal debts of the trustee). Simply put, "because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not property of the [debtor's] estate." Cannon, 277 F.3d at 849 (internal quotation marks omitted). Thus, the personal debts of the trustee cannot be satisfied by the trust corpus. They do not support the proposition that the separate and binding obligations of the trust itself may be fully extinguished unilaterally by a transfer of the trust corpus to the settlor in his individual capacity.

Thus, the Winget Trust, through its trustee, owned the property titled in its name. When Winget revoked the Winget Trust, all of the Winget Trust's rights in this property became "fully vested in Larry J. Winget, individually." This was a transfer of the Winget Trust's property to Winget within the meaning of MUFTA.

### 2. Chase's Claim Arose before the Transfer

Chase also says that the pleadings conclusively establish the first element of constructive fraud: Chase's "claim arose before the transfer was made or the obligation was incurred." M.C.L. § 566.35(1). The Court agrees.

The MUFTA defines a "claim" as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." M.C.L. § 566.31(c). As

the Michigan Court of Appeals has repeatedly recognized, a "claim need not be reduced to judgment or undisputed" to satisfy the MUFTA's definition.  Mather Investors, LLC v. Larson, 720 N.W.2d 575, 578 (Mich. Ct. App. 2006); see also Zigmond Chiropractic, P.C. v. AAA Mich. Auto. Ins. Ass'n, 2012 WL 3198465, at *6 (Mich. Ct. App. Aug. 7, 2012) ("[D]efendant did not need to secure a judgment . . . before defendant first filed a [claim under the MUFTA]."); Americorp Fin. Grp., Inc. v. Powerhouse Licensing, LLC, 2007 WL 189374, at *4 (Mich. Ct. App. Jan. 25, 2007) ("[T]he term 'claim' is defined broadly to encompass 'a right to payment,' without the imposition of restrictions such as the necessity of reduction to a judgment.").

Here, Venture and its subsidiaries commenced bankruptcy proceedings under Chapter 11 on March 28, 2003.  The petitions were converted to Chapter 7 cases on January 17, 2006.  After the disposition of the debtors' assets in bankruptcy, Chase and the lenders held a claim against the debtors' estates for amounts still due and owing under the Credit Agreement.  Chase then began proceedings to enforce the Guaranty and pledge agreements against Winget and the Winget Trust on September 8, 2008. Chase's right to payment therefore arose no later than September 8, 2008—more than five years before the Winget Trust's revocation, which Winget has represented occurred in January 2014.  The fact that the Amended Final Judgment against the Winget Trust did not enter until after the revocation does not change that Chase had a "claim" within the meaning of MUFTA at the time of the revocation.

Thus, the record establishes that Chase's claim - a right to payment from the Winget Trust - arose well before the transfer.

### 3.  The Winget Trust Became Insolvent as a Result of the Transfer

The second element of Chase's constructive fraud claim requires that the Winget Trust became insolvent as a result of the revocation. This fact is evident from the record. The trust revocation document states that "Larry J. Winget . . . hereby revokes the Trust in its entirety." An entity that no longer exists obviously has no assets with which to satisfy its obligations, and is therefore by definition insolvent. See M.C.L. § 566.32 ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."). Thus, this element is satisfied.

### 4. The Winget Trust Did Not Receive Reasonably Equivalent Value for the Assets Transferred

Chase further says that the pleadings and Winget's judicial admission in his motion to dismiss counterclaims establish the final element of Chase's constructive fraud claim: that the Winget Trust did not receive reasonably equivalent value for the assets transferred. The Court agrees. Winget has admitted the Winget Trust received nothing at all. Winget's motion to dismiss Chase's counterclaims explained: "Winget paid and the Living Trust received 'reasonably equivalent value' for [the transfer]: Nothing." See Winget's Motion to Dismiss at 11, Winget, 15-13469, Doc. No. 15. Winget went on to explain "the Living Trust received exactly what its bare legal title was worth ($0.00) upon revocation." Id. at 12. These "deliberate factual assertions" from Winget's brief constitute judicial admissions that the Trust received nothing in exchange for the transfer to Winget. See Ford v. New Century Mortg. Corp., 797 F. Supp. 2d 862, 868 (N.D. Ohio, June 22, 2011) (explaining that deliberate and clear statements in briefs are considered judicial admissions).

