UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JPMORGAN CHASE BANK, N.A.

     Plaintiff and Counter-Defendant,   Case Number 08-13845

v.                 Honorable David M. Lawson

LARRY J. WINGET and the LARRY J.
WINGET LIVING TRUST,

     Defendants and Counter-Plaintiffs.

_____/

**OPINION AND ORDER OVERRULING OBJECTIONS, ADOPTING SPECIAL
MASTER'S REPORT AND RECOMMENDATION, GRANTING IN PART
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, IMPOSING
CONSTRUCTIVE TRUST, DENYING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, DENYING DEFENDANTS' MOTION TO STAY COLLECTION
PROCEEDINGS, AND SCHEDULING STATUS CONFERENCE**

In the last century (1999), Venture Holdings LLC (owned by defendant Larry J. Winget)

entered into a credit agreement with a group of lenders. In a 2002 amendment to the credit

agreement, defendants Winget and the Larry J. Winget Living Trust guaranteed the loan of almost

a half-billion dollars. Plaintiff JPMorgan Chase Bank is the administrative agent for the lenders.

Venture Holdings declared bankruptcy in March 2003, an event of default that made all obligations

due and payable. After pursuing collection in the bankruptcy proceedings, the lenders were still

owed millions of dollars, and on October 28, 2005, Chase sued Winget and his trust to enforce the

guarantees, which eventually led to the present case filed in 2008. Winget and the trust have spent

the last decade-and-a-half attempting to avoid their obligations. Through twists and turns,

including multiple decisions by my predecessor, the Honorable Avern Cohn (who, regrettably, has

retired), and at least eight trips to the court of appeals, the case now presents itself in the later

stages (perhaps) of Chase's collection efforts directed at the trust, in "the latest episode in a

longstanding saga that must now come to a close." Those words were written by court of appeals Judge Alice Batchelder in her 2017 opinion deciding the fourth appeal. *See JPMorgan Chase v. Winget*, 678 F. App'x 355 (6th Cir. 2017). With no pretense to finality, *see JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d 748, 752 (6th Cir. 2019) ("We now know better than to think that our decision today will close the book for good."), the Court will address Chase's pending summary judgment motion, which was thoroughly vetted by the Special Master Judge Cohn appointed for that purpose.

I.

Through previous decisions by this Court and the court of appeals, Winget's exposure under the Guarantee has been limited to $50 million (which he has paid), but his trust is liable for the full amount of the debt. The litigation over the past few years has focused on Winget's strategy of parlaying his limited personal exposure into a device to insulate the trust assets from Chase's collection efforts. Those machinations largely have been unsuccessful. It is useful to trace the path that bought the parties to this point in the litigation.

Although the loan is over 20 years old, this dispute dates back to 2003, when a group of companies owned by Winget or the Winget Trust filed for bankruptcy. Before the bankruptcy, Chase, as agent for a group of lenders, had extended a nearly half-billion-dollar credit facility to the companies in a Credit Agreement. To support that Credit Agreement, Winget and the Winget Trust both guaranteed the obligations under the Credit Agreement and partially secured the facility through a pledge of assets. The Guaranty provided that the guaranteed obligations would not be "released, discharged or otherwise affected by . . . any change in the corporate existence, structure or ownership of the Borrower or any other guarantor of any of the Guaranteed Obligations." ECF No. 1-3 at 3, § 4(iv). After the March 2003 bankruptcy, and after pursuing collection in the

bankruptcy proceedings, the lenders were still owed over $300 million under the Credit Agreement.  ECF No. 1 ¶ 23.

On October 28, 2005, Chase sued Winget seeking (1) specific performance of the provision in the Guaranty that granted Chase inspection rights and (2) a declaration that Chase had used all reasonable efforts before seeking to foreclose on the Pledge Agreements ("Inspection Action"). *Chase v. Winget*, 05-74141.  Eventually, Judge Cohn entered judgment in favor of Chase on count 1 of the complaint and dismissed count 2 without prejudice.  *See* case no. 05-74141, ECF No. 50. Winget appealed, and the Sixth Circuit affirmed.  *Chase v. Winget*, 510 F.3d 577 (6th Cir. 2007).

On August 2, 2006, Winget sued Chase and others asking for a declaration that Chase had *not* used all reasonable efforts before seeking to enforce the Pledge Agreements, as required by the Guaranty and Section 5.2 of the Pledge Agreements.  *Winget v. Chase*, 06-13490.  Chase and others moved to dismiss on the grounds the issue was raised and resolved in the Venture bankruptcy; therefore, Winget's claims were barred by *res judicata*.  The Court granted the defendants' motion and dismissed the case.  *Winget v. Chase*, 2007 WL 715342 (E.D. Mich. Mar. 7, 2007).  Winget appealed and, again, the Sixth Circuit affirmed.  *Winget v. Chase*, 537 F.3d 565 (6th Cir. 2008).

