UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALTER DOMUS, LLC,

                Plaintiff/Counter-Defendant,           Case Number 08-13845

v.                                                Honorable David M. Lawson

LARRY J. WINGET and the LARRY J.
WINGET LIVING TRUST,

                Defendants/Counter-Plaintiffs.

_____/

### ORDER OVERRULING IN PART DEFENDANTS' OBJECTION TO SPECIAL MASTER'S REPORT AND RECOMMENDATION ON PROCEDURES FOR JUDICIAL SALE, ADOPTING IN PART REPORT AND RECOMMENDATION, AND APPROVING JUDICIAL SALE PROCEDURES

This Court's predecessor, the Honorable Avern Cohn, appointed a Special Master to address a number of post-judgment collection issues in this commercial litigation matter.  *See* ECF No. 890.  Judge Cohn subsequently adopted the Special Master's report that recommended granting a motion for a writ of execution on certain corporate stock, and he directed the plaintiff to submit to defendant Larry J. Winget Living Trust (referred to as the Winget Trust or the Trust hereafter) a proposed form of judicial sale, allowing the defendant an opportunity to object.  ECF No. 915.  After additional litigation in this Court and the court of appeals, the Court granted the plaintiff's motion for a status conference, which was held on January 20, 2021.  ECF No. 986.  The Special Master attended the conference and was given the task, with the parties' consent, of overseeing the sales process.  He filed a report recommending the sales procedures.  ECF No. 1000.  The Winget Trust filed objections, and after another round of appellate litigation filed supplemental objections after remand.  The proposed judicial sale procedure for the corporate stock is now before the Court for fresh review.  Some of the Trust's concerns and objections have

merit, but most of them don't.  The Court will adopt most of the Special Master's proposals for the judicial sale, with slight modifications set forth below.

I.

The parties are familiar with the long and tortuous history of the 15+ year-old litigation, which has been summarized multiple times in the several opinions issued by this Court and the nine appellate opinions in this case.  For the latest versions, *see* ECF Nos. 986 & 1024.  Suffice it to say that a group of creditors, whose interests at one time were assigned to JP Morgan Chase and now lie in the hands of their present agent, plaintiff Alter Domus, LLC, obtained a judgment against the Winget Trust that has grown to nearly a billion dollars, which remains unsatisfied.

The administrative agent for the lenders — then JPMorgan Chase (the "Agent") — moved to execute on the corporate stock owned by the Trust.  (In early 2021, Chase entered an Agency Transfer Agreement with Alter Domus, LLC, that made Alter Domus the successor administrative agent for the lenders in this case.  *See* ECF Nos. 989-90.)  The corporate stock owned by the Trust was in the following entities: Golf Course Corporation 1, Golf Course Development Co., Oakland Land Company, PIM Management Company, Venture Sales & Engineering Corp., and VIMCO Corporation (the "Trust corporations").  *See* ECF No. 863.  The Court referred the motion to a Special Master, who determined that the Agent was entitled to a writ of execution on the Trust corporations' stock.  The Court adopted the Special Mater's Report and Recommendation and ordered the trustee of the Trust — Winget — to "deliver to the District Court all stock certificates titled in the name of the Trust or its trustee" of the Trust corporations.  *See* ECF No. 915, PageID.29784 (the "Status Quo Order").  The Court also ordered the Agent, after considering the Trust's reasonable objections, to submit to the Court a proposed form of judicial sale.  *Ibid*.  Winget and the Trust did not appeal the writ.

- 2 -

On May 15, 2020, the Agent filed a notice of a proposed form of judicial sale.  Winget and the Trust submitted their objections, and after considering them, the Agent revised the proposed sale procedures.  *See* ECF No. 970-1.  Winget filed objections, *see* ECF No. 973, to which the Agent responded, *see* ECF No. 984.  The revised procedures state that the Agent seeks to "enforce the Final Judgment by selling at public sale as judgment creditor those assets of the Winget Trust consisting of equity interests in certain corporations as more fully set forth on Exhibit A."  *See* ¶ 2, ECF No. 970-1, PageID.31463.  Exhibit A in turn lists the number of shares held in each of the six Trust corporations listed in the writ of execution, including 1,000 shares constituting "100% of the outstanding shares of Oakland Land Company."  *See* Ex. A, ECF No. 970-1, PageID.31473.

Overseeing the process, the Special Master summarized the other relevant provisions of the proposed sale procedures as follows:

(1)     The corporate stock will be sold on an "as is, where is" basis, pursuant to a share transfer instrument, and without any representations or warranties of any kind, nature, or description.

(2)     The corporate stock will be sold free and clear of any liens, claims, interests or encumbrances, with any such liens, claim, interests or encumbrances to attach to the sale proceeds. This will exclude, however, any existing liens, claims or encumbrances on the Trust corporations' assets or on any subsidiary entities of the corporations.

(3)     The Agent will retain a marketing agent to assist with the sale process and the evaluation of bids.

(4)     The Agent will publish a notice of the sale in the *Wall Street Journal*, *USA Today*, and the *Detroit Free Press* for three consecutive weeks.  The sale notice also will be given to Winget, any parties identified by Winget who have the ability to purchase the corporate stock, and any other parties that the Agent determines has the interest and ability to purchase the stock.

(5)     The sale will be held either at the law offices of Dickinson Wright LLP located in Detroit, Michigan, or through a publicly accessible remote format such as Zoom or WebEx, as circumstances may warrant.

