UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALTER DOMUS, LLC,

        Plaintiff/Counter-Defendant,        Case Number 08-13845

v.        Honorable David M. Lawson

LARRY J. WINGET and the LARRY J.
WINGET LIVING TRUST,

        Defendants/Counter-Plaintiffs.

_____/

## OPINION AND ORDER GRANTING IN PART PLAINTIFF'S SECOND MOTION TO HOLD DEFENDANT LARRY J. WINGET IN CIVIL CONTEMPT OF COURT

Under circumstances involving the plaintiff's ever continuing effort to collect a substantial money judgment against the Larry J. Winget Living Trust, the Court imposed a constructive trust upon assets that had belonged to the Trust and were distributed to defendant Larry Winget. The constructive trust was imposed as a remedy for the plaintiff's successful claim of unjust enrichment against Winget, and among the remedies for that violation, the Court ordered "that a constructive trust is imposed on the following assets in the possession or control of defendant Larry J. Winget: . . . a $135 million demand promissory note issued by JVIS on June 29, 2017 to the Larry J. Winget 2015 Retained Annuity Trust that was assigned to Winget; . . . [and] a $15 million demand promissory note issued by JVIS on June 29, 2017 to Winget." ECF No. 986, PageID.31897. In addition, the court ordered Larry Winget to "assign the [two] promissory notes [to the plaintiff]"; and to "pay [the plaintiff] the amounts paid on the promissory notes." *Ibid.*

Before the Court is a motion by plaintiff Alter Domus, the agent charged with collecting the judgment, to hold Larry Winget in contempt of the Court's order because, it contends, JVIS has made two payments on the notes to Winget, one for $2.5 million and another for $20 million, which Winget was ordered to pay over to the plaintiff. The Court held a hearing on the motion

and now concludes that Winget is in contempt of the Court's order for failing to pay over the $2.5 million note payment to the plaintiff. However, the plaintiff has not offered sufficient evidence to show that Winget received the $20 million payment. The Court will grant in part and deny in part the plaintiff's motion and provide remedial relief as set forth below.

I.

The parties and Court are familiar with the facts giving rise to this long-running financial dispute between plaintiff Alter Domus (the Agent), Larry J. Winget, and the Winget Trust. For more details, read *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2021 WL 37479 (E.D. Mich. Jan. 5, 2021), *aff'd in part, rev'd in part*, No. 21-1568, 2022 WL 2389287 (6th Cir. July 1, 2022).

The present dispute concerns the plaintiff's recovery of two promissory notes as part of its efforts to satisfy its substantial judgment against the Winget Trust that has now swelled to nearly a billion dollars. In 2014, nearly six years after the Agent sued Winget and the Trust on their guarantee of a debt, Winget revoked the Trust and removed all trust assets. Winget did not disclose the revocation for more than a year. During this time, the Court entered an amended final judgment establishing that the Trust owed the Agent nearly half-a-billion dollars, and the parties actively were litigating whether the Agent could attach the trust assets — which, unbeknownst to the Agent, had been moved from the Trust — to satisfy that debt.

Winget revealed the revocation when he sought a declaratory judgment that would establish that, with the revocation, the Agent had no further recourse against him or the assets that were once held in the Trust. The Agent counter-claimed, arguing that the revocation was a fraudulent transfer under the Michigan Uniform Fraudulent Transfer Act (MUFTA). The Court agreed with the Agent and granted its motion for judgment on the pleadings. Winget did not appeal

that ruling. Rather, he rescinded his revocation as of February 26, 2018, retitling to the Trust all assets that it held at the time of the revocation, which did not include the promissory notes.

After Winget reinstated and re-funded the Trust, the Agent requested entry of Charging Orders directed to membership interests in certain limited liability companies (LLCs) held by the Trust. The Court issued the requested Charging Orders on August 15, 2018, and the Sixth Circuit affirmed entry of the Charging Orders. *JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d 748, 750 (6th Cir. 2019).