Winget, however, says that "nothing" was reasonably equivalent value for any

transfer because again, according to Winget, the trustee held only "bare legal title" to the assets, which Winget asserts had no value as a matter of law. Again, Winget confuses the trustee's own personal obligations with the obligations of the Winget Trust itself. As explained above, a trustee's own personal creditors cannot use the trustee's possession of legal title of the assets he holds in trust for another to satisfy the trustee's personal obligations, the same cannot be said regarding creditors of the trust. The Winget Trust did in fact hold assets beyond legal title. Chase has a claim against those assets. Upon revocation, these assets were transferred to Winget, who has admitted he paid nothing for them.

Because the revocation of the Winget Trust caused a transfer of value to Winget for which Winget's admits not payment was made, Chase has satisfied all of the elements for a constructive fraud claim and is therefore entitled to judgment on the pleadings as to liability based on constructive fraud. The issue of relief and damages, as Chase seems to concede, has not been conclusively established because of outstanding discovery disputes.

### 5. Winget's Arguments Do Not Carry the Day

As Chase correctly notes, each of Winget's legal arguments in response to the motion rests on a single premise– that the Winget Trust never "owned" any property as a matter of law. This premise, as explained above, turns principles of trusts and fraudulent-transfer law on its head. Winget's position ignores that a revocable trust is a separate and distinct legal entity capable of owning property and entering into obligations. Although a trustee does not have a personal interest in the trust corpus, it

14

does not follow that the trust itself can never own anything. To accept Winget's argument would mean that Chase cannot reach property held by the Winget Trust under any circumstances—even if property had continued to remain in the Winget Trust to this day because that property was not "owned" by the Winget Trust. This position is tantamount to saying any contract with a trust is unenforceable; a trust would no longer be a "separate legal entity" but instead become nothing more than an alter-ego of the settlor. There is no support for this position in statutory or case law. Moreover, it is contrary to the law of this case in which the Sixth Circuit held that Winget and the Winget Trust were separate and distinct entities for purposes of the obligations under Section 3 of the Guaranty, JPMorgan Chase Bank, N.A. v. Winget, 602 F. App'x 246, 256 (6th Cir. 2015). Finally, and most disturbingly, it also implies that the years-long litigation regarding the Winget Trust's obligations under the Guaranty were a colossal waste of the Court's time and resources inasmuch as Winget's current position is that Chase never had any right of recourse to the Winget Trust from the moment the Winget's Trust breached the Guaranty until the present day.

Additionally, the cases Winget cites are inapposite. They all involve claims by creditors of a trustee seeking to satisfy the trustee's own personal debts using trust assets. These cases stand for the known proposition that a trustee, who manages property on behalf of a trust, does not have a personal interest in the trust's assets reachable by the trustee's personal creditors. See, e.g., In re Dayton Title Agency, Inc., 724 F.3d 675, 679–80 (6th Cir. 2013); In re Cannon, 277 F.3d 838, 849–51 (6th Cir. 2002).

This case is different. The Amended Judgment is against the Winget Trust.

Under the Guaranty, as interpreted by the Sixth Circuit, the Winget Trust—separately from Winget—guaranteed the obligations in the Credit Agreement. As a result, the Winget Trust—again, as distinct from Winget personally—owes a $425 million debt to Chase. Chase was entitled to seek recourse against the property held in the Winget Trust to satisfy this debt and may recover the property constructively fraudulently conveyed by the Winget Trust to Winget.

In sum, Chase is entitled to judgment on the pleadings on its constructive fraud claim.

## IV. Chase's Motions to Compel

### A. General Background

While Chase's motion for judgment on the pleadings has been pending, Chase sought discovery from Winget as to the assets once held in the Winget Trust to aid in execution on the Amended Final Judgment and for determining damages on its fraud claims. Getting this information has not been easy. The discovery Chase seeks is the subject of its motion to compel compliance and motion to compel.

Having concluded above that the revocation of the Winget Trust satisfies all of the elements for constructive fraud, the motions to compel become relevant to Chase's efforts to locate the former Winget Trust assets in order to collect on the Amended Final Judgment against the Winget Trust.

### 1. Chase's Motion to Compel Compliance

#### a. Relevant Background

In September 2016, Chase filed a motion to compel production of documents responsive to Chase's First Set of Document Requests in Aid of Execution of Judgment.

(Doc. 692.)  The first document request at issue in the motion sought "documents relating to Winget's and/or the Larry J. Winget Living Trust's (the "Winget Trust") financial condition," including "any federal and state tax returns for 2002 through 2014, together with all schedules and attachments thereto."  (Doc. 692-4 at 6.)