Finally, Chase filed the present action in 2008 against Winget and the Winget Trust seeking to enforce the Guaranty and Pledge Agreements.  On December 20, 2013, after years of litigation and intervening appeals, this Court granted Chase's motion for entry of judgment on its claims against Winget and the trust.  On January 24, 2014, the Court entered a final judgment (the "Final Judgment") against Winget and the trust in the amount of $425,113,115.59, plus attorney's fees and costs under Section 17 of the Guaranty (ECF No. 487).  The Court, however, ruled that Chase's recourse was limited as to both Winget *and* the Winget Trust to $50 million.  This finding was

-3-

based on a determination, following a bench trial, that the parties had made a mutual mistake in not applying the $50 million liability limitation to *both* Winget *and* his trust, and therefore the Guaranty should be reformed to correct that "error." (ECF No. 365). Chase appealed. The court of appeals reversed in part, concluding that Chase's recourse against Winget was limited to $50 million, but it found no basis to support a mutual mistake and held that Chase's recourse against the Winget Trust was not limited. The case was remanded for entry of judgment so stating. In January 2014, Winget paid Chase $50 million.

On July 28, 2015, the Court entered an Amended Final Judgment against Winget and the Trust in the amount of $425,113,115.59. Chase began collection efforts under Federal Rule of Civil Procedure 69 and Michigan law against the Winget Trust. These collection efforts included writs of garnishment and serving discovery on Winget and the Winget Trust. During these post-judgment proceedings, Chase learned that, effective January 1, 2014, which was almost 12 years after the execution of the Guaranty (in 2002), and nearly six years after Chase filed this lawsuit, Winget had revoked the Winget Trust and removed all of the trust assets. Winget did not reveal the revocation to Chase and, as the Court previously stated, kept the fact of revocation "*in pectore* [a Latin phrase roughly translated as "close to the chest"] until Chase began collection efforts." ECF No. 732, PageID.26284.

On October 1, 2015, following the secret revocation, and approximately four months after the entry of the Amended Final Judgment, and while the Amended Final Judgment was on appeal, Winget filed a separate action for declaratory relief, *Winget v. Chase*, No. 15-13469 ("the Avoidance Action"), seeking a declaration that Chase has no further recourse against Winget or the assets that were once held in the Winget Trust. Chase filed counterclaims, which essentially contended that Winget's revocation was a fraudulent transfer. The Court determined that Chase's

-4-

counterclaims were the functional equivalent of post-judgment proceedings in the present case and therefore consolidated the Avoidance Action with this case and directed that all pleadings be filed in this case.  *See* ECF No. 686.

On December 1, 2016, Chase moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) on Count II of its counterclaims for constructive fraudulent transfer (the "Constructive Fraudulent Transfer Claim") under the Michigan Uniform Fraudulent Transfer Act ("MUFTA") Mich. Comp. Laws § 566.35 (now the Michigan Uniform Voidable Transactions Act).

On July 5, 2017, Judge Cohn issued an order (the "Fraudulent Transfer Order") finding that all of the elements of a constructive fraudulent transfer claim had been satisfied and that Chase was entitled to judgment on the pleadings as to liability only. (ECF No. 732).  The Fraudulent Transfer Order did not reach the issue of relief and damages.  Winget and the Winget Trust moved for reconsideration of the Fraudulent Transfer Order.  (ECF No. 734).  The motion was denied. (ECF No. 751).  Winget and the Winget Trust did not appeal the Fraudulent Transfer Order. Instead, the parties proceeded with discovery as to the damages Chase suffered from the revocation.

Meanwhile, the Sixth Circuit affirmed entry of the Final Amended Judgment.  *JPMorgan Chase Bank, N.A. v. Winget*, 678 F. App'x 355 (6th Cir. 2017).

On February 26, 2018, Winget informed the Court that, in compliance with the Fraudulent Transfer Order, he had rescinded his revocation of the Winget Trust, revived and reinstated it, and retitled in the name of the Winget Trust all property interests that were titled in the name of the Trust as of December 31, 2013, which was the day before Winget says that he revoked the Trust.

Winget took this action voluntarily and filed an unsolicited "Notice of Compliance." *See* ECF No. 777.