(6)     Prospective bidders must qualify to participate in the sale by providing to the Agent certain disclosures, including a signed and completed form attesting to the prospective

bidder's qualifications as an "accredited investor" under Rule 501 of Regulation D promulgated under the Securities Act of 1933, as well as an executed confidentiality agreement. It will be within the sole discretion of the Agent to determine which bidders shall become qualified bidders based on their ability to consummate the proposed sale. The Agent, on behalf of the lenders, or any entity or entities created by the Agent for the submission of a bid at the sale, will be deemed to be a qualified bidder and may, but is not obligated to, credit bid in amounts up to the judgment amount.

(7)      A data room will be assembled and maintained by the Agent for purposes of allowing qualified bidders to complete their due diligence in connection with the sale. It will contain financial and corporate information of the Trust corporations, as well as copies of the Winget Trust and information regarding corporate subsidiaries of PIM operating in South Africa. [Apparently, the sale of PIM's stock therefore implicates South African competition law.]

(8)      All bids must be in cash (unless the bid is a credit bid), made in public, and recorded by a court reporter, with all subsequent bids to be in increments of $500,000. Bidding will start with bids for the corporate stock as one lot. Bidding will then commence on the corporate stock individually, or in multiple lots. At the end of the bidding process, if the aggregate of the highest bids for individual or multiple lots is greater than the highest bid for the entire lot, the highest bidder for the entire lot will have the opportunity to increase its bid by an increment of $500,000, and the highest bidders for the individual or multiple lots will have the opportunity to likewise increase their bids. The bidding will continue until no further bids are made.

(9)      A hearing on the confirmation of the sale will take place no sooner than three days following the completion of the bidding process, with any objections to the sale being limited to whether the sale process was conducted in accordance with the sale procedures. At the hearing, the Court will be asked to enter a sale confirmation order.

(10)     The winning bidder will be required to pay the purchase price for the purchased corporate stock upon entry of the sale confirmation order.

(11)     All costs incurred in connection with the sale will constitute costs of collection under the guaranty and will be recoverable in addition to the judgment amount.

On May 29, 2020, the Trust filed objections to the proposed sale notice and procedures. Most of Winget's objections were based on the purported inadequacy of the sale notice and procedures. Winget asked that the documents be amended to describe the assets being sold as the legal title in the stock of certain corporations subject to his preexisting rights; provide protocols for complying with South African competition laws in selling PIM's stock; establish minimum

standards for selecting the marketing agent; grant him the ability to place information related to the sale assets in the data room for qualified bidders' consideration; require the Agent to act in good faith when designating qualified bidders and verify that such bidders are accredited investors; set out detailed protocols for using remote technology to conduct the auction and provide for the auction's transcription; include a runner-up bidder protocol; and set deadlines for the closure of the sales process, a sales confirmation hearing, and the submission of objections to the sale.  He also objected to imposing a $500,000 bidding increment and to proceeding with the sale while his motion for summary judgment remained pending.  *See* ECF No. 973.

On March 4, 2021, the Special Master filed a report recommending that the Court enter an order approving the proposed form of judicial sale, subject to certain minor revisions.  *See* ECF No. 1000.  Winget again filed objections to the Special Master's report.  The Court did not consider the objections or the report while Winget's appeal of the Court's opinion and order granting the Agent's motion for partial summary judgment remained pending.  After the Sixth Circuit issued its decision affirming the Court in part, Winget moved for leave to file amended objections to the Special Master's report to conform the objections to the July 1, 2022 opinion of the court of appeals.  The Court granted Winget's motion for leave to amend while prohibiting Winget from revising objections not impacted by that opinion or from making new objections to the report.  *See* ECF No. 1029.

On September 29, 2022, Winget filed his amended objections to the report.  *See* ECF No. 1032.  The Agent filed a response contending in part that the amendment went beyond the scope of the Court's order.  *See* ECF No. 1032.

II.

Winget filed 12 objections to the report and recommendation.  His overriding objection to the Special Master's report is that the judicial sale of the Trust assets should not proceed at all. Alternatively, he objects to the omission of certain provisions from the sale procedures and to the inclusion of others.

Upon objection, the Special Master's recommendations are given fresh review. Fed. R. Civ. P. 53(f)(3); *see also* Order Appointing Special Master, ECF No. 890, PageID.29327 (citing 28 U.S.C. § 636(b)(1)) (stating that "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made").

As a general proposition, "[a] money judgment is enforced by a writ of execution, unless the court directs otherwise." Fed. R. Civ. P. 69.  Federal courts apply state law rules for collecting judgments "unless a federal statute provides an alternative procedure." *Lewis v. United Joint Venture*, 691 F.3d 835, 839 (6th Cir. 2012) (citing Fed. R. Civ. P. 69(a)).  The parties agree that Michigan law governs the sale procedures in this case. *See JPMorgan Chase Bank, N.A. v. Winget*, 801 F. App'x 962, 963 (6th Cir. 2020).

The Michigan Revised Judicature Act sets forth the procedures for execution on corporate stock and for its sale.  Mich. Comp. Laws §§ 600.6031 and 6037.  The statute does not furnish extensive instructions for the sale of corporate stock, requiring only 10 days' notice of a sale, with such notice to be posted in three public places in the city or township where the sale is to occur. Mich. Comp. Laws § 600.6031.  However, the Act also permits the Court, when enforcing a money judgment, to "[m]ake any order as within [its] discretion seems appropriate . . . to subject any nonexempt assets of any judgment debtor to the satisfaction of any judgment against the judgment

debtor." Mich. Comp. Laws § 600.6104(5). The Court's authority under this provision is "very broad." *In re John Richards Homes Bldg. Co., L.L.C.*, 298 B.R. 591, 609 (Bankr. E.D. Mich. 2003) (citing *Rogers v. Webster*, 779 F.2d 52, 1985 WL 13788, at *1 (6th Cir. 1985) (*per curiam*) (table)); *see also Winget*, 801 F. App'x at 963 ("Michigan law gives courts extremely broad authority to enforce their judgments." (quotation omitted)).