During the interregnum, however, one of the companies formerly owned by the Trust, JVIS-USA, LLC, distributed millions of dollars in cash and promissory notes to Winget. Two of the notes were issued by JVIS on June 29, 2017, one to a new grantor retained annuity trust (the "GRAT") for $135 million, and one to Winget personally for $15 million. *Ibid.* The notes called for the principal balance to be paid upon demand by the obligee, but no later than July 1, 2020. When Winget reinstated the Trust, he did not retitle the promissory notes to the Trust, but rather assigned the $135 million note to himself. However, he did retitle the LLC's membership interests to make the Trust, again, the sole member of JVIS.

The Agent sued Winget for unjust enrichment and sought a constructive trust over all of the distributions made during the period after Winget revoked the Trust but before he rescinded the revocation, that is, between January 1, 2014 and February 26, 2018. The Court granted the Agent summary judgment and ordered the imposition of a constructive trust over the distributions, including the $150 million in promissory notes. It also ordered that Winget immediately assign the promissory notes to the Agent and pay to the Agent "the amounts paid on the promissory notes, including [a] $22.5 million payment" that JVIS had paid on the notes. *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2021 WL 37479, at *11 (E.D. Mich. Jan. 5, 2021). On June 1,

2021, the Court entered a final judgment on the fraudulent-transfer claim and the unjust-enrichment claim. *See JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *2 (6th Cir. July 1, 2022); ECF No. 1017, *Alter Domus v. Winget*, No. 08-13845 (E.D. Mich. Jun. 1, 2021) (judgment). Winget placed the cash and promissory notes into escrow while he appealed the rulings.

The Sixth Circuit affirmed in part. *Winget*, 2022 WL 2389287, at *11. It agreed that Winget's revocation of the Trust constituted a fraudulent transfer intended to put the Trust's assets beyond the reach of the Agent, and that Winget was unjustly enriched by the LLC distributions he received during the revocation period, including the promissory notes issued by JVIS. *Id.* at *5-9. The Court found that, but for the fraudulent revocation, the Trust — not Winget — would have been the member of JVIS, and thus the Trust would have loaned JVIS cash and received the promissory notes in return. *Id.* at *7. The court concluded that the notes belonged to the Trust and that the Agent therefore was entitled to them. *Ibid.* However, the court reversed a portion of the ruling as to $79 million in cash distributions that Winget contended were used to pay the LLC's tax obligations. *Id.* at *8-9.

After the court of appeals issued its ruling, the Agent obtained the promissory notes and the $22.5 million from escrow, only to discover that Winget and JVIS had amended the terms of the notes on June 30, 2020. Those amendments are the subject of another lawsuit, in which the Agent has asserted claims against Winget and the Agent for payment on the notes, which now are in default, as well as claims under Michigan's Uniform Voidable Transfer Act (MUVTA) and for unjust enrichment. *See Alter Domus v. JVIS-USA, LLC*, No. 23-10458 (E.D. Mich.). JVIS filed a counterclaim in that lawsuit seeking to invalidate the notes and asserting that it has the right to recover any payments it made, including the $22.5 million payment now in the possession of the

Agent. Motion practice has thinned JVIS's counterclaims somewhat; the Court held that JVIS could maintain a claim to invalidate the notes but could not assert a claim to recover the $22.5 million. *See Alter Domus, LLC v. Winget*, No. 23-10458, 2024 WL 4584681, at *9-10 (E.D. Mich. Oct. 24, 2024).