The Court granted Chase's motion to compel on December 15, 2016, stating Chase "has the right to obtain all relevant documents—in unredacted form." (Doc. 700 at 6).  Chase then submitted a proposed form of order on the motion to compel, and Winget filed an objection.  (Doc. 701.)  Winget objected that Chase's proposed Order "would include Winget's personal tax returns."  (Id. at 2.)  Hoping to avoid this result, Winget submitted an "alternative proposed Order," which would have required Winget to produce "documents in their individual or joint possession, custody, or control showing all assets held in or titled in the name of the Winget Trust through the Relevant Period." (Doc. 701-1 at 3.)

The Court entered Chase's order, which says that Winget **"shall produce all documents in his possession, custody or control that are responsive to Chase's requests consistent with this Order."**  (Doc. 702 at p. 2, emphasis added.)

Chase says that Winget has not complied with the Court's order.  Instead, Chase says Winget produced tax return documents on February 3, 2017 that are so heavily redacted that Chase says they are meaningless.  Chase says that Winget's production is in violation of the Court's order and inhibits Chase's ability to assess the Winget Trust's holdings through the relevant period.

In correspondence to Chase, Winget argued that Chase is only entitled to know what was in the Trust throughout the relevant period, stating that "[n]othing in the

17

Court's Opinion or Order indicates that Chase is entitled to income and financial information from Winget's jointly filed tax returns."  (Chase's Ex. A, Letter from Hubbard 2/10/2017 Ltr. at 1.)

In responding to Chase's motion, Winget offers a different argument.  Winget says that Chase is entitled only to the names of assets once held by the Winget Trust and nothing else.

### b.  Discussion

Chase has the better view.  Indeed, Winget's argument has already been rejected.  As noted above, after the Court granting Chase's Motion to Compel (Doc. 700), Chase tendered a form of order at the Court's request. (See Doc. 700 at p. 2 (instructing Chase to submit a proposed order).  Winget opposed Chase's proposed order, noting that, if entered, the proposed order would obligate Winget to produce documents that included "Winget's personal tax returns."  (Doc. 701.)  The Court entered Chase's order two days later, thereby rejecting Winget's objection.  (Doc. 702.).

Undeterred, Winget points to language in the Court's order granting Chase's motion to compel where the Court recognized Chase's need to know "what was in the Winget Trust throughout the relevant period."  See Doc. 700 at p. 4.

Winget's argument misunderstands Chase's argument and interprets the Court's statement of "relevant period" too narrowly.  The Court's comments came in rejecting a variety of positions articulated by Winget, including Winget's argument that Chase was not entitled to any discovery at all beyond the heavily redacted "proffer" of summary information that Winget had provided, and that the offer to make Larry Winget available for a deposition relieved him of any additional need to produce documents.  The fact

18

that the Court acknowledged that Chase had a right to information about what was in the Trust in rejecting Winget's argument to the contrary does not mean the Court intended to limit the scope of discovery to only that information. Indeed, were that the Court's intent, it would have entered Winget's alternative proposed order.

Winget also says that Chase's decision to bring a motion to compel compliance is in contravention to the 2008 pre-trial order and the Court's standing orders regarding discovery disputes. In other words, Winget says that Chase should have arranged a conference call with the Court before filing its motion. While that is generally the Court's preferred method, the parties have shown this course is no longer fruitful. The Court has expressed to both parties that it has come to believe that telephone conferences had been abused in this litigation. One example is from a January 26, 2016 telephone conference regarding Winget's motion for partial satisfaction for judgment. The Court told the parties that the appropriate course going forward was for the parties to file a motion rather than seeking informal guidance from the Court.

Chase is entitled to the relief it seeks in its motion to compel compliance. Winget must produce unredacted tax returns.

### 2. Chase's Motion to Compel

### a. Relevant Background

Chase says that Winget has refused to respond to reasonable discovery requests. In this motion, Chase seeks to compel Winget to provide information to enable Chase to ascertain the nature and whereabouts of the property held in Trust. Chase says that Winget's objections lack merit. Chase therefore asks the Court to compel Winget to fully and completely respond to Chase's second request for

production of documents by immediately producing all documents in his possession, custody, or control that are responsive to Chase's requests. Chase also says it intends to move for reasonable expenses and attorneys' fees incurred in bringing this motion. Fed. R. Civ. P. 37(a)(5)(A) if the Court grants the motion.

Chase's second set of discovery requests are reflected in the attached responses of Larry Winget (Exhibit A) and the Winget Trust (Exhibit B). Essentially, there are three requests with subparts. Chase has asked Winget for the following:

1. Any and all documents related to the income, expenses, assets, liabilities, profits, losses, inventory, cash flows, property holdings, or any other document evidencing the value of the following...