On June 21, 2018, the Court granted Chase's Motion for Entry of Final Judgment regarding pre-judgment interest, which increased the judgment amount to $778,276,929.23. ECF No. 823. The Court also entered intervening orders granting Chase's application for costs and expenses related to its efforts to enforce its rights against Winget and the Winget Trust, further adding to Winget and the Winget Trust's financial obligation to Chase.

Shortly thereafter, Chase requested entry of charging orders (the "Charging Order Motions") with respect to membership interests in certain limited liability companies (LLCs) (the "Membership Interests") held by the Trust. ECF Nos. 791-820. Winget and the Winget Trust responded to the Charging Order Motions, arguing among other things, that the Winget Trust does not own the subject membership interests or any other property for that matter. Rather, Winget reasoned, as settlor of the Winget Trust, he owns all of the property held in the Trust; and because he satisfied the judgment against him individually by paying $50 million to Chase, Chase cannot execute on property that Winget owns as settlor of the Winget Trust. The Court disagreed with Winget's argument, granted the Charging Order Motions, and entered the requested Charging Orders on August 15, 2019. ECF Nos. 839-853. In connection with entry of the Charging Orders, the Court stayed the Avoidance Action and directed Chase to focus its collection efforts on the assets held in the Winget Trust. ECF No. 855.

Winget appealed entry of the Charging Orders. Significantly, Winget argued that because Winget "owned" all of the Winget Trust property, the Guaranty did not allow Chase to attach that property through charging liens or otherwise. That argument did not take root. On November 7, 2019, the Sixth Circuit affirmed entry of the Charging Orders and rejected Winget's argument,

explaining that "it doesn't matter who 'owns' the trust property," because "a party who has a contract with a trust can recover from the property held by the trust." *JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d at 750. Thus, the Sixth Circuit held that Chase could recover against the Winget Trust from the property held by the Winget Trust (the "Charging Order Opinion"). *See* ECF No. 924.

After entry of the Charging Orders, Chase filed additional motions related to its collection efforts, including a Motion for a Constructive Trust (ECF No. 860) and a Motion for Writ of Execution on Corporate Stock (ECF No. 863). Winget filed a Motion to Stay these collection efforts pending his appeal of the Charging Orders. ECF No. 873. The Court referred the motions to a Special Master. *See* ECF No. 890.

The Special Master recommended that the constructive trust motion should be denied without prejudice and dealt with in the Avoidance Action, which had been stayed, and recommended that the Court allow the Avoidance Action to go forward. The Special Master also recommended that Chase's Motion for Writ of Execution on Corporate Stock be granted and Winget's motion to stay be denied. ECF No. 906.

The Court agreed and adopted the Special Master's recommendations. ECF No. 914. The Court thereafter entered the appropriate orders, including an order granting Chase's Motion for Writ of Execution on Corporate Stock ("Execution Order") and enjoined Winget from interfering with the Winget Trust property while the parties proceeded with a judicial sale of the stock. ECF No. 915. Winget and the Winget Trust appealed the injunction portion of the Execution Order, and the Sixth Circuit affirmed. *JPMorgan Chase Bank, N.A. v. Winget*, 801 F. App'x 962 (6th Cir. 2020).

That brings us to the present matter before the Court. After the stay of the Avoidance Action Proceeding was lifted and five days after the Sixth Circuit issued its Charging Order Opinion, Chase filed a motion for partial summary judgment, ECF No. 926, requesting summary judgment on Count V (the "Unjust Enrichment Claim") of its amended counterclaims against Winget, ECF No. 771, and largely requests the same relief as the Constructive Trust Motion. The Court referred the motion for partial summary judgment to the Special Master. On March 19, 2020, the Special Master issued a Report and Recommendation (R&R) on Chase's motion. The parties have filed objections to the R&R.

Winget filed a motion in the Avoidance Action, consolidated with this case as noted earlier, for a summary judgment declaring that he always owned the property held by his trust and that he could remove that property at his discretion, despite Chase's judgment against the trust. ECF No. 971. Winget also moved to stay all collection proceedings until the issues raised in the various motions are resolved. ECF No. 974.

After the court of appeals issued its mandate in the latest appeal, Chase filed a notice of proposed form of judicial sale. ECF No. 970. Chase also filed a motion to set a status conference to discuss the judicial proceedings. ECF No. 979.

## II.

### A.

As noted above, when the Winget Trust was revoked on January 1, 2014, the LLC Membership Interests held by the Winget Trust were transferred to Winget. After the Membership Interests were transferred, Winget received cash distributions from the LLCs as well as certain promissory notes that Winget says evidence the LLCs' indebtedness to him. In an attempt to recapture these distributions for itself, Chase filed a motion to impose a constructive trust on LLC

membership distributions, including the payments and obligations made during the "Revocation Period" (between July 28, 2015 and February 26, 2018). Chase supplemented its motion about six months later. Chase wants the Court to impose a constructive trust on the cash distributions, the promissory notes, and certain payments made to Winget on those promissory notes during that time.