The Special Master found the Agent's proposed sale procedures to be adequately designed to ensure a competitive bidding process, a fair and open sale, and the highest sale price. Although he acknowledged that the procedures differ from those set out in the Michigan Revised Judicature Act, he concluded that they are substantially similar to a bankruptcy court asset sale that is conducted under 11 U.S.C. § 363, or to asset sales conducted by federal court receivers and governed by 28 U.S.C. § 2001 and 28 U.S.C. § 2004, and that a number of courts in this district have entered orders allowing sales of property by receivers on terms substantially similar to those proposed here. Noting that the sales process exists because there is a judgment against the Winget Trust that now amounts to nearly a billion dollars, and the Trust's assets effectively are the Agent's collateral, the Special Master concluded that it is appropriate for the Agent largely to control the sale process with oversight from the Court.

The Special Master's report addressed Winget's objections and concerns with the process and made some modifications to the Agent's proposal. Winget's amended objections to the report and recommendation largely parrot the objections he submitted to the Special Master and are discussed below.

A. First Objection

In his first objection, Winget argues that a sale of the Trust corporations' stock cannot proceed until he resolves certain trust administration issues raised by the Sixth Circuit's July 1,

2022 opinion.  Winget says that the Sixth Circuit nullified the Winget Trust and retroactively created a new, irrevocable trust.  But Winget mischaracterizes the court of appeals' opinion, which neither nullified the Trust nor held that it was irrevocable.  Rather, the Sixth Circuit repeatedly acknowledged that the Winget Trust is a revocable trust.  *See JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *4 (6th Cir. July 1, 2022) ("Indeed, Winget admits that the Trust received nothing.  That's the nature of a revocable trust . . . ."), *cert. denied sub nom. Winget v. Alter Domus, LLC*,  143 S. Ct. 748 (Mem) (U.S. Jan. 23, 2023); *ibid.* ("Winget's right to revoke was limited by the Trust's obligation to Chase — an obligation Winget himself assumed as trustee.").  After the Trust's duty to repay the Agent is satisfied, nothing in its July 1, 2022 opinion (or any order by this Court) prohibits Winget from revoking the Trust.

The July 1, 2022 opinion does not provide any basis for pausing collection efforts.  To the contrary, the court of appeals affirmed the Agent's right to recover its judgment from the Trust property despite the novel issues of trust administration potentially raised by this Court's fraudulent transfer finding.  Acknowledging that, as a result of that finding, "the typical rules for revocable trust may not apply," *id.* at *8, the Sixth Circuit nevertheless unambiguously found that the Agent "is entitled to all" of the assets held in a constructive trust "but the $79 million that Winget paid in taxes" on the limited liability companies' distributions during the revocation period, *id.* at *9.  The court of appeals also reaffirmed the Agent's right to enforce its judgment against property titled in the name of the Trust, regardless of who "owned" the Trust property, explaining again that "if ownership mattered, creditors of a trust . . . could almost never recover from the trust property."  *See id.* at *3 (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d 748, 750 (6th Cir. 2019)).  And it emphatically rejected Winget's efforts to revisit its prior rulings and raise fact questions regarding "whether he as settlor intended to allow the Trust's guaranty to

bind his property or restrict his revocation rights." *Id.* at \*3, 5.  In expressing its clear "hope" that its July 1, 2022 opinion "marks the final chapter" in this litigation, the Sixth Circuit plainly did not contemplate additional factfinding into the trust administration questions Winget raised in his objections to the Special Master's report.  *Id.* at \*11.

Winget also says that his trust administration questions are in the exclusive jurisdiction of the Michigan state probate court, which was considering a petition he filed in light of the July 2022 appellate opinion.  However, the "narrowly limited" probate exception to federal jurisdiction does not apply in this case, *see Chevalier v. Est. of Barnhart*, 803 F.3d 789, 800-01 (6th Cir. 2015), and by asking the probate court to nullify years of contributions to the Winget Trust, Winget earned a motion by the Agent to hold him in contempt of the Court's Status Quo Order.  After the Court held a hearing on that motion, the Michigan probate court dismissed the petition, so it no longer would be an obstacle to proceeding with the judicial sale.  Winget appealed that order, and he argues in a supplemental response to the contempt motion that the probate court's refusal to address the question about trust administration boomerangs the question whether he holds equitable title of the Trust *res* back here.  But, as noted above, that ship has sailed, and this Court and the court of appeals has held repeatedly that the Agent may look to the Trust assets to satisfy the judgment.

Winget's first objection to the Special Master's report will be overruled.

## B.  Second and Fifth Objections

In his second and fifth objections, Winget argues that the sale procedures inaccurately describe the sale assets and his property interests in the Trust *res*.  The Agent contends that the objection should be struck because Winget added it wholesale when he filed his amended objections, even though it is not based on the Sixth Circuit's July 1, 2022 opinion.  That is incorrect.  Although Winget added expository language, the amended objection is substantially

similar to the original objections he offered to the Special Master's report.  *See* Objs., §§ II and III, ECF No. 1006, PageID.32126-31.  Nevertheless, Winget's arguments are without merit, because this Court and the Sixth Circuit repeatedly have established the Agent's right to execute on the Trust corporations' stock.