The present contempt proceeding is an outgrowth of the 2023 litigation. There, JVIS recently has represented that the principal remaining outstanding on the notes is not the combined $127.5 million assumed by the Agent. ECF No. 149, PageID.2111, *Alter Domus v. JVIS-USA, LLC*, No. 23-10458 (E.D. Mich.) ("JVIS-USA denies that the amounts currently owing on the Notes are undisputed. Specifically, JVIS-USA will prove at trial that these alleged amounts are incorrect."); ECF No. 189, PageID.2809 (arguing that the principal balance remaining was $105 million). The sum of $127.5 million, of course, would be the principal remaining on the combined notes if the known $22.5 million payment were subtracted from $150 million total. This revelation prompted the Agent to issue interrogatories to JVIS and Winget seeking information about any payments on the notes beyond the $22.5 million already in its possession. On August 14, 2024, Winget objected to the interrogatory as untimely but stated that the information sought by the Agent could be ascertained from certain discovery disclosures in the present (2008) case, including the February 26, 2018 recission agreement, a February 26, 2018 "Acknowledgement," Winget's May 24, 2018 deposition testimony, and JVIS's 2017 and 2018 tax returns. ECF No. 189-2, PageID.2823-24, *Alter Domus, LLC v. JVIS-USA, LLC*, No. 23-10458 (E.D. Mich.). Winget also stated that a payment was made on June 29, 2018 to JVIS Investments, LLC, although elsewhere he states that the payment was made on July 1st of that year. *Compare ibid. with* ECF No. 1154, PageID.34255.

Based on these statements, the Agent contends that JVIS made at least two additional payments on the notes. First, it identifies a $2.5 million payment made to Winget in 2017, although a precise date is not available. For his part, Winget does not appear to deny that he received this payment; he maintains, however, that it should have been obvious to the Agent long ago because JVIS's 2017 tax returns, produced in 2019, reflect a "Loans from shareholders" liability that increased from $0 to $125 million that year. Resp., ECF No. 1154, PageID.34248. The $125 million figure is $25 million less the $150 million value of the notes. And because adding the known $22.5 million payment and $2.5 million yields $25 million, Winget sees the Agent's failure to question this payment earlier as a critical oversight.

The Agent also seeks to hold Winget in contempt for JVIS's June 29, 2018 payment of $20 million on the notes. Winget acknowledged this payment in his interrogatory response, *Alter Domus*, No. 23-10458 (E.D. Mich.), ECF No. 189-2, PageID.2824, and there is some evidence for it in JVIS's 2018 tax returns, which disclose a reduction in JVIS's liabilities for loans from shareholders from $125 million to $105 million. However, Winget says that JVIS Investments, LLC, which is not a payee on the notes, received the funds.

On August 29, 2024, the Agent filed the present motion to hold Winget in contempt of this Court's January 5, 2021 order requiring the turnover of payments made on the notes and seeking immediate compliance. Winget responded, and the Court heard oral argument on December 17, 2024.

II.

The Agent argues that the Court's January 5, 2021 order clearly required Winget to assign it the Notes and turn over any funds paid on them. Winget's failure to turn over either payment, it says, violates that order. The Agent seeks a contempt finding against Winget and an order that

- 6 -

requires Winget, his counsel, and the managers of JVIS-USA, LLC to submit declarations attesting that all amounts paid on the notes have been disclosed. It also asks the Court to order Winget to pay its attorney's fees and 10% interest.

Winget argues that he is not in contempt of the Court's turnover order because both payments are outside the scope of the Agent's original unjust enrichment claim, which he says was limited to the listed $22.5 million payment and extended only to distributions made during the Revocation Period. He adds that the Agent offers no proof that Winget was unjustly enriched by either payment, and he cannot be liable for the 2018 payment of $20 million because the turnover order was directed to him alone, not to JVIS Investments, which received the payment. Finally, Winget says the Agent should bear the consequences of failing to discover the payments sooner.

A party may seek to enforce a court order through a contempt motion. *See Shillitani v. United States*, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."); *Elec. Workers Pension Tr. Fund of Local Union #58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003) ("Contempt proceedings enforce the message that court orders and judgments are to be complied with in a prompt manner."). To succeed, the plaintiff must prove "by clear and convincing evidence" that the defendant violated the Court's prior order. *Glover v. Johnson*, 934 F.2d 703, 707 (6th Cir. 1991). The order violated must be "definite and specific" and must require the defendant "to perform or refrain from performing a particular act or acts." *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) (quoting *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987)). The plaintiff also must show that the defendant had "knowledge of the court's order." *Ibid.* However, since civil contempt is remedial in nature, the charging party

need not establish willfulness; "intent in disobeying [an] order . . . is irrelevant to the validity of the contempt finding." *In re Jaques*, 761 F.2d 302, 306 (6th Cir. 1985) (citation omitted).