Chase goes on to list twenty-seven [1(a) through 1(aa)] entities believed to be once owned by Winget and or the Winget Trust.

2. Any and all documents related to the income, expenses, assets, liabilities, profits, losses, inventory, cash flows, property holdings, or any other document evidencing the value of any and all of the subsidiaries of the entities identified in the Request 1(a) through 1(aa).

3. Any and all documents and/or communications related to the revocation of the Larry J. Winget Trust.

### b. Discussion

Winget's continued resistance to Chase's requests for information about the assets previously held in the Trust is purportedly based on this Court's statement in granting Chase's motion to compel that Chase "wants to know what assets were held by the Trust, and when and how they were transferred." Winget appears to interpret this statement to mean Chase is entitled only to the names of the assets previously held in the Trust, and nothing more. This is wrong and it ignores the remainder of the Court's opinion and order, which plainly compels Winget to produce "**all documents**"

**responsive to Chase's first request for production of documents, (Dkt. 702 at 1),**

**including "[a]ny and all documents relating to [Winget's] financial condition**."
(Doc. 700 at p. 4, emphasis added (describing Chase's requests for financial
information about the property previously held in the Trust as "relevant to Chase's
post-judgment efforts to learn what was held through the Trust and what has happened
to those assets").)  In fact, the Court said that Chase is entitled to "full discovery of the
assets currently or previously held in or titled in the name of [the Trust] and the
whereabouts of those assets." (Doc. 702 at p. 1.)  The "detailed financial information"
that Winget refuses to produce is plainly within the scope of the Court's opinion and
order.

The Court's order granting Chase's motion to compel did not limit discovery in
this case.  The Court compelled Winget to respond to Chase's first set of requests
seeking financial and other information about the property previously held in the Trust.
Winget's contention that an order compelling him to respond in full to one set of
document requests effectively created limits on a later set of document requests is
simply wrong.  Winget's misinterpretation of this Court's previous order does not
absolve him of his responsibility to respond to Chase's second discovery request.

Putting aside Winget's misinterpretation of the Court's order, none of Winget's
additional objections have merit.

Winget says that the documents Chase seeks have no relevance to this litigation.
Not so.  The documents are central to an essential element of Chase's claims against
Winget, damages.  Chase must have discovery as to the value of the assets that were
previously held in the Trust in order to prove damages on its counterclaims and to

enforce the Amended Final Judgment. Winget's assertion that "[d]isclosure of each asset previously held in the Trust and its disposition" is sufficient for Chase to pursue its fraudulent conveyance claims is not correct. Again, the Court has already spoken on this. In opposing Chase's prior motion to compel, Winget argued that Chase could not obtain "detailed information about [Mr. Winget's] personal assets" until it had prevailed on its fraudulent conveyance claims. The Court rejected this and other arguments by ordering Winget to produce "all documents in his possession, custody or control that are responsive to Chase's requests." (Doc. 702 at 2.) The requests at issue did not seek only the names of entities once held by the Trust, but also documents relating to "assets, liabilities, net income, and cash flows." (See, e.g., Doc. 689-3, Chase Request No. 1.)

Winget also argues discovery as to asset value is unnecessary because "[i]t is an uncontroverted fact that the entities held in Trust were worth more than nothing at the time of revocation of the Trust." (Doc. 726 at p. 10 n.5.) According to Winget, because no party contests that the assets had some value, Chase is not entitled to prove what that value was. This argument confuses the existence of a fraudulent or constructively fraudulent transfer with the amount of damages. Chase is entitled to discovery aimed at both questions.

Winget also argues that Chase's requests are overbroad. However, Winget has not identified what documents responsive to Chase's requests existed and were not being produced or to negotiate in good faith regarding the scope of production. Winget has done neither. Winget's unsupported "overbroad" argument does not carry the day.

Winget also relies on Michigan's Limited Liability Company Act in a further effort

22

to avoid producing relevant documents. This act applies to satisfaction of a judgment against a member of an LLC. See generally M.C.L. § 450.4507 (providing that a court "may charge the membership interest of the member with payment of the unsatisfied amount of judgment"). Based on this statute, Winget says that Chase is not permitted to discover any information about the financial condition of LLCs that were once held in the Trust. Not so. Chase's second set of document requests does not seek to foreclose on a debtor's membership interest in an LLC. Chase does have a judgment against the Winget Trust but the Winget Trust is no longer a member of any of the LLCs in question. By Winget's own statements, the Winget Trust transferred all of its assets to Winget in January 2014. Chase seeks discovery regarding the nature and whereabouts of the property transferred from the Winget Trust to Larry Winget in order to prove up its counterclaims. Chase is not seeking to satisfy a judgment against Larry Winget's LLC membership interest—it is seeking discovery into the assets that were fraudulently transferred. The statute therefore has no application to Chase's discovery requests.