Chase measures the Revocation Period as beginning on the date Chase obtained the Amended Final Judgment against the Trust (July 28, 2015) and ending on the date Winget informed the parties that he had rescinded his revocation of the Trust (February 26, 2018). Chase argues that during that period, Winget received $148,490,481.00 in cash distributions from the LLCs (the "Cash Distributions") and promissory notes from certain entities.

The first promissory note is in the amount of $135 million and initially was issued to the Larry J. Winget 2016 Retained Annuity Trust and then transferred to Winget. One of the LLCs, JVIS–U.S.A., LLC, made a $22.5 million payment to Winget on that note. The second promissory note is for $15 million. As a result of Winget receiving the cash and notes, Chase argues, Winget was unjustly enriched in an amount totaling $298,490,481.00 ($148,490,481.00 in Cash Distributions and $150 million in promissory notes) at Chase's expense. As a remedy, Chase seeks a constructive trust on the Cash Distributions and the notes.

The Special Master found that the following facts are undisputed:

The Court entered the Amended Final Judgment on July 28, 2015;

Under the Amended Final Judgment, Chase had rights to execute on the assets of the Trust, including obtaining charging orders as to the [LLC's] Membership Interests[;]

Winget revoked the Winget Trust effective January 1, 2014;

Prior to the Trust's revocation, the Winget Trust held membership interests in the LLCs;

After the Trust's revocation, Winget retitled the property held by the Trust as of December 21, 2013 in his name, including the Membership Interests formerly held by the Winget Trust;

On February 26, 2018, Winget informed both Chase and the Court that he had rescinded his revocation of the Trust and retitled in the name of the Trust all property interests titled in the name of the Trust as of December 31, 2013;

The property retitled in the name of the Trust included the Membership Interests;

Between the date the Amended Final Judgment was entered (July 28, 2015) and the date Winget informed Chase and the Court that he had rescinded his revocation of the Trust (February 26, 2018), Winget received distributions on account of those Membership Interests;

Winget does not deny that he did not return the distributions to the LLCs that were retitled in the name of the Winget Trust.

R&R at 15-16, ECF No. 949-1, PageID.31186-87 (record citations omitted).

The Special Master also concluded based on these undisputed facts that Chase was entitled to relief on its unjust enrichment claim because Winget received a benefit from assets that properly should have been within Chase's reach, and that an inequity exists to Chase as a result of Winget's retention of those benefits.  The Special Master, however, agreed with Winget that the operative time period began not on July 28, 2015, the date of the Amended Final Judgment, but on August 11, 2015, which was 14 days after entry of the Amended Final Judgment, because Chase could not have executed on the judgment before then.  *See* Fed. R. Civ. P. 62(a) (2009) ("Except as provided in Rule 62(c) and (d), execution on a judgment and proceedings to enforce it are stayed for 14 days after its entry, unless the court orders otherwise.").

The Special Master recommended that the Court grant summary judgment to Chase on its unjust enrichment claim set forth in Count V of its counterclaims against Winget with respect to distributions made between August 11, 2015 and February 26, 2018.  As a remedy, the Special Master recommended that the Court place a constructive trust upon (i) the Cash Distributions in

-10-

the amount of $104,775,478, which Winget has admitted were distributed to him between August 11, 2015 and February 26, 2018, (ii) the $135 million demand promissory note issued by JVIS on June 29, 2017 to the Larry J. Winget 2015 Retained Annuity Trust that was assigned to Winget, (iii) the $15 million demand promissory note issued by JVIS on June 29, 2017 to Winget, and (iv) the $22.5 million payment, plus any other payments made to Winget on account of the promissory notes.   The Special Master further recommended that the terms of the constructive trust imposed by the Court require Winget to pay to Chase the $104,775,478 in Cash Distributions, (ii) assign the promissory notes to Chase, and (iii) pay Chase the amounts paid on the promissory notes, including the $22.5  million payment.

Finally, the Special Master recommended that an evidentiary hearing be held with respect to the remaining $45,365,000 of the cash distributions that Chase alleges Winget received during the Revocation Period, and which Winget contends were made before August 10, 2015.  The Special Master found the record was not sufficiently clear as to whether Winget received those distributions before August 10, 2015.

Both parties have objected to the R&R.