The "writ of execution *on corporate stock*" issued by the Court directed Winget, as trustee of the Winget Trust, to deliver to the Court "all *stock certificates* titled in the name of the Trust or its trustee."  *See* ECF No. 915, PageID.29783-84 (emphasis added).  Winget never challenged the writ of execution on appeal.  *See JPMorgan Chase Bank, N.A. v. Winget*, 801 F. App'x 962 (6th Cir. 2020).  However, at various times he unsuccessfully has argued that while the Winget Trust owned only "bare legal title" to the assets titled in its name, he always remained the real owner of the property held in the Trust.  Both this Court and the Sixth Circuit rejected that argument as inconsistent with basic trust principles and affirmed that the Agent, as a creditor of the Trust, may recover the property held by the Trust, regardless of who "owns" the Trust property.  *Ibid.*; *Winget*, 942 F.3d at 750-51; *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2017 WL 2868538, at *5 (E.D. Mich. July 5, 2017), *aff'd*, No. 21-1568, 2022 WL 2389287 (6th Cir. July 1, 2022).

Winget now attempts to relitigate, yet again, whether the Trust ever could have owned the Trust corporation stock.  That question already has been asked, answered, and affirmed, and it is not necessary for the probate court, or anyone else, to reconsider the nature of the interests held by the Winget Trust in order for the instant sale to proceed.  The sale procedures plainly define the sale assets as the shares in the six Trust corporations listed in the writ of execution, the only property subject to the sale.  The shares are described as the "equity interests in certain corporations," because that is what corporate stock is.  *See, e.g.*, *Stock*, *Black's Law Dictionary* (11th ed. 2019) (defining "corporate stock" as "an equity security issued by a corporation").

Winget has not raised any valid grounds in his second objection for why the sale of the stock should not finally proceed.

In his fifth objection, Winget also asks the Court to add language to the sale procedures suggesting that the corporate stock cannot be sold and that litigation remains pending that will determine whether he has the right to recover all of the sale assets. The language is unnecessary for the reasons stated above. And, as the Special Master noted, it appears geared toward chilling the bidding and thwarting the sale entirely. Far from "inspiring confidence in the court-ordered sale," as Winget insists he is endeavoring to do, Winget's fifth objection appears geared toward making the auction an "empty exercise[]." *First Nat. Bank of Jefferson Par. v. M/V Lightning Power*, 776 F.2d 1258, 1261 (5th Cir. 1985).

Winget's second and fifth objections to the Special Master's report will be overruled.

### C.  Third, Seventh, Eighth, Ninth, and Eleventh Objections

Winget lodges several overlapping objections related to the fairness of the proposed sale procedures in which he argues that the procedures leave too much discretion to the Agent, do not adequately require the Agent to act in good faith, and do not adequately permit him to object to the sale on unlimited grounds. Winget cites almost no authority in support of any of these objections and makes no citations whatsoever of controlling statutes or caselaw.

The sale procedures provide that, at the confirmation hearing following the sale, any party may object that the sale was not conducted in accordance with the sale procedures. Winget objects to the scope of the permitted objections, arguing that he also should be able to object that the sale procedures themselves were unfair. But Winget already has had several opportunities to challenge the fairness of the sale procedures over the last three years, including by filing the amended objections to the Special Master's report now before the Court. The point of the present exercise is precisely to allow him the chance to challenge the fairness of the sale procedures. There is no

need to allow him yet additional time to relitigate these questions after-the-fact.  And since the objections to the sale will be confined to whether the procedures were followed properly, Winget has not presented any reason why seven days is an inadequate amount of time to prepare and file an objection to the confirmation of the sale.

As for the matter of the Agent's discretion, Winget objects to the fact that the sale procedures are silent as to what information must be placed in the data room, what procedures must be followed if the sale is conducted remotely, and how to proceed if the winning bid fails. Likewise, the procedures do not identify the qualifications of the Marketing Agent.  Winget contends that additional details must be included in the sales procedures to safeguard the integrity of the process, including a provision requiring the Agent to act in good faith.  Otherwise, Winget insists that the Agent will undermine or even sabotage the sale.  That is illogical: the Agent has endeavored to execute on its judgment for nearly five years to finally resolve this decades-long dispute.  Other than in a rare circumstance described below, the Agent has every incentive to ensure that the Trust corporations' stock sells for the highest price, and Winget has presented no evidence that it will proceed otherwise.  Nor has Winget identified anything under Michigan law requiring provision of a runner-up bidder protocol.  As Winget himself notes, Michigan law focuses instead on ensuring that the highest bidder actually delivers, imposing liability on bidders that refuse to take and pay for property at an execution sale.  *See* Mich. Comp. Laws § 600.6045; Objs., ECF No. 1006, PageID.32138.

It also is unclear precisely to what Winget is objecting.  It appears that Winget never before has stated what information he wishes to be placed in the data room, despite the Agent representing that it would consider and include in the data room any material information provided by Winget. *See* R&R, ECF No. 1000, PageID.32014.  Now, he merely asks that the Agent include in the data

room specific orders from this Court and opinions from the Sixth Circuit — a redundant request, since the sale notice already urges interested parties to review the Court's docket for this case in its entirety. *See* Winget Prop. Redlines, ¶ 12, ECF No. 1032-6, PageID.32645-46; Sale Proc., ECF No. 1000-2, PageID.32044. Winget similarly has not identified any specific issues that may arise due to the procedures' failure to spell out the protocols for a holding a remote sale. Three years into the COVID-19 pandemic, it seems unlikely that the "circumstances [will] warrant" a remote sale in any case. *Id.* at PageID.32031. And Winget acknowledges that the Agent already has advised him of the identity of the Market Agent it has chosen to assist with the sale and evaluate bids. Winget does not contend that said Marketing Agent is inexperienced, has conflicts of interest, or otherwise is unqualified. Am. Objs., ECF No. 1006, PageID.32137. Having evidently already accepted the Marketing Agent's qualifications, Winget is unable to explain why those qualifications must be detailed in the sale procedures in order to protect the integrity of the sale.