"Clear and convincing evidence is . . . not a light burden and should not be confused with the less stringent, proof by a preponderance of the evidence." *Elec. Workers*, 340 F.3d at 379 (citation omitted). But "[o]nce the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is presently unable to comply with the court's order." *Ibid.* (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). "To meet this production burden in this circuit 'a defendant must show categorically and in detail why he or she is unable to comply with the court's order.'" *Ibid.* (quoting *Rolex Watch*, 74 F.3d at 720.)

It has been said that "a defendant that 'hew[s] to the narrow letter of the injunction while simultaneously ignoring its spirit' charts such a course at its peril." *CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, No. 11-13744, 2015 WL 13022178, at *5 (E.D. Mich. Feb. 20, 2015) (quoting *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014)). Defendants act "at their own risk by failing to seek the court's interpretation of the injunction if they had any good faith doubt as to its meaning." *Polo Fashions, Inc. v. Stock Buyers Int'l, Inc.*, 760 F.2d 698, 700 (6th Cir. 1985). That is because a rule that a party has "immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined . . . would give tremendous impetus to the program of experimentation with disobedience of the law." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).

The Court's order imposing the constructive trust was clear: the Court directed Winget to "pay [the Agent] *the amounts paid on the promissory notes*, including the 22.5 million payment." *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2021 WL 37479, at *11 (E.D. Mich. Jan.

5, 2021) (emphasis added). Winget appears to concede that there were payments on the notes beyond the initial $22.5 million payment that has been litigated at length in this case and in the 2023 case. *See* Resp., ECF No. 1154, PageID.34256 ("[T]he Judgment does not cover the July 1, 2018, $20 million payment made by JVIS-USA to JVIS Investments because it was outside the Revocation Period."), PageID.34258 (referring to "the $2.5 million payment made in 2017. . ."). These concessions are oblique, but as Winget appears to now concede, there were additional payments on the notes, and they fall within the order's definite command that Winget turn over the payments he received to the plaintiff. His failure to do so violates the Court's clear order.

There are two payments in play here, and they must be examined separately. The first occurred sometime "in 2017" in the amount of $2.5 million. ECF No. 1154, PageID.34257. The second was a payment of $20 million made in June or July of 2018. *Id.* at PageID.34255. Winget says that the $20 million payment was not made during the revocation period, but that does not matter. The Court's order imposing a constructive trust required him to turn over payments on the two *promissory notes* (totaling $150 million) *issued during the revocation period*. *See Winget*, 2021 WL 37479, at *11. His focus on the timing of cash payments on the notes therefore is misplaced.

In any event, Winget fails to explain why the Agent would not be entitled to the payment of $2.5 million, which he admits was made "in 2017," indisputably within the revocation period. ECF No. 1154, PageID.34258. He does not argue that this payment was made to anyone but him. In fact, deposition testimony cited by both sides provides some evidence that he received this payment. During Winglet's deposition in 2018, the Agent's attorney inquired about a document disclosing a $22.5 million payment on the notes dated June 30, 2017. Winget dep., ECF No. 1154-3, PageID.34273. Winget responded that he recalled "getting a payment for the GRATs from

JVIS. I thought it was 25, but obviously it was 22." *Ibid.* Winget's initial recollection of receiving $25 million in 2017 is evidence that he did receive that amount in total and that the Agent's counsel somehow overlooked the $2.5 million payment by focusing on the payment to the GRAT. As Winget points out in his response brief, the 90:10 ratio between $22.5 million and $2.5 million mirrors the 90:10 ratio between the $135 million note originally issued to the GRAT and the $15 million issued to Winget individually. ECF No. 1154, PageID.34247. Because the difference between the $25 million Winget initially recalled receiving and the $22.5 million he later admitted is $2.5 million, Winget's initial recollection supports the Agent's contention that Winget received a payment he was ordered to turn over and didn't.