The closest Winget comes to mentioning access to information about an LLC's holdings is M.C.L. § 450.4507(6), which deals with the right to an accounting. This section provides:

> A court order to which a member may have been entitled that requires a limited liability company to … provide an accounting … is not available to a judgment creditor of that member attempting to satisfy a judgment out of the member's membership interest.

This language of the statute is inapplicable. Chase has a judgment against the Trust (which is not an LLC) and is pursuing fraudulent conveyance claims against Larry

Winget (who is also not an LLC). Chase has not asked the court to "charge [any] membership interest of [Winget] with payment," order "any distribution or distributions to which [Winget] is entitled" be paid to Chase, or foreclose on any membership interest.

To the extent Winget is arguing that the statute prohibits Chase from obtaining discovery regarding the assets of companies previously held by the Trust on the grounds that those companies are LLCs, this argument lacks merit. This argument conflates an "accounting" with civil discovery, but case law makes clear they are different. Michigan law provides that a member of an LLC "may have a formal accounting of the limited liability company's affairs … whenever circumstances render it just and reasonable." M.C.L. § 450.4503(5). Courts have noted that because "a suit for an accounting invokes a court's equitable powers," an accounting is inappropriate where "discovery is sufficient to determine the amounts at issue." Weiner v. Weiner, 2008 WL 746960, at *8 (W.D. Mich. Mar. 18, 2008) (internal quotation marks omitted). The availability of a formal accounting has nothing to do with whether discovery is permissible. Winget's reliance on the Limited Liability Company Act is therefore misplaced.

Finally, Winget says the documents are protected by attorney client privilege or the work product doctrine. Winget also says the request amounts to "Chase may as well have demanded this firm's entire file." (Doc. 726 at 13.) Winget therefore says that creating a log would be overly burdensome.

Winget is mistaken. Chase simply seeks documents (or a log of documents) related to the decision to revoke the Trust and the revocation itself. Considering the actual scope of the request, it is clear that Chase is entitled to any non-privileged

documents related to the Trust's revocation and a log of any documents over which Winget asserts privilege.

Moreover, Federal Rule of Civil Procedure 26 is clear: when a party makes a claim of privilege, it must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A); see also, e.g., Smith v. ComputerTraining.com, Inc., 2014 WL 4231175, at *3 (E.D. Mich. Aug. 27, 2014) ("A privilege log must contain the basis for withholding discovery of the document and sufficient detail beyond conclusory allegations to demonstrate the fulfillment of the legal requirements for application of the privilege.") A privilege log is also necessary to allow Chase to assess whether Winget is improperly claiming privilege over documents that do not contain legal advice or amount to work product. Further, a log will help Chase to determine whether the crime-fraud exception to any claim of privilege applies. While Winget argues Chase is seeking a "fishing expedition" because "Chase has no evidence that the crime/fraud exception applies," Chase has justified its right to make the inquiry. Among other things, Winget has acknowledged that Larry Winget "paid the Trust nothing for the assets transferred out of the Trust" which is a marker of a fraudulent conveyance. See Estate of Page v. Slagh, 2007 WL 1385957, at *2 (W.D. Mich. May 8, 2007) (invoking the crime-fraud exception because "the timing and effect of the [allegedly fraudulent] transfers at issue in this case raise a reasonable suspicion that the transfers were undertaken in violation of the MUFTA"). Moreover, Winget has asserted that documents related to the revocation of the Trust are subject to privilege or work

product protection, indicating that attorneys played a role in that revocation.  Thus, Winget's assertion that Chase has put forward no basis to suggest the crime-fraud exception may apply is incorrect.

## V.  Conclusion

For the reasons stated above, Chase's motion for costs and expenses is HELD IN ABEYANCE pending a ruling from the Court of Appeals for the Sixth Circuit on Winget's appeals.

Chase's motion for judgment on the pleadings is GRANTED as to liability only on its constructive fraud claim.

Chase's motions to compel are GRANTED.

What is left of this case is (1) a ruling on Chase's motion for costs and expenses after the Sixth Circuit resolves the appeals, (2) Chase's efforts to collect on the Amended Final Judgment.

SO ORDERED.


S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated: July 5, 2017
        Detroit, Michigan