### B.

Upon objection, the Special Master's recommendations are given fresh review.  Fed. R. Civ. P. 53(f)(3); *see also* Order Appointing Special Master, ECF No. 890, PageID.29327 (citing 28 U.S.C. § 636(b)(1)) (stating that "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made").

1.

Chase takes issue with the Special Master fixing the beginning date of the Revocation Period to account for the automatic stay of execution for 14 days after the Amended Judgment was entered as required by the 2009 version of Rule 62(a).  It appears that Chase believes that the court of appeals's mandate had an effect on the operative date of this Court's Amended Judgment.  However, the mandate merely gave legal effect to the court of appeals's ruling, which "remand[ed the case] with instructions to enter judgment in favor of Chase on Count I of Chase's complaint." *JPMorgan Chase Bank, N.A. v. Winget*, 602 F. App'x 246, 266 (6th Cir. 2015).  There is no suggestion, and no authority has been cited to support the idea, that any aspect of Rule 62(a) was suspended.  The Special Master was correct in his determination of the Revocation Period.

Chase also argues that it met its summary judgment burden showing that the distributions at issue were made after the effective date of the Amended Final Judgment.  Chase insists that, Winget's evidence to the contrary, an affidavit by Bryan Pukoff, Winget's CPA, is conclusory and fails to create a genuine issue of material fact.

It was Chase's burden, however, to demonstrate that Winget was unjustly enriched through the distributions tied to the LLCs' membership interests that would have been subject to the charging orders.  That does not merely impact "damages," as Chase contends, but it goes to the heart of Chase's argument that an inequity occurred.  Chase, therefore, bore the burden to prove that the misdirected assets inequitably were distributed and retained by Winget.  *Kammer Asphalt Paving Co. v. E. China Twp. Sch.*, 443 Mich. 176, 188, 504 N.W.2d 635, 642 (1993) ("The burden of proof is upon the person seeking the imposition of such a trust.") (citing *MacKenzie v. Fritzinger,* 370 Mich. 284, 121 N.W.2d 410 (1963)).  And to meet that burden, Chase had to show by uncontested evidence that the distributions were made during the Revocation Period.

-12-

Chase did not provide any evidence that the entirety of the 2015 distributions were made during the Revocation Period. Chase did not meet its initial burden, which made it unnecessary for Winget to offer proof to establish a genuine issue of material fact on this topic, regardless of what Michigan law says with respect to proving the amount of damages.

Moreover, Winget denied that a $500,000 distribution was made after August 10, 2015. In addition, the Rescission Agreement discusses the return of distributions by the Winget Family Trust by the companies whose "Equity Ownership Interests" were transferred to the Winget Family Trust and then distributed to Winget. The Court believes, therefore, that there is a question of material fact with respect to the $45,365,000 that Winget says was distributed before August 10, 2015, including the $500,000 distribution made to VCIP.

Chase's objections will be overruled.

### 2.

Winget's objections repeat many of the arguments considered and rejected many times in this case. He divides them into seven arguments, but they are based on three basic premises: (1) that Winget always owned the property titled in the name of the trust, and therefore the transfer of title to him was in reality no transfer at all; (2) some cash distributions and promissory notes were made for the payment of taxes and in recognition of antecedent debts; and (3) equitable remedies (constructive trust, unjust enrichment) should not be recognized when Chase has an adequate remedy at law in the form of the fraudulent transfer action.

### a.

Winget's main argument is that the Winget Trust never owned the trust property. For openers, he poses a blanket objection based on the idea that the Special Master did not account for the Sixth Circuit's comment contained in a footnote to its penultimate opinion in this case, which

questioned whether Winget could lawfully revoke the trust and remove the trust property. *See JPMorgan Chase Bank, N.A. v. Winget,* 942 F.3d 748, 750 n.1 (6th Cir. 2019). Winget argues that the footnote casts doubt on whether Judge Cohn's constructive fraudulent transfer ruling was proper, and because the Unjust Enrichment Claim is based on the fraudulent transfer, the propriety of the constructive fraudulent transfer claim must be fully briefed and decided before Chase has any rights to an equitable remedy. But according to that footnote, the court of appeals invited the parties to present that question for a decision there, and they declined.