Winget maintains that additional fairness protections are necessary to ensure that the sale secures the highest possible price. That argument is incongruous with Winget's broader efforts to undermine the integrity of the sale, including his aforementioned insistence that the sale procedures include language suggesting that bidders are buying nothing of value. It also is incongruous with the Agent's evident and long-professed desire to recover the value of its judgment. And in the unlikely happenstance that the sale is marred by fraud or collusion, Winget is not without recourse. If the sale assets fetch a price grossly disproportionate to the value of the property, Winget would be well within his rights to move to set aside the sale before confirmation. *Ballentyne v. Smith*, 205 U.S. 285, 291 (1907) (upholding lower court's decision to refuse to confirm a judicial sale because of the inadequacy of the price); *see also Citibank, N. A. v. Data Lease Fin. Corp.*, 645 F.2d 333, 339 (5th Cir. 1981) (collecting cases); *Page v. Kress*, 80 Mich.

85, 89, 44 N.W. 1052, 1053 (1890) ("When property is exposed for sale under a judicial decree, and offered to the highest bidder, and the sale is without fraud, and is fairly conducted, after proper notice, and is struck off to a third person, it will require a strong case, and some peculiar exigency, to warrant a court in setting it aside.").

There are potential fairness issues, however, that arise from the Special Master's proposal for allowing credit bids.  Normally, credit bids are allowed for secured creditors who may submit an amount equal to the value of their security interest in the assets to be auctioned.  But the Agent here does not have a security interest in the corporate stock to be sold, and there is nothing in the record that fixes its value.  And it is not the Agent who has the beneficial interest in the sale proceeds; that would belong to the creditors that the Agent represents.  Those creditors should not be permitted to submit an undervalued bid to obtain the Trust's corporate stock, only to sell it later at a profit.  Therefore, the Court will require as part of the procedures that the Marketing Agent may not accept any credit bid or aggregate bid that has a credit component unless it is in the full amount of the judgment that remains outstanding.  In addition, the Marketing Agent may not accept any individual bid by a creditor of the defendant represented by the Agent, or a joint bid in which such a creditor participates, unless it is in the full amount of the judgment that remains outstanding.

Other than that, Winget's third, seventh (A and C), eighth, ninth, and eleventh objections to the Special Master's report will be overruled.

### D. Fourth, Seventh (B), and Tenth Objections

In his fourth, seventh, and tenth objections, Winget argues that the sale procedures do not conform to Michigan law.  The fourth objection does not identify with any particularity the ways in which the proposed sale procedures are unlawful; rather, Winget broadly contends that the Court lacks the discretion to fashion procedures beyond those that exist under the relevant Michigan statute.  Actually, the governing law is the opposite.  Michigan law vests the Court with "very

broad" discretion to fashion procedures for executing on the assets of judgment debtors.  *In re John Richards Homes Bldg. Co.*, 298 B.R. at 609 (citing Mich. Comp. Laws § 600.6104(5)).  Were it otherwise, the Court could approve no sale procedures beyond establishing the time, place, and contents of the sale notice — the only three requirements established by the Michigan Revised Judicature Act.  *See* Mich. Comp. Laws § 600.6031.

Notably, the proposed sale procedures comply with only two of those three requirements. The procedures provide for three weeks' notice of the sale by publication and to certain interested parties in writing, and the sale notice includes the time and place where the sale is to be had.  *See* Sale Procedures, ¶ 8, ECF No. 1000-2, PageID.32030-31; Sale Notice, § III, ¶ 3, ECF No. 1000-2, PageID.32042.  Missing, however, is any requirement that the sale notice be "fasten[ed] up . . . in 3 public places in the city or township" where the sale is to take place.  *See* Mich. Comp. Laws § 600.6031.  That vestigial requirement may be outdated and obsolete in the age of the internet. And Winget has not identified or contested the omission or argued that he is "in any way injured or aggrieved" by the proposed notice procedure.  *See Cross v. Fruehauf Trailer Co*., 354 Mich. 455, 467, 93 N.W.2d 233, 239 (1958) (finding sale pursuant to writ of execution valid even though the sale was not posted in three places in the township); *see also Kelso v. Coburn*, 334 Mich. 43, 55, 53 N.W.2d 686, 692 (1952) (same).  Nor could he: "It is obvious that provisions of the statute . . . are designed for the protection of third parties who may deal with the property in good faith without notice or knowledge of any irregularity or omission."  *Cross*, 354 Mich. at 466, 93 N.W.2d at 238.  Consequently, "[t]he omission of any officer to give the notice of sale required" in section 6031 does "not affect the validity of any sale made to a purchaser in good faith, without notice of such omission."  *Id.* at 466, 93 N.W.2d at 238-39 (quoting Mich. Comp. Laws § 600.6054(3)); *see also Kelso*, 334 Mich. at 55, 53 N.W.2d at 692 (finding that a litigant was not "in position to seek

relief" where he did not show that he was prejudiced by sale procedures that did not comply with the statutory notice requirement).

In his seventh and tenth objections, Winget finally identifies specific ways in which the proposed sale procedures violate Michigan law: by limiting "qualified bidder" status to bidders who demonstrate that they have the ability to consummate the proposed sale (objection 7(B)), and by establishing bidding increments (objection 10).  Winget does not cite any *controlling* authority for either proposition.  But there is some practical merit to them, at least in part.  Regarding qualified bidders, he cites treatises and an out-of-circuit opinion indicating that a defendant in a cause of action may qualify as a bidder in an execution sale.  *See* 30 Am. Jur. 2d, *Executions*, *Etc.*, § 331 (citing state court decisions for the "general rule" that "any person who is competent to contract" and not conflicted "may become a purchaser at an execution sale"); *FM. Indus., Inc. v. Citicorp Credit Servs., Inc.*, 656 F. Supp. 2d 795, 800 (N.D. Ill. 2009) (noting that the "Illinois Citation Statute does not restrict the ability of a defendant to be a potential buyer in a judicial sale of a chose in action."), *aff'd sub nom.* 614 F.3d 335 (7th Cir. 2010).  But no one contests that proposition here.  As the Special Master notes, Winget may qualify as a bidder by delivering the same documents and disclosures as everyone else, because nothing in the sale procedures prevents Winget from bidding if he demonstrates an ability to consummate his proposed sale.  *See Allen v. Gillette*, 127 U.S. 589, 596 (1888) ("The principle that a trustee may purchase the trust property at a judicial sale brought about by a third party, which he had taken no part in procuring, and over which he could not have had control, is upheld by numerous decisions of this court . . . .").  And the Court sees no reason why Winget should not qualify as a bidder if he is able to demonstrate that he is able to consummate the sale.  He need not furnish any other qualifications.