The Agent also seeks an order requiring that Winget turn over the $20 million payment made in June or July of 2018 as well, but Winget emphasizes that the payment was made to JVIS Investments, LLC — not to him, and the Agent has presented no affirmative evidence that Winget received the payment himself. It is not clear why JVIS would have made a payment on the notes to an entity that is not a party to them. *See* ECF Nos. 46-2, 46-3, *Alter Domus, LLC v. Larry J. Winget*, No. 23-10458 (E.D. Mich.) (listing Larry J. Winget and the GRAT as the payees of the notes). But the Agent, which bears the burden of proof on the motion for contempt, has offered no evidence that suggests that Winget ever received the $20 million payment, credited it, or caused it to be paid to JVIS Investments. The only evidence regarding the 2018 payment appears to be JVIS's 2018 tax returns showing a $20 million drop in the company's "Loans from shareholders" liability that year. *See* ECF No. 1149-2, PageID.34087. Unlike the $2.5 million payment, Winget does not acknowledge receiving the $20 million payment himself, and there is no deposition testimony supporting an inference that he did.

This evidentiary gap poses a problem for the Agent because the Court's January 5, 2021 order imposed a constructive trust only on "payments *made to Winget* on account of the promissory notes." *Winget*, 2021 WL 37479, at *11 (emphasis added). The Agent attempts to bridge the gap by stating that JVIS Investments is wholly owned by Winget, and perhaps it could advance a theory that JVIS Investments acted to deprive the Agent of the payment in contravention of the Court's order. Civil Rule 65(d)(2), after all, provides that the Court's orders are binding even on non-parties who have actual notice and act "in active concert or participation" with the parties, the parties' officers, agents, employees, or attorneys. Fed. R. Civ. P. 65(d)(2). But the problems with that theory are twofold. First, the Agent has cited no portion of the record disclosing Winget's connection to JVIS Investments other than his interrogatory response disclosing it as the recipient of JVIS's $20 million payment. Second, the 2018 payment was made before there was any Court order that could be violated, and there is no evidence in the record suggesting JVIS Investments has sought to keep the funds from the Agent.

Certainly, the Agent may argue in the 2023 case that JVIS's payment did not reduce the amount it owes on the notes. (Apparently, JVIS believes its payment to a third party somehow satisfied its obligations, *see* ECF No. 189, No. 23-10458; ECF No. 1149-2, PageID.34087 (showing a $20 million decrease in JVIS's "Loans from shareholders" liability on its 2018 tax returns)). At present, however, there is no clear and convincing evidence that JVIS's 2018 payment to JVIS Investments furnishes cause to hold Winget in civil contempt.

Winget's main argument in opposition is that the Agent has failed to prove that he was unjustly enriched by receiving the two note payments. Winget reasons that, despite the prior unjust enrichment judgment for which the constructive trust was imposed as an equitable remedy, and despite the charging orders against LLC's, including JVIS, the Agent must prove the elements of

an unjust enrichment claim to recover any distribution an LLC owned by the trust might make. He bases this argument on opinions of this Court and the Sixth Circuit. *See JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *8 (6th Cir. July 1, 2022) ("[I]t's [the Agent's] burden to show that Winget was unjustly enriched by the full amount of the cash distributions."); *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2021 WL 37479, at *6 (E.D. Mich. Jan. 5, 2021) ("It was [the Agent's] burden, however, to demonstrate that Winget was unjustly enriched through the distributions tied to the LLCs' membership interests that would have been subject to the charging orders. That does not merely impact 'damages,' . . . but it goes to the heart of [the Agent's] argument that an inequity occurred. [The Agent], therefore, bore the burden to prove that the misdirected assets inequitably were distributed and retained by Winget. And to meet that burden, [the Agent] had to show by uncontested evidence that the distributions were made during the Revocation Period." (citations omitted)). On Winget's theory, because the Agent offered no proofs that he was unjustly enriched by either the $2.5 million or $20 million payments, they cannot properly be considered part of the constructive trust.