In its 2019 opinion, the Sixth Circuit upheld Chase's right to enforce its judgment against property titled in the name of the trust, regardless of who "owned" the trust property. *Id.* at 750 (holding that "it doesn't matter who 'owns' the trust property (at least as trust law uses that term). After all, trusts usually don't 'own' property. So if ownership mattered, creditors of a trust — revocable or not — could almost never recover from the trust property. And that would surely surprise the many authorities who have written to the contrary.") (citations omitted). The court then dropped this footnote:

> To be sure, this does not resolve whether Winget could revoke the Trust and simply remove all the trust property. Winget tried to do exactly that back in 2014 but later reversed course. In related proceedings, the district court held that this revocation was a fraudulent conveyance under Michigan law. *See* Mich. Comp. Laws § 566.35. But if Winget "owns" the trust property, that may affect whether the district court was correct. At oral argument, we asked the parties whether we should address this issue in the current appeal. But they did not pursue that suggestion. Our decision therefore does not address the fraudulent conveyance issue.

*Id.* at 75- n.1. One wonders why Winget did not seek a definitive answer from the court of appeals then. Instead, he now asks this Court to unwind its previous decisions against him on this point. But there is no good reason to do so.

In 2017, Judge Cohn addressed this argument face-on and rejected it:

> Winget and the Winget Trust however have consistently argued that the Winget Trust, through its trustee (Winget), owned only "bare legal title" to the assets titled

-14-

in its name, and that Winget himself was always the real owner of the property throughout the course of these proceedings. As such, the argument goes, the transfer of the assets to Winget as a result of the revocation of the Winget Trust was not a "transfer"; Winget simply retained property he already owned.

Winget's argument is inconsistent with fraudulent transfer law and basic trust principles. . . .

Under Winget's theory, . . . a settlor who causes a trust to enter into a binding contractual obligation could erase that obligation simply by revoking the trust, thereby unilaterally insulating that property from the trust's creditors. Winget has not cited any legal authority to support such a result. . . .

[T]he Winget Trust, through its trustee, owned the property titled in its name. When Winget revoked the Winget Trust, all of the Winget Trust's rights in this property became "fully vested in Larry J. Winget, individually." This was a transfer of the Winget Trust's property to Winget within the meaning of MUFTA.

ECF No. 732 PageID.26287-89.

Winget argues that this decision is based on an erroneous reading of the court of appeals's 2015 opinion, which held "that Winget and the Trust are separate and distinct legal persons." *JPMorgan Chase Bank, N.A. v. Winget*, 602 F. App'x 246, 256 (6th Cir. 2015). That, however, mischaracterizes Judge Cohn's reasoning. His only reference to the 2015 court of appeals decision in his 2017 opinion and order reiterated the idea that Winget and his trust are distinct, and the judgment can be enforced against each. Judge Cohn wrote:

To accept Winget's argument would mean that Chase cannot reach property held by the Winget Trust under any circumstances — even if property had continued to remain in the Winget Trust to this day because that property was not "owned" by the Winget Trust. This position is tantamount to saying any contract with a trust is unenforceable; a trust would no longer be a "separate legal entity" but instead become nothing more than an alter-ego of the settlor. There is no support for this position in statutory or case law. Moreover, it is contrary to the law of this case in which the Sixth Circuit held that Winget and the Winget Trust were separate and distinct entities for purposes of the obligations under Section 3 of the Guaranty, *JPMorgan Chase Bank, N.A. v. Winget*, 602 F. App'x 246, 256 (6th Cir. 2015).

*Id.* at PageID.26292-93.

As can be seen, the question has already been decided by this Court, as has the question of whether the revocation of the Trust was a constructive fraudulent transfer. The Sixth Circuit's opinion does not change that fact. Winget also argues that, because it is the constructive fraudulent transfer that gives rise to the unjust enrichment claim, Chase's remedies under MUFTA must be determined first. But if the issue of the ownership of the Trust assets must be determined first, it would also preclude a determination of Chase's remedies under MUFTA as well. It serves no useful purpose to replow this ground.

Winget says that it is unfair to "punish" him for relying on earlier rulings from this Court in 2011 and 2012 that he in fact owned the trust assets. He fashioned this argument to the Special Master under the law-of-the-case doctrine, but now refashions it as an equitable plea. In the earlier decision, Judge Cohn held that the trust was Winget's "*alter ego*." *JP Morgan Chase Bank, N.A. v. Winget*, 901 F. Supp. 2d 955, 972 (E.D. Mich. 2012). But, as noted, Chase timely appealed that decision and it was reversed. 602 F. App'x 246 (6th Cir. 2015). Relying on a challenged district court opinion by drawing assets from a potentially vulnerable trust is not the sort of conduct that favors equitable consideration. The objections based on Winget's recycled argument that the trust did not "own" property are overruled.

Aside from Winget's misguided reliance on the idea that shifting title to the trust property did not amount to a "transfer," he does not object to the conclusion that Chase established its unjust enrichment theory as a matter of law.

b.