However, Winget also insists without irony that the bidder criteria must remain open to those who cannot pay.  But that amounts to arguing that bidders must be allowed to participate in the sale in bad faith — precisely the opposite of what Winget demands of the Agent in his other objections.  Michigan law does not impose any such requirement.

The Michigan's Revised Judicature Act does not explicitly authorize the setting of bidding increments.  That does not mean, however, that sale procedures cannot utilize bidding increments.  As repeatedly noted, section 6104(5) of the statute grants the Court broad authority to fashion the procedures of a sale of assets to satisfy its judgments.  *See, e.g.*, *Rogers*, 1985 WL 13788, at *1 (6th Cir. 1985) ("Michigan has given its courts extremely broad authorization to aid execution on their judgments, including ordering satisfaction out of liquidated or unliquidated property and the appointment of a receiver.").

But despite the large amount owed on the judgment and the potential substantial value of the corporate stock, it is not clear from the Agent's proposal or the Special Master's report and recommendation why subsequent bids should be limited to $500,000 increments.  That provision does not appear to be designed to maximize the return at the auction.  Certainly, allowing nominal incremental bids might slow or even frustrate the process.  But the determination of how to entertain subsequent bids should be left to the Marketing Agent, with some guidelines.  Therefore, the Court will sustain Winget's objection in part and direct that the Marketing Agent impose minimum limits on subsequent bids up to $250,000 if, in his discretion, they will serve to maximize the return on the sale of the corporate stock.

Otherwise, Winget's fourth, seventh (B), and tenth objections to the Special Master's report will be overruled.

### E.  Sixth Objection

In his sixth objection, Winget contends that the sale procedures must acknowledge the South African laws applicable to consummating the sale of the PIM stock.  It is undisputed that the receipt of regulatory approvals from the South African government is a condition precedent to the sale of that stock.  Rather, the question raised by Winget's objection is whether it is sufficient to include information regarding PIM's South African subsidiaries in the data room so that qualified bidders may perform their own due diligence, or whether the sale procedures must instead explicitly note the issues that could arise from the PIM stock's transfer.

Winget says that *Rogers v. Webster* is instructive.  There, the court of appeals considered a writ of execution against stock in Canadian corporations.  Although it found that the writ did not pose "any threat of significant interference with the sovereignty of Canada," it allowed that it is "a matter of worthy consideration" whether a "judicially-ordered sale" of the stock "would conflict with the sovereign right of Canada to regulate its closely-held corporations and the transfer of ownership interests therein."  1985 WL 13788 at *3.  However, because the district court had yet to order a sale of the stock, the court of appeals did not reach that question.  *Ibid.*  And it does not appear that the court of appeals or the Michigan courts have considered it again since.

The Special Master concluded that the information in the data room will put qualified bidders on notice of the foreign-law issues that could arise from a transfer of the PIM stock.  In contrast, Winget contends that relying on the data room is inadequate, because the sale procedures do not require the Agent to include in the data room anything about South African competition law.  But Winget *himself* did not suggest that the Court impose that requirement: his redlined changes to the sale procedures do not include any provision requiring that the Agent place any such information in the data room.  *See* Winget Prop. Redlines, ¶ 12, ECF No. 1032-6, PageID.32645; Am. Objs., § VII, ECF No. 1032, PageID.32511.  Presumably, the fact that PIM

holds stock in a South African company will be noted in PIM's financial information, and qualified bidders will also glean from this record that certain approvals may be needed from the South African government before the sale of PIM's stock is consummated.

The Special Master reasonably determined that it is unnecessary to acknowledge the South African law issues in the sale procedures because bidders will wish to make their own legal assessment of any foreign-law issues implicated in the sale. He also observed that noting the foreign-law issues in the sale procedures does nothing to ensure that the buyer actually complies with South African law. The sale procedures set out the process for qualifying bidders and making and accepting bids; they do not require bidders to do anything beyond making disclosures and paying the purchase price for the sale assets upon entry of the confirmation order. The information Winget seeks to add about the South African Competition Act therefore is beyond the scope of the procedures and notice at issue. However, the Agent must inform potential bidders that their failure to comply with domestic or foreign laws will not relieve them of the obligation to complete the sale after a bid is accepted.

Winget's sixth objection to the Special Master's report will be overruled.

### F.  Twelfth Objection

Finally, in his twelfth objection, Winget challenges the proposed description of the sale assets in the Oakland Land Company. He bases his objection on the revelation that he caused a change in the ownership of the company in 2021 via a capital infusion, and that as a result the Trust no longer owns 100% of the company. The Agent contends that the infusion effectively was a transfer of 90% of the ownership of the company to Winget in violation of the Court's Status Quo Order. It suggested in its response to Winget's objections that it may seek recovery of any diminution in value of the Trust property arising from the transfer, as well as recovery of any equity Winget purportedly received in connection with the Oakland Land Company transaction.