Related to that argument is Winget's insistence that any effort to recover the payments on the notes could not be justified by the Court's unjust enrichment judgment because, according to him, that question never was litigated. He says that relief was not requested in the Agent's complaint, and he cites cases for the unremarkable proposition that a court only may grant relief based on allegations presented in the plaintiff's pleadings and justified by the plaintiff's proofs. *See Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974, 984 (6th Cir. 2017), *Sylvan Beach v. Koch*, 140 F.2d 852, 861-62 (8th Cir. 1944), and *United States v. Spallone*, 399 F.3d 415, 424 (2d Cir. 2005).

There are a number of problems with Winget's position. To start, his challenge to the validity of the constructive trust and the judgment that generated it has no place in a proceeding to enforce it by contempt. "[I]t is settled law that [a court's order] still must be obeyed until and unless it is overturned on appeal." *N. Am. Coal Corp. v. Loc. Union 2262, United Mine Workers of Am.*, 497 F.2d 459, 465 (6th Cir. 1974) (citing *United States v. United Mine Workers of America*, 330 U.S. 258 (1947)). It is true that if the underlying order in a civil contempt proceeding is invalidated, the contempt adjudication falls along with it. *See United Mine Workers*, 330 U.S. at 295. But Winget never raised an argument that the constructive trust remedy exceeded the relief sought in the pleadings, and the judgment itself was upheld on appeal. *JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287 (6th Cir. July 1, 2022), *cert. denied sub nom. Winget v. Alter Domus, LLC*, 143 S. Ct. 748 (Mem) (U.S. Jan. 23, 2023).

Moreover, the Agent's pleadings and proofs in support of its motion for summary judgment on its unjust enrichment claim and request for a constructive trust were more than sufficient to alert Winget that it sought *any* payment he received during the revocation period. *See Winget*, 2021 WL 37479, at *4 ("[The Agent] wants the Court to impose a constructive trust on the cash distributions, the promissory notes, and certain payments made to Winget on those promissory notes during that time."); *see also* Agent's Motion for Partial Summary Judgment, ECF No. 926, PageID.29857-58 ("During the Revocation Period, Mr. Winget retitled the Trust's membership interests in the LLCs into his own name. After doing so, Mr. Winget took distributions from the LLCs. These distributions were in the form of money payments and promissory notes."). Perhaps the Agent did not frame its request explicitly to cover note payments beyond the $22.5 million payment discussed *ad nauseum* in this and the 2023 companion matter, but it did not need to, and Winget's insistence to the contrary misses the forest for the trees. He forgets that the Agent's

major focus was the two promissory notes, totaling $150 million, issued by JVIS *during* the revocation period. *See Winget*, 2021 WL 37479, at *11. Obtaining the full value of the notes would include any payments that reduced the principal. The Agent did not seek the notes merely as mementos to memorialize this ever-enduring case. It should have been — and likely was — obvious to Winget that the Agent wanted any payment he had received on the notes. The Court's order did not exceed its authority but was the natural product of the litigation.

The scope of the constructive trust was litigated and decided more than three years ago and was affirmed by the Sixth Circuit. The Court directed Winget to "pay [the Agent] the amounts paid on the promissory notes, including the $22.5 million payment." *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2021 WL 37479, at *11 (E.D. Mich. Jan. 5, 2021). This was based on its proofs that Winget "received the distributions that would have otherwise gone to [the Agent] under the charging orders." *JPMorgan Chase Bank, N.A. v. Winget*, No. 21-1568, 2022 WL 2389287, at *6 (6th Cir. July 1, 2022). He cites no case for the proposition that the Agent must prove unjust enrichment as to matters already decided. The relevant question now is whether the Agent has proved by clear and convincing evidence that Winget's failure to turn over the payments was a violation of a definite and specific order of this Court. As to the $2.5 million payment, it has.

Even if it were appropriate to relitigate long-settled issues regarding the scope of the Court's prior judgment, Winget's argument that the Agent needed to prove that it was unjustly enriched by each payment on the notes is illogical. It is true that Michigan law imposes a tracing requirement on the contents of a constructive trust. *See In re Mayer*, 451 B.R. 702, 713 (E.D. Mich. 2011) ("[W]hen the subject property has changed in form, the purported beneficiary of the constructive trust must be able to trace the proceeds of the property back to its original form.")