Winget also says it is inequitable for Winget to have to pay Chase the $79 million he already paid to the IRS for taxes on the LLCs. He further argues that the R&R ignores testimony that the promissory notes reflect debt to Winget arising before the Amended Final Judgment.

The Special Master thoroughly discussed the purpose and timing of the Promissory Notes, and the Court agrees with and adopts his conclusions.  As he noted, the undisputed evidence establishes that JVIS did not authorize the Promissory Notes until January 1, 2017, and neither of the Promissory Notes became binding on JVIS until June 29. 2017.  Also notably, both Promissory Notes call for interest to begin accruing as of the execution dates, and do not provide for retroactive interest.

It is undisputed that from the distribution the LLCs made to Winget, he used $79 million to pay taxes.  Because the LLCs elected to be taxed as pass-through entities, that tax liability was Winget's personal obligation.  The Court agrees with the Special Master that Winget was unjustly enriched by that distribution, even though the money was used to pay taxes that the LLCs would have been obliged to pay had they elected to be taxed as a corporation.

c.

Winget argues that Chase has adequate remedies at law and a constructive trust is not an appropriate remedy.  Once again, the Special Master thoroughly addressed that argument, and the Court agrees with his conclusion.

It bears repeating that this case is in a post-judgment collection posture, where Chase has a judgment allowing it to recover from the trust property.  "And Michigan has given its courts 'extremely broad' authority to execute on their judgments. *JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d 748, 751-52 (6th Cir. 2019) (citing *Rogers v. Webster*, No. 84-1096, 1985 WL 13788, at *1 (6th Cir. Oct. 22, 1985) (per curiam)).

It is true that "recognition of a constructive trust requires that the money or property on which the trust is imposed must be 'clearly traced' to the beneficiary of the constructive trust." *United States v. One Silicon Valley Bank Account*, 549 F. Supp. 2d 940, 955–56 (W.D. Mich.

-17-

2008) (citing *Biddle v. Biddle*, 202 Mich. 160, 167, 168 N.W. 92, 94 (1918); *In re CyberCo Holdings, Inc.*, 382 B.R. 118, 129 (Bankr. W.D. Mich. 2008)).  But here, Winget takes no issue with the origin and destination of the transferred assets.  Instead, he argues that Chase should look to other remedies to satisfy its judgment.  As the Special Master observed, however, even if the unjust enrichment claim may be the only route to recover the distributions made during the Revocation Period, there may be an adequate remedy for Chase under MUFTA.  But remedies also exist under the Michigan Revised Judicature Act or under a common law cause of action for unjust enrichment.  Chase has elected to advance the unjust enrichment claim, and it is entitled to prevail on that claim.

The Court finds no merit in Winget's other objections.

III.

Winget's motion for summary judgment in the Avoidance Action is merely the opposite side of the same coin as his defense against Chase's affirmative collection efforts against the trust. Winget cites authority supporting the argument that when the trustee, settlor, and beneficiary of a trust are one and the same person, the settlor can do with the trust property whatever he wants. Based on that premise, Winget asks the Court to declare that he could defund the trust and remove its assets, which in this case effectively would place those assets beyond the reach of its creditors who can no longer collect from Winget himself.  As noted above, Judge Cohn rejected that argument in earlier rulings.  Winget repeats the argument that those earlier rulings were founded on an incorrect reading of the court of appeals's decisions.

Winget accurately cites the provisions of the Michigan Trust Code, but those statutes address the relationships between a revocable trust's settlor, trustee, beneficiaries.  They do not say who "owns" trust property, and they do not undermine the holding of the court of appeals that

-18-

the creditor of a trust is entitled to collect a judgment against a trust from the property held by the trust. *See Winget*, 942 F.3d at 751.

For his ownership premise, Winget relies on Michigan Compiled Laws § 556.128, which prevents a settlor from insulating assets from creditors by the expedient of titling them in a revocable trust. *Ibid.* ("When the grantor in a conveyance reserves to himself an unqualified power of revocation, he is thereafter deemed still to be the absolute owner of the estate conveyed, so far as the rights of his creditors and purchasers are concerned."). That means that a judgment creditor of a settlor can reach trust assets. It does not mean that assets titled in the name of a trust cannot be used to satisfy a judgment against the trust. Such a holding would directly contradict the court of appeals, which noted that "these statutes merely codify the principle that creditors can recover from the beneficial interest. They do not repeal the principle that creditors of the trust can recover from the trust property as well." *Winget*, 942 F.3d at 751.