However, the Agent has taken no further action since or proposed any remedy for the Court's consideration, and the Court does not believe that *buying* stock in one of the corporations violates the Status Quo Order.

If the Agent continues to proceed with the judicial sale and Winget continues to retain ownership of 90% of the shares in the Oakland Land Company, then the description of the sale assets must be changed to reflect accurately the Trust's ownership share. Based on Winget's representations, the list of sale assets in that case will be amended to reflect that the 1,000 shares in the Oakland Land Company being offered at auction consist of "10% of the outstanding shares." *See* Sale Assets, ECF No. 1000-2, PageID.32038.

Winget's twelfth objection to the Special Master's report will be sustained.

III.

Other than the exceptions noted above, the Special Master has adjudicated properly the defendants' objections to the proposed corporate stock sale procedures proposed by the Agent.

Accordingly, it is **ORDERED** that the defendant's objections and amended objections to the Special Master's report and recommendation are **OVERRULED IN PART AND SUSTAINED IN PART**, and the Special Master's report and recommendation (ECF No. 1000) is **ADOPTED IN PART**.

It is further **ORDERED** that the following corporate stock shall be offered for sale (the Sale Assets) under the procedures set forth below:

1. 1,000 shares of Golf Course Corporation 1, a Michigan corporation, constituting 100% of the outstanding shares of Golf Course Corporation 1.

2. 1,000 shares Golf Course Development Co., a Michigan corporation, constituting 100% of the outstanding shares of Golf Course Development Co.

3. 1,000 shares of Oakland Land Company, a Michigan corporation, constituting 10% of the outstanding shares of Oakland Land Company.

4. 1,000 shares of PIM Management Company, a Michigan corporation, constituting 100% of the outstanding shares of PIM Management Company.

5. 5,000 shares of Venture Sales & Engineering Corp., a Michigan corporation, constituting 100% of the outstanding shares of Venture Sales & Engineering Corp.

6. 400 shares of VIMCO Corporation, a Michigan corporation, constituting 4% of the outstanding shares of VIMCO Corporation.

It is further **ORDERED** that the following procedures apply and shall be followed by the current administrative agent, plaintiff Alter Domus, LLC, (the Agent):

A.     The Agent will sell the Sale Assets on an "as is, where is" basis without representations or warranties of any kind, nature or description by the Agent, any Lender, or any of its agents.

B.     The Sale Assets are currently held by the District Court pursuant to the Order Granting JPMorgan Chase Bank, N.A.'s Writ of Execution on Corporate Stock and Restraint of Transfer entered by the District Court on September 11, 2019 (ECF No. 915) and affirmed by the Sixth Circuit on April 22, 2020 (mandate issued May 14, 2020). The District Court hereby authorizes the Agent, in its capacity as judgment creditor, to convey the Sale Assets to the highest bidder at the public sale pursuant to a share transfer instrument in form and substance satisfactory to the Agent and to execute such transfer instrument and any other or further documents in its capacity as judgment creditor necessary to effectuate the sale of the Sale Assets. The Sale Assets shall be sold free and clear of any liens, claims, interests or encumbrances (for the avoidance of doubt, excluding existing liens, claims, interests or encumbrances existing at subsidiary entities included in the Sale Assets).

C.     The sale is being conducted pursuant to Section 600.6037 of the Michigan Compiled Laws and this Order.

D.     The Agent shall retain a marketing agent (the "Marketing Agent") on behalf of the Lenders to assist with the Sale Process and the evaluation of bids.

E.     Winget and the Winget Trust shall cooperate in good faith with the Sale Process, including, without limitation by providing documentation or other relevant information promptly to Agent, Marketing Agent or any Qualified Bidders (defined below) upon reasonable written request and by making available senior officers at the Companies (as defined below) for discussions with Agent, Marketing Agent and any Qualified Bidders.

F.     The Agent shall publish a notice of sale in substantially the form attached to the Special Master's report and recommendation, ECF No. 1000-2, PageID.32039-45, in the Wall Street Journal, USA Today and the Detroit Free Press for three consecutive weeks (the "Sale Notice") commencing at least four weeks before the intended date of sale. In addition, the Agent

shall provide notice to the following parties: Winget; those parties identified in writing delivered to the Agent by Winget, which writing shall demonstrate such parties' interest in the assets and the ability to consummate a purchase of the assets to the sole satisfaction of the Agent; and any other party the Agent determines in its sole discretion may have interest in and the wherewithal to pursue the Sale Assets.

G.      The Sale Assets shall be sold at a public sale ("Public Sale") to be held **no later than August 31, 2023** either at the offices of Dickinson Wright LLP, 500 Woodward Avenue, Suite 4000, Detroit, Michigan 48226-3425 or through a publicly accessible remote format such as Zoom or WebEx, in the discretion of the Marketing Agent and as circumstances may warrant. The Public Sale may be adjourned from time to time in the sole discretion of the Marketing Agent and notice of any adjourned sale date will be given only at the time of the scheduled public sale and to those who attend the sale and to Winget.

H.      In order to participate in the Sale Process, a prospective bidder must provide the Agent the following by no later than seven (7) days prior to the Public Sale:

A written disclosure of the identity of each entity that will be bidding for the Sale Assets or otherwise participating in connection with such bid;

Evidence acceptable to the Agent in good faith of the financial capability, expertise and wherewithal to consummate the proposed sale;

A signed and completed form attesting to the prospective bidder's qualification as an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended;

A detailed listing of any approval, consent, license, permit, waiver or other authorization from any governmental authority necessary for the prospective bidder to acquire the Sale Assets; and

An executed confidentiality agreement in form and substance satisfactory to the Agent.