(Cook, J.); *United States v. Holland*, No. 13-10082, 2020 WL 6701912, at *5 (E.D. Mich. Nov. 13, 2020). But that requirement is easily satisfied here. The Court determined that the Agent was entitled to the two promissory notes, together totaling $150 million, because JVIS distributed them to Winget when they properly should have gone to the Trust. To obtain the full value of these notes, the Agent necessarily was entitled to any payment Winget received that reduced the principal. As long as the Agent establishes that the payments at issue here were on account of the notes, it has established that they are properly part of the constructive trust.

Winget next maintains that the Agent's failure to uncover the payments from discovery materials produced years earlier and denote them in its motion for a constructive trust places the funds outside of the Agent's reach. This argument also is flawed. Winget cites no case holding that the Agent must have identified, *ex ante*, all funds to which it claims entitlement before it may obtain them via a constructive trust. He cannot credibly claim that he was unaware of his obligation under the Court's order to "pay [the Agent] the amounts paid on the promissory notes . . . ." even if the Agent failed to mention the $2.5 million payment explicitly. *Winget*, 2021 37479, at *11. Instead, this argument calls to mind a laches defense to the enforcement of the Court's turnover order.

The Sixth Circuit has described laches as "the negligent and unintentional failure to protect one's rights." *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 584 (6th Cir. 2015) (quoting *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002)). "It is an equitable defense that bars relief when a plaintiff sits on his or her rights and, in doing so, disadvantages the other party's present defense against the claim." *Cernelle v. Graminex, L.L.C.*, No. 21-1579, 2022 WL 2759867, at *9 (6th Cir. July 14, 2022) (citing *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007)). To win on a laches defense, Winget must prove

that the Agent lacked diligence in asserting its rights and that it was prejudiced as a result. *See Chirco*, 474 F.3d at 231. "Delay alone cannot warrant laches." *McKeon Prods., Inc. v. Howard S. Leight & Assocs., Inc.*, 15 F.4th 736, 742 (6th Cir. 2021) (citing *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003)).

Winget maintains that the Agent had access to records that would have made the payments obvious long ago. The Agent concedes it had certain records, but says that the additional payments were not obvious. It also points to an April 2020 document request seeking "any and all documents related to the [notes] . . . and [their] location" and argues that Winget should have produced more definite information about the payments at that time. *See* ECF No. 1154-7, PageID.34296. The Agent has the stronger position. Although the documents in the Agent's possession provide evidence that JVIS made additional payments, it is far from obvious. The tax returns, for instance, disclose changes in a line item for "Loans from shareholders," not detailed recitations of payment information. And there is little information about the 2018 payment other than JVIS's 2018 tax returns showing another reduction in the "Loans from shareholders" entry. Finally, Winget's 2018 deposition responses, which furnish proof of the additional $2.5 million payment, are equivocal. *See* Winget dep., ECF No. 1154-3, PageID.34273 ("I remember getting a payment for the GRATs from JVIS. I thought it was 25, but obviously it was 22."). The Agent accuses Winget of offering false testimony on this point, but read naturally, the question and answer both focused on the payment by JVIS to the GRAT. His answer — $22.5 million — is the correct figure as to that question; it merely omits mention of the payment made on account of the note issued directly to him rather than to the GRAT. Perhaps all of these factors should have been cause for additional questions on the Agent's part, but Winget's receipt of additional payments was anything but

obvious. The notion that $105 million in principal remains outstanding on the notes only appears to have come to the fore due to JVIS's recent litigation decisions in the 2023 case.

Even if the Agent should have been charged with ascertaining information about the payments earlier, Winget has failed to articulate any sort of prejudice caused by the Agent's delay in seeking court intervention. *Chirco*, 474 F.3d at 231. Although it has been said that delay can give rise to prejudice due to the deterioration of witness memories and increased defense costs, *Cernelle*, 2022 WL 2759867, at *11 (citing *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 411-12 (6th Cir. 2002)), there is little risk of those problems here because the evidence of the contempt largely is document-based. Winget also fails to direct the Court to any case holding that that delay absolves him of responsibility for failing to abide by the Court's orders. His laches argument does not save him.