Winget also makes too much of the court of appeals's comment that "trusts usually don't 'own' property." *Winget*, 942 F.3d at 750. That comment followed the court's declaration that it did not matter who "owned" the trust property, since "if ownership mattered, creditors of a trust — revocable or not — could almost never recover from the trust property. And that would surely surprise the many authorities who have written to the contrary." *Ibid.*

Winget offered all of this on the way to his ultimate conclusion that his secret defunding of the trust could not amount to constructive fraud because all the assets were his to do with as he pleased. But that does not change the fact that those assets were titled in the name of the trust, and Chase had a judgment against the trust that remained unsatisfied. And even if Winget could somehow lawfully remove those assets from the trust (which this court has held repeatedly he could not), he voluntarily returned them. This Court has enjoined their further removal, and that

-19-

injunction was affirmed by the court of appeals. *Winget*, 801 F. App'x 962. And that court, referring to its footnote in the earlier opinion, stated that "whether Winget could have revoked the Trust before the district court enjoined him from interfering with it is beside the point now. Michigan law gives the district court the power to enjoin actions contrary to its collection orders." *Id.* at 963.

Winget's arguments in his summary judgment motion mirror those already asserted several times in this Court, including in response to Chase's motion for partial summary judgment. Winget has had ample opportunity to present those arguments, and they fail as a matter of law. The Court will deny Winget's motion for summary judgment on his Avoidance Action complaint and grant summary judgment of dismissal to Chase. *See* Fed. R. Civ. P. 56(f)(1).

Winget also moved to stay collection proceedings until his summary judgment motion was decided. That motion will be denied as moot.

IV.

As noted above, the Sixth Circuit affirmed Judge Cohn's order imposing a writ of execution on trust property and enjoining Winget from transferring assets. Shortly after the mandate issued in that appeal, and in accordance with the Court's execution order (ECF No. 915), Chase submitted a proposed form of judicial sale on May 15, 2020. Chase also filed a motion for a status conference as a follow-up to its notice of proposed form of judicial sale. The Court's execution order contemplates a status conference following submission of the proposed form of judicial sale "to discuss the proposed form of sale and further execution of the writ." ECF No. 915, PageID.29784.

The Execution Order provides for a status conference, and the Court will schedule one, to be attended by the Special Master. Chase is entitled to the sale, and because the procedure is

complicated, the Court contemplates having the sale process overseen by the Special Master, who is familiar with the case and these type of sale proceedings.

V.

After fresh review of the motion for partial summary judgment, the Special Master's report and recommendation, and the parties' objections, Chase is entitled to a judgment as a matter of law on its unjust enrichment claim as to nearly all of the assets transferred to defendant Larry Winget from the Larry J. Winget Living Trust. The Special Master was correct in his application of the law to the facts and in finding that there is a dispute as to whether approximately $45 million in cash distributions were made before the Amended Final Judgment became effective.

Accordingly, it is **ORDERED** that plaintiff JPMorgan Chase Bank's motion for partial summary judgment (ECF No. 926) is **GRANTED IN PART**.

It is further **ORDERED** that a constructive trust is imposed on the following assets in the possession or control of defendant Larry J. Winget:

A.  Cash Distributions in the amount of $104,775,478, which were distributed to defendant Larry J. Winget between August 11, 2015 and February 26, 2018;
B.  a $135 million demand promissory note issued by JVIS on June 29, 2017 to the Larry J. Winget 2015 Retained Annuity Trust that was assigned to Winget;
C.  a $15 million demand promissory note issued by JVIS on June 29, 2017 to Winget; and
D.  a $22.5 million payment, plus any other payments made to Winget on account of the promissory notes.

It is further **ORDERED** that, under the terms of the constructive trust Winget must

A.  pay to Chase the $104,775,478 in Cash Distributions;
B.  assign the promissory notes referenced in paragraphs B and C, above, to Chase; and
C.  pay Chase the amounts paid on the promissory notes, including the $22.5 million payment.

It is further **ORDERED** that an evidentiary hearing be held with respect to the remaining $45,365,000 of the cash distributions that Chase alleges Winget received during the Revocation

-21-

Period, and which Winget contends were made before August 10, 2015.  The hearing will take place after a determination of the procedures for a judicial sale of trust assets in accordance with the Execution Order.

It is further **ORDERED** that Winget's motion for summary judgment (ECF No. 971) is **DENIED**.

It is further **ORDERED** that the declaratory judgment complaint (Case Number 15-13469, ECF No. 1) is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the motion to stay collection efforts (ECF No. 974) is **DENIED as moot**.

It is further **ORDERED** that the motion for a status conference (ECF No. 979) is **GRANTED**.  The parties and the Special Master shall appear for a status conference to be conducted via videoconference on **January 20, 2021 at 9:00 a.m.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  January 5, 2021