I.      A prospective bidder that delivers the foregoing documents (the "Required Bid Documents") as set forth above and who the Agent determines in its sole discretion has the ability to consummate the proposed sale shall become a "Qualified Bidder." If Winget submits evidence acceptable to the Agent of the financial capability, expertise and wherewithal to consummate the proposed sale, he will be deemed a "Qualified Bidder."

J.      A data room shall be assembled and maintained by the Agent. A Qualified Bidder shall have access to the data room. The data room shall consist of any publicly available information about the Sale Assets, information in Agent's possession and control regarding the Sale Assets received from Winget and the Winget Trust during the litigation process (including, without limitation, (1) all financial information produced to Chase in connection with these enforcement proceedings related to the entities whose stock is being sold (the "Companies"),

including, but not limited to, the financial information of all of the Companies' subsidiaries; (2) all corporate information produced to Chase in connection with these enforcement proceedings related to Companies and all of the Companies' subsidiaries; (3) true copies of the Larry J. Winget Living Trust dated December 23, 1987, and the amended and restated "Larry J. Winget Living Trust dated March 9, 2013;" and (4) the October 23, 2019, communication from VOSA, which includes legal analysis from its counsel Werksmans, to Chase) and such other information as Winget and the Winget Trust may be required to provide pursuant to any order or direction of this Court or as may be reasonably requested by the Agent, Marketing Agent or any Qualified Bidders. Notwithstanding the foregoing, the Agent shall be under no obligation to seek any information from Winget or the Winget Trust regarding the Sale Assets, or to place any specific information in the data room. No other or further diligence will be made available by the Agent to any Qualified Bidder, and neither the Agent nor any of the Lenders will be deemed to make any representations regarding the accuracy or completeness of any information provided.

K.     All bids must be in cash, except for credit bid authorized herein. Qualified Bidders may bid for all of the Sale Assets or individual Sale Assets. Bids from Qualified Bidders may be grouped together. Collusive bidding shall not be allowed. Bidding at the public sale shall start with a bid for the Sale Assets in one lot. The Marketing Agent may impose minimum limits on subsequent bids up to $250,000 if, in his discretion, they will serve to maximize the return on the sale of the corporate stock. Bidding shall continue until no further bids for the Sale Assets in one lot are received (the highest such bid, the "Highest Lot Bid"). Bidding will then commence on the Sale Assets individually or in multiple lots. The Marketing Agent likewise may impose minimum limits on subsequent bids up to $250,000. The bidding shall continue until no further bids for the Sale Assets individually or in multiple lots are received (each such highest bid, the "Highest Individual Bid"). If the aggregate of the Highest Individual Bids exceeds the Highest Lot Bid, the bidder with the Highest Lot Bid shall have the opportunity to increase its bid by an increment subject to the Marketing Agent's minimum bid limit, and the bidders that made in the aggregate the Highest Individual Bids may increase their bid subject to the same incremental minimum limit. The bidding shall continue until no further bids are made, at which time the Qualified Bidder(s) making the highest bid(s) shall be announced by the Agent as the "Successful Bidder."

A judgment creditor of the defendants (or a creditor whose beneficial interest is represented by the Agent in this case) who qualifies as a Qualified Bidder (a Credit Bid Party) may submit a credit bid subject to the following limitations: the Marketing Agent may not accept any credit bid or aggregate bid that has a credit component unless it is in the full amount of the judgment that remains outstanding. The Marketing Agent may not accept any individual bid by a creditor of the defendant represented by the Agent, or a joint bid in which such a creditor participates, unless it is in the full amount of the judgment that remains outstanding.

All bids shall be made in public and on the record as recorded by a court reporter. The cost of transcription shall initially be paid for by the Agent or Marketing Agent and can be recovered as set forth in paragraph N below.

L.     The Agent shall file a notice (the "Successful Bid Notice") of the Successful Bidder with this Court for confirmation no later than twenty-one (21) days of the completion of the bidding process contemplated above, at which point the Agent will request that the Court set a hearing to

confirm the sale (the "Confirmation Hearing") at a time convenient for the Court, but no sooner than seven (7) days after the Successful Bid Notice is filed. The Successful Bid Notice shall be served on Winget and on all Qualified Bidders that participated in the bidding process. Notice of the Confirmation Hearing shall be served on the same parties. Any objections made by any party at the Confirmation Hearing shall be limited to objections that the Sale Process was not conducted in accordance with this Order. Any such objections must be filed with the Court no later than seven (7) days after the Successful Bid Notice is filed with the Court. At the Confirmation Hearing, the Court, if appropriate, will enter an order providing, among other things: that the sale to the Successful Bidder was conducted in accordance with the Sale Process and the Sale Process Order; that the sale to the Successful Bidder constitutes the highest bid for the Sale Assets; that the Successful Bidder is entitled to all the protections afforded to a good faith purchaser purchasing assets at a judicially supervised sale; that the Sale Assets shall be transferred and conveyed free and clear of any liens, claims, interests or encumbrances (for the avoidance of doubt, excluding existing liens, claims, interests or encumbrances existing at subsidiary entities included in the Sale Assets); and that the Agent has the authority to execute all documents necessary to effectuate the sale of the Sale Assets to the Successful Bidder, including any share transfer agreements.

M.     The Successful Bidder, other than any Credit Bid Party, shall be required to pay the purchase price for the Sale Assets upon entry of the Confirmation Order. The purchase price must be paid in cash, by cashier's check, or in other immediately available funds. If a Credit Bid Party is the highest bidder at the public sale, the Credit Bid Party may pay the purchase price by crediting the amount of the purchase price against the Judgment Amount and filing a Satisfaction of Judgment.

N.     All costs incurred in connection with the bid procedures shall constitute costs of collection under the Guaranty and shall be recoverable from the Larry J. Winget Living Trust thereunder and shall be in addition to the Judgment Amount.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 27, 2023