In a final gasp, Winget says the Agent failed to prove that he did not receive the money for some other purpose, such as to satisfy JVIS's tax obligations. This argument borrows from the Sixth Circuit's holding that the Agent had failed to prove unjust enrichment as to the approximately $79 million in cash distributions Winget used to pay federal taxes on the LLCs' income. *Winget*, 2022 WL 2389287 at *8. However, this suggestion is improbable, and it doesn't matter anyway. Because Winget received the payment on the note, his failure to turn it over violated the Court's order.

It also is important to distinguish the Sixth Circuit's holding, which concerned free-floating cash distributions, from the payments here. Winget's own evidence supports the conclusion that he received $2.5 million to reduce the principal on the notes. As discussed earlier, JVIS's 2017 tax returns, produced in 2019, reflect a "Loans from shareholders" liability that increased from $0 to $125 million that year. Resp., ECF No. 1154, PageID.34248. This is in spite of the fact that

the notes JVIS issued to Winget and the GRAT — which properly would have been reported in that line — have a collective $150 million face value. The difference between these figures is $25 million, and removing the known $22.5 million payment to the GRAT, already turned over to the Agent, leaves a $2.5 million difference. Because Winget was the payee on the notes, it is easy to conclude that the $2.5 million payment in 2017 was on account of the notes.

None of Winget's arguments, individually or collectively, are sufficient to undermine the Agent's demonstration that he violated a definite and specific order of this Court by failing to turn over payments on the notes. The Agent has produced clear and convincing evidence demonstrating that Winget violated the definite and specific provisions of the injunctive terms of the Court's January 5, 2021 turnover order by failing to provide the 2017 payment of $2.5 million to the Agent. Winget, therefore, is in contempt of this Court's order.

### III.

The "objective of any contempt determination is to enforce the message that court orders and judgments are to be taken seriously." *Elec. Workers Pension Tr. Fund of Local Union #58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 385 (6th Cir. 2003) (citing *Cincinnati Bronze*, 829 F.2d at 590). For civil contempt, "judicial sanctions can be used not only to coerce compliance, but also to compensate the complainant." *Ibid.* (quoting *United Mine Workers*, 330 U.S. at 303-04); *see also United States v. Work Wear Corp.*, 602 F.2d 110, 115 (6th Cir. 1979) ("Civil contempt is meant to be remedial and to benefit the complainant either by coercing the defendant to comply with the Court's order via a conditional fine or sentence or by compensating the complainant for any injury caused by the defendant's disobedience."). Here, an order to turn over the payment received serves both goals: compliance and compensation. The Agent also asks the Court to order

Winget pay 10% interest from the date the payments were made and attorney's fees incurred in connection with the motion.

An award of interest is not appropriate at this time. The determination of the payment of interest, if any, will abide the outcome of the litigation over the enforcement of the notes in case number 23-10458. The plaintiff may apply for attorney's fees at the conclusion of the collection proceedings in this case.

Accordingly, it is **ORDERED AND ADJUDGED** that Larry J. Winget is in **CIVIL CONTEMPT** of the order of this Court to turn over "the amounts paid on the promissory notes."

It is further **ORDERED** that the plaintiff's second motion to hold Larry J. Winget in civil contempt (ECF No. 1150) is **GRANTED IN PART**.

It is further **ORDERED** that Larry J. Winget may purge his contempt by paying over to the plaintiff the $2.5 million payment he received on the promissory note(s) **on or before February 28, 2025.**

It is further **ORDERED** that Larry J. Winget, **on or before February 19, 2025**, must furnish to the plaintiff a declaration signed under the penalty of perjury listing all payments he received, including the dates and amounts of payments, on the promissory notes that he was ordered to turn over to the plaintiff as part of this Court's order of January 5, 2021 (ECF No. 986).

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: February 14, 2025