UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALTER DOMUS, LLC,

               Plaintiff and Counter-Defendant,         Case Number 08-13845

v.                                            Honorable David M. Lawson

LARRY J. WINGET and the LARRY J.
WINGET LIVING TRUST,

               Defendants and Counter-Plaintiffs,
_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION
## TO SET ASIDE JUDICIAL SALE AND CONFIRMING JUDICIAL SALE

On March 17, 2025, the Court ordered that the judicial sale of certain assets of defendant Larry J. Winget Living Trust was to be held no later than April 21, 2025 (ECF No. 1194) to satisfy a money judgment entered against it. The sale originally was scheduled to take place "no later than August 31, 2023" but was delayed by the parties' respective appeals of the Court's sales order. The Sales Procedures Order itself set out detailed instructions as to how the sale would be conducted, drawn extensively from input furnished by the Special Master and the plaintiff. The sale was administered by a Marketing Agent nominated by the plaintiff and appointed by the Court. The sales auction proceeded as scheduled in April, with defendant Larry Winget submitting the highest bid of $19 million for the entire lot of assets. Plaintiff Alter Domus cries foul, arguing in a motion that the auction should be nullified and redone. Alter Domus argues that the defendants violated the Sales Procedures Order by failing to provide required information on the value of the assets, and that they failed to cooperate with the procedures in good faith. It also contends that the price that the assets fetched is inadequate. The Court held a hearing on the motion on August 27, 2025. The parties presented oral argument, but neither side offered any evidence. They did agree, however, that if the auction results were not set aside, it would be appropriate to confirm the sale

in accordance with the Sales Procedure Order.  Because there were no material violations of the Sales Procedure Order, and because no evidence has been presented that establishes that the auction price shocks the conscience, the motion to set aside the auction sale will be denied and the sale will be confirmed.

I.

A.  Background

The relevant facts of this case are summarized at length in the Court's order approving the sales procedures (ECF No. 1103).  Larry Winget and the Larry J. Winget Living Trust guaranteed a loan for one of Winget's companies, which filed for bankruptcy in 2003.  For two decades, the administrative agent for the lenders — now, Alter Domus — has sought to enforce those guarantees.

On June 21, 2018, the Court awarded JPMorgan Chase Bank, then the Agent for the lenders, a judgment against the Trust for more than $775 million. The judgment remains unsatisfied and continues to accumulate interest.  The Agent moved to execute on the corporate stock owned by the Winget Trust in the following entities: Golf Course Corporation 1, Golf Course Development Co., Oakland Land Company, PIM Management Company, Venture Sales & Engineering Corp., and VIMCO Corporation.  The Court referred the motion to a Special Master, who determined that the Agent was entitled to a writ of execution on the Trust's corporate stock. The Court adopted the Special Master's report and recommendation and ordered the trustee of the Trust — Winget — to "deliver to the District Court all stock certificates [of the Trust's corporations] titled in the name of the Trust or its trustee." ECF No. 915, PageID.29784.  The Court also ordered the Agent, after considering the Trust's objections, to submit to the Court a proposed form of judicial sale.  Neither Winget nor the Trust appealed those aspects of the order.

On May 15, 2020, the Agent filed a notice of a proposed form of judicial sale, which it had developed in part with Winget and the Trust's input.  On May 29, 2020, Winget filed objections to the proposed sale notice and procedures.  Most of Winget's objections were based on the purported inadequacy of the sale notice and procedures.  On March 4, 2021, the Special Master filed a report recommending that the Court enter an order approving the proposed form of judicial sale, subject to certain minor revisions.  *See* ECF No. 1000.  Winget again filed objections to the Special Master's report.  The Court did not consider the objections or the report while Winget's appeal of the Court's earlier opinion and order granting the Agent's motion for partial summary judgment on its separate unjust enrichment claim remained pending.  After the Sixth Circuit issued its decision affirming the Court in part, Winget moved for leave to file amended objections to the Special Master's report to conform the objections to the July 1, 2022 opinion of the court of appeals, which the Court allowed.

On September 29, 2022, Winget filed his amended objections to the report.  The Agent responded, and the Court issued an opinion on July 27, 2023 overruling many of Winget's objections to the proposed sale, adopting in part the Special Master's report and recommendation, and approving judicial sales procedures.  *See* ECF No. 1103.

## B. The Sales Procedures Order

The Court ordered the Agent to sell the stock on an "as is, where is" basis with the assistance of a marketing agent.  *Id.* at PageID.33657.  The Court also directed Winget and the Trust to "cooperate in good faith" with the sale, including by "providing documentation or other relevant information" promptly to the Agent, the marketing agent, and any qualified bidders, and "by making available" senior officers of the subject companies for discussions.  *Ibid.*  The Agent was to assemble a "data room" consisting of information about the sale assets, which included publicly available information, information the Agent had received from Winget and the Trust

during the litigation, and "such other information as Winget and the Winget Trust may be required to provide pursuant to any order or direction of this Court or as may be reasonably requested by the Agent, Marketing Agent or any Qualified Bidders." *Id.* at PageID.33659.

To participate in the sale, prospective bidders needed to pre-qualify by submitting certain written disclosures. These included a submission setting out the identity of each bidder, evidence of its capability to consummate the sale, evidence of its status as an "accredited investor," evidence of its possession of any necessary government authority to acquire the sale assets, and an executed confidentiality agreement. *Id.* at PageID.33658. The Court also added a provision prohibiting the Agent from credit bidding less than the full amount of its judgment and prohibiting the lenders it represents from participating in aggregate cash and credit bids for less than the full amount of judgment. *Id.* at PageID.33659. Although the Court ordered that the sale be held by August 31, 2023, the Court also authorized the marketing agent to adjourn the sale in his sole discretion. *Id.* at PageID.33658. The order provided that the Court would hold a hearing to confirm the sale and adjudicate any objections, which were limited to objections "that the Sale Process was not conducted in accordance" with the order setting out the sales procedures. *Id.* at PageID.33660.

Winget appealed the Sales Procedures Order, and the Agent filed a motion for reconsideration, asking the Court to remove the provisions that prohibited it from credit bidding for less than the full amount of its judgment and prohibited the lenders it represents from participating in cash or credit bids for less than the full amount of the judgment. On March 18, 2024, the Court denied the Agent's request for reconsideration and emphasized that the credit bidding limitations were necessary to mitigate the risk of a potential windfall, to guard against collusion, and to encourage additional bidding. *Alter Domus, LLC v. Winget*, No. 08-13845, 2024 WL 1344216, *5 (E.D. Mich. Mar. 18, 2024). The Agent then took its own appeal. On January

31, 2025, the Sixth Circuit dismissed both appeals after it determined it lacked jurisdiction to consider the sales procedures until the Court entered a final order confirming the sale. *See JPMorgan Chase Bank, N.A. v. Winget*, No. 23-1788, 2025 WL 610048, at *3 (6th Cir. Jan. 31, 2025).

After the matter returned from the court of appeals, the Court ordered that the sale proceed by April 21, 2025. ECF No. 1194. It also rejected two last-minute requests by the defendants to further adjourn or modify the sales procedures. ECF Nos. 1196, 1201. However, on the parties' stipulation, the Court permitted notice of the sale to be published in the Detroit Free Press and the DailyDAC, an online resource that lists public notices of auctions and sales, rather than the previously-proposed media outlets. ECF No. 1194.

### C. The Sale

In the motion presently before the Court, the Agent maintains that Winget and the Trust failed to cooperate with the marketing agent in the weeks leading up to the sale and "blocked the circulation" of a "Confidential Information Presentation" meant to engage prospective bidders. To support that contention, the Agent furnished a declaration of Clifton H. Roesler, a partner at Angle Advisors, the firm serving as the marketing agent for the sale.

Roesler states that the marketing agent began preparation by developing a list of information and documents that prospective buyers would need to assess the companies whose stock was to be sold. Roesler Decl. ¶ 7, ECF No. 1206-2. The Agent originally requested this material from the defendants in May of 2021, again in August 2023 after the Court entered the Sale Procedure Order, and once again in February 2025 after the appeals were dismissed. *Id.* ¶¶ 7-10. On March 19, 2015, approximately a month before the sale, counsel for the Trust contacted the marketing agent to request that it identify the highest priority items on its list. *Id.* ¶ 13. Roesler believed that all or nearly all of the requested information was necessary, but the marketing agent

nevertheless shared a modified request that categorized the sought-after information into priority tiers. In total, the marketing agent sought approximately 6,000 documents. *Id.* ¶¶ 14, 17, 18. Roesler states that the defendants produced only 62 documents over the course of the month. *Id.* ¶¶ 21-23.

To spread word about the sale, the marketing agent shared a "teaser" memo with a targeted list of more than 400 companies, including manufacturers in the plastics and automotive industries, as well as a variety of private funds. *Id.* ¶ 29. Seven entities expressed interest and submitted signed confidentiality agreements. *Id.* ¶ 33. Roesler says that the marketing agent's plan was to circulate a Confidential Information Presentation ("CIP") to the prospective bidders. *Id.* ¶ 34. The marketing agent prepared a draft CIP and shared it with the defendants. *Id.* ¶¶ 36, 39. The draft included certain financial information about the companies for sale. It also mentioned the Agent's long-standing claim that BMJD, LLC — an asset held by one of the companies subject to the stock sale — was fraudulently formed. *Id.* ¶ 41. This statement drew a strong objection from the defendants, who asserted that if the marketing agent did not remove that section, those entities it mentioned would take action to "hold Angle Advisors responsible" for the "false assertion[s]." *Id.* ¶ 45. Two days later, the defendants sent a letter to the marketing agent objecting to the circulation of any CIP and stating that it would seek to hold the marketing agent in contempt of court if it were disseminated. *Id.* ¶ 47. The marketing agent ultimately decided not to circulate the CIP. *Id.* ¶ 51.

The marketing agent complains that its "inability" to circulate a CIP meant that prospective bidders only had access to the short teaser before the deadline to decide whether to become a qualified bidder. In Roesler's opinion, "it is unprecedented for a bidder to be asked to produce information demonstrating its own financial position when the bidder has not received any

substantive information about the companies on which it may be bidding." *Id.* ¶¶ 55-56. He reports that only two entities besides Winget and the Agent sought to become qualified bidders, and both only were interested in the assets of the golf company subject to sale. *Id.* ¶ 58. One later chose not to complete the qualification process. *Id.* ¶ 59. The remaining bidder, after obtaining access to the virtual data room, represented that the information was insufficient, so it would not participate in the sale. *Id.* ¶ 61.

The sale occurred as scheduled on April 21, 2025. Winget and the Agent were the only two qualified bidders to attend. When the auction commenced, Winget bid $19 million for the entire lot of assets. The Agent did not bid, although it could have submitted a cash bid in any amount instead of a credit bid for the full amount of the judgment. Instead, a representative of the Agent made a short statement reiterating its opposition to the credit bid limitations and claiming that it "was prepared to credit bid up to hundreds of millions" from its judgment for the assets. *See* Tr. of Judicial Sale, ECF No. 1220-5, PageID.35676. The Agent filed a successful bid notice stating that "the bid of Larry J. Winget . . . was the highest bid for the lot of Sale Assets." ECF No. 1203, PageID.34941.

### D. Objections to the Auction

The Agent offers two principal objections to the sale that it says should result in a re-do. First, it argues that Winget and the Trust violated the Sales Procedures Order's requirement that they act in good faith. The Agent primarily focuses on the defendants' alleged failure to provide updated financial information about Mayco Holdings, BMJD, and BMJD's subsidiaries Mayco International and Mayco Freight. None of these companies were on the auction block, but the stock of another company owned by the Trust, PIM Management Company, owned Mayco Holdings, which held non-voting stock shares of BMJD, which owned the other entities. The

- 7 -

Agent says that without this information, qualified bidders that obtained access to the data room would not be able properly to evaluate what were potentially the most valuable assets subject to the sale.   The Agent also faults the defendants for "preventing" the circulation of a CIP to attract qualified bidders.   The result, according to the Agent, is that the auction was an empty exercise, and because Winget knew the Agent would not credit bid its entire judgment, he could name his price for the assets.

For that reason, the Agent also contends that the sales price is inadequate and should not be approved.   The Agent surmises that the assets collectively are worth at least $350 million, far more than the winning $19 million bid.   It says that Michigan and federal courts frequently have found higher sales-price-to-value ratios to be inadequate and have refused to confirm those judicial sales.

The defendants take umbrage at the Agent's suggestion that they engaged in untoward conduct to hamper the sale.   They point to their production of "tens of thousands of pages of financial documents" for the companies whose stock was subject to the sale and of their subsidiaries and state that their cooperation earned them a commendation from the marketing agent for their "continued help/constructiveness" during the sale process.   ECF No. 1220, PageID.35602 (quoting emails, ECF No. 1220-6, PageID.35681).   The defendants also maintain that the Agent's focus on the Mayco companies' and BMJD's financial information is misguided because they are not subsidiaries of any of the companies that are part of the sale.

The defendants also reject the Agent's non-cooperation characterization based on alleged interference with the dissemination of the CIP, pointing out that the Sales Procedures Order did not authorize any such disclosure to "prospective bidders" who had not already been deemed "Qualified Bidders."   They argue that the Agent has failed to provide any admissible evidence that

they chilled participation in the sale, and in fact, the sole evidence that suggests any bidding was chilled comes from the hearsay statements of Mr. Roesler that interested bidders did not want to go through the qualification process to gain access to information about the sales assets in the data room, which was a requirement that the Agent itself suggested.

Finally, the defendants reject the Agent's assertion that the sale must be set aside based on the price obtained. They contend that the Agent's proposed $350 million valuation of the assets is drawn from cherry-picked data on the companies' balance sheets that lack context, and it is not supported by any admissible evidence. In reality, they say, many of the companies have suffered losses for several years, so a valuation of that sort defies reality.

## II.

"A money judgment is enforced by a writ of execution, unless the court directs otherwise." Fed. R. Civ. P. 69(a)(1). Federal courts apply state law rules for collecting judgments "unless a federal statute provides an alternative procedure." *Lewis v. United Joint Venture*, 691 F.3d 835, 839 (6th Cir. 2012) (citing Fed. R. Civ. P. 69(a)). The parties have agreed throughout that Michigan law governs the sale procedures in this case. *See JPMorgan Chase Bank, N.A. v. Winget*, 801 F. App'x 962, 963 (6th Cir. 2020).

The Michigan Revised Judicature Act sets forth the procedures for executing on corporate stock and for its sale. Mich. Comp. Laws §§ 600.6031 and 6037. The statute does not furnish extensive instructions for the sale of corporate stock, requiring only 10 days' notice of a sale, with such notice to be posted in three public places in the city or township where the sale is to occur. Mich. Comp. Laws § 600.6031. However, the Act also allows a judge, when enforcing a money judgment, to "[m]ake any order as within his discretion seems appropriate . . . to subject any nonexempt assets of any judgment debtor to the satisfaction of any judgment against the judgment

debtor." Mich. Comp. Laws § 600.6104(5).  The Court's authority under this provision is "very broad."  *In re John Richards Homes Bldg. Co., L.L.C.*, 298 B.R. 591, 609 (Bankr. E.D. Mich. 2003) (citing *Rogers v. Webster*, 779 F.2d 52, 1985 WL 13788, at *1 (6th Cir. 1985) (*per curiam*) (table)); *see also Winget*, 801 F. App'x at 963 ("Michigan law gives courts extremely broad authority to enforce their judgments." (quotation omitted)).

### A.  Defendants' Alleged Failure to Cooperate

The Agent argues the auction was tainted because the defendants violated Paragraph E of the Sales Procedures Order, which requires Winget and the Trust to "cooperate in good faith with the Sale Process, including, without limitation by providing documentation or other relevant information promptly . . . upon reasonable written request and by making available senior officers at the Companies (as defined below) for discussions."  ECF No. 1103, PageID.33657.  The Agent urges the Court to set aside the sale on the ground that Winget and the Trust engaged in a "campaign of non-cooperation and intimidation" designed to "clear[] the field of potential bidders and thereby allow[] the only bidder at the auction, Mr. Winget, to enter a lowball bid."  ECF No. 1206, PageID.35195.  It makes two main accusations: that the defendants failed to provide timely information about the assets subject to the sale, and they interfered with the marketing agent's attempts to drum up interest in the sale by threatening litigation if the marketing agent were to send his proposed CIP.

### 1.   Disclosing Asset Information

The Agent primarily focuses on the lack of updated financial information for Mayco Holdings and its subsidiary entities (BMJD, LLC, Mayco International and Mayco Freight), even though it is the stock of PIM Management Company, which holds stock in those entities, that is one of the companies actually subject to sale as a Trust asset.  It is not clear whether the Agent

contends that the defendants failed to turn over other critical documents about the sale of other Trust assets as well. *See* Roesler decl. ¶¶ 18, 21-23, ECF No. 1206-2 (stating that the defendants only turned over sixty-two out of a requested 6,000 documents).

The Mayco entities have long been a flashpoint in this case. PIM (one of the Trust assets whose stock was auctioned), owns a 100% stake in an entity called Mayco Holdings Corporation. Mayco Holdings, in turn, owns 100% of the non-voting preferred shares of an entity called BMJD, LLC, which itself owns 100% of Mayco International and Mayco Freight. See below:



Taken from ECF No. 1206-5, PageID.35273.

The Agent has asserted that Winget created this structure during the period when he had improperly revoked the Trust to place Mayco International and Mayco Freight outside the direct control of PIM and under an entity that afforded him voting control (BMJD). Twice, the Agent sought leave to file a motion for summary judgment on its claim that Winget's restructuring amounted to a fraudulent transfer in this case. Winget, of course, vehemently denies those allegations, and the Court has denied the Agent's requests without prejudice while other portions of litigation have proceeded. ECF Nos. 1016, 1058. The Court identified certain anticipated case developments, such as the conclusion of an appeal and consideration of the Special Master's recommendation, and told the plaintiff that it may renew its request after those events, which have since occurred. That was almost three years ago. In March of 2024, the plaintiff attempted to broach the issue somewhat differently, arguing that the Court should address it by setting a trial schedule on the unresolved damages portion of its fraudulent transfer claim against Winget. *See* ECF No. 1128. The Court denied the request at the time due to the pendency of the parties' appeals of the sales procedures order, ECF No. 1143, and the plaintiff has not seen fit to take up that issue since.

The Agent insists that the defendants were obligated to provide updated financial information for the entities PIM owns under the terms of the Sales Procedures Order. It points out that the Order required the marketing agent to place in the data room "the financial information of all of the Companies' subsidiaries." ECF No. 1103, PageID.33658-59. According to Roesler, the marketing agent requested this information, but it never was provided. Roesler decl. ¶¶ 17, 24, ECF No. 1206-2. The defendants contend that the Court already has rejected a similar argument pressed by the Agent in 2023 when it quashed a subpoena for information directed to Mayco

International in light of the "attenuated chain of ownership" connecting it to PIM.  *See* Ruling on

Motion to Quash, ECF No. 1099, PageID.33557-62.  The defendants also emphasize that Michigan

corporate law would not treat BMJD as a subsidiary of PIM or Mayco Holdings because neither

owns a majority of the *voting* shares in the entity.

As a matter of sound business practice, one certainly can see why a prudent potential bidder

would be interested in financial information about BMJD and the Mayco entities.  If PIM indeed

owns all or nearly all of the subsidiary corporations, their performance could materially affect

PIM's value.  As the defendants point out, however, BMJD, Mayco International and Mayco

Freight are not PIM's subsidiaries because PIM lacks voting control.  *See* Mich. Comp. Laws §

450.1778 (defining subsidiary as "a legal entity of which a majority of the *voting* shares are owned,

directly or indirectly, by another person") (emphasis added).  Therefore, it is far from clear that

Winget or the Trust violated any provision of the Sales Procedures Order by declining to turn over

information about the downstream companies' financial performance.  The Agent does not identify

specific information it lacked about Mayco Holdings, which *is* a subsidiary of PIM; the primary

contention is that it could not ascertain the value of its holdings of the other entities' stock.  Of

course, the Agent's position is that Winget improperly restructured the companies to remove them

from PIM's control, and under its theory of the case, the Mayco entities would be subsidiaries.

Nonetheless, it has not argued convincingly that the Court must hold off on the sale of PIM's stock

until the propriety of the restructuring and any resulting harm to its status as a judgment creditor

is litigated.  *See Alter Domus, LLC v. Winget*, No. 08-13845, 2024 WL 1344216, at *5 (E.D. Mich.

Mar. 18, 2024) ("[T]he Agent's contention that it would be improper to proceed with the sale

before the resolution of its putative claim against Winget for the allegedly improper transfer of

Mayco from PIM would be more persuasive if the Agent had not repeatedly urged the Court to

issue its sales procedure order promptly.").   Moreover, the sale procedures explicitly were structured to shield the Agent from questions about the value of the assets and provided that the Agent bore "no obligation to seek any information from Winget or the Winget Trust regarding the Sale Assets."   ECF No. 1103, PageID.33659.   In any event, the marketing agent sought no assistance from the Court regarding information on the assets to be auctioned, nor did it express a need to adjourn the sale; and the Agent offers no sound objection to proceeding with the sale of PIM's stock at this juncture.

Moreover, the Agent's concern about the lack of information about the Mayco entities could not plausibly have affected the sale.  For the reasons explained below, the detailed financial information sought by the Agent could not have been used to attract bidders; it only would have been available to those entities that attained qualified bidder status. Roesler avers that the only entity besides Winget and the Agent to do so was interested in bidding only on the stock of the company controlling golf-related assets, not PIM.  Roesler decl. ¶ 58, ECF No. 1206-2.  Yet the Agent does not contend the defendants failed to provide sufficient information about those assets.

### 2.  The Confidential Information Presentation

The Agent also argues that the defendants interfered with the sale by threatening litigation that prevented the marketing agent from including information about the Agent's position on BMJD and Mayco Holdings' improper formation in a draft CIP meant to secure interest in the sale and then from circulating any CIP at all.  There are several problems with this argument.

For one, the Sale Procedures Order does not authorize any such CIP.  According to the marketing agent, these presentations "customarily" are provided to prospective bidders and include "considerable information about the companies subject to sale, including a thorough overview of their operations, markets, products and services, and growth or shrinkage of key products or

service lines . . . and goes into reasonable detail on historical financial statements and financial projections." Roesler Decl. ¶ 34, ECF No. 1206-2, PageID.35215-16. Providing a CIP to interested bidders may be industry custom, but it is not the procedure adopted by this Court after extensive consultation with the Special Master and input from the parties. Instead, the order required prospective bidders to qualify by submitting certain information and executing confidentiality agreements. ECF No. 1103, PageID.33568. Only then would they have access to the data room containing information about the companies. This process made sense since much of the information in the data room is subject to protective orders in this litigation. The marketing agent appears to have obtained signed confidentiality statements and accredited investor forms from the prospective bidders, but becoming a qualified bidder requires more, including certifications of financial wherewithal to consummate a transaction and a listing of necessary governmental approvals to acquire the assets. *Ibid.* The marketing agent does not represent in his declaration that the prospective bidders satisfied all of these requirements. The Agent itself originally drafted these requirements into the sale procedures as a prerequisite to accessing confidential information placed in the data room. *See* Agent's Proposed Sale Process, ECF No. 970-1, PageID.31466-68. Circulating a document containing confidential information to prospective bidders who had not submitted materials entitling them to status as qualified bidders effectively would have amounted to a re-writing of the Court's order. Even if the point were arguable, the defendants' threat of contempt proceedings, which likely would have focused on a good-faith disagreement about the terms of the Court's order, would not have amounted to "interference" with the sale.

Moreover, the Agent has not persuasively argued that this issue, or the other issue about the procedures it raised, plausibly affected the results of the sale. The marketing agent sent high-

level information about the sale to more than 400 potential participants with a possible interest in the assets subject to sale. Roesler decl. ¶ 28, ECF No. 1206-2. This communication apparently only attracted a grand total of seven entities — not including Winget and the Agent — to submit confidentiality agreements and accredited investor forms so they could further explore a deal. *Id.* ¶ 33. Most of these entities did not take all the steps necessary to obtain qualified bidder status. It appears that the marketing agent intended to circulate the CIP to the entities who had submitted only confidentiality agreements and investor forms. Roesler explains that the marketing agent's inability to circulate a CIP left those entities with the "unprecedented" choice of submitting information of sufficient financial wherewithal to consummate a purchase of the sale assets "when the bidder has not received any substantive information about the companies on which it may be bidding." *Id.* ¶ 56. He also points out that it would be "difficult if not impossible for a potential bidder to assess whether it has the financial wherewithal to bid for assets when it has no meaningful information about those companies." *Ibid.*

There are several inaccuracies in this argument. First, the marketing agent was not *unable* to circulate a CIP. He chose not to. The Agent always could have sought clarification from this Court about whether such a circulation would have been permissible under the terms of the sales order. Blaming the defendants is a distraction. Second, perhaps the absence of a CIP diminished the effectiveness of the sale process, but again, the process largely was the Agent's own creation. Third, obtaining qualified bidder status hardly could be characterized as an onerous undertaking. *See* ECF No. 1103, PageID.33658 (listing five requirements). It is hard to imagine a serious bidder finding the requirements a major deterrent.

Ultimately, only two of the seven bidders sought qualification, and one chose not to complete the process after it learned more about the asset it was most interested in, which was not

PIM.  There is no guarantee that a CIP would have generated other qualified bidders.  To the extent the marketing agent determined that more time was necessary to prepare for, solicit interest in, or obtain information bearing on the sale assets, it had the authority to adjourn the sale "from time to time in [his] sole discretion."  *Ibid.*.  Whatever the problems with the sale, the Agent's objection is not that it "was not conducted in accordance with" the procedures set out in the Court's order.  Its quarrel is with the procedures themselves, not the defendants.  *Id.* at PageID.33660.   These objections will be overruled.

### B.  The Auction Price

The Agent also insists that the auction should be nullified because the price obtained at the sale — $19 million for the all the assets — is woefully inadequate.  Under the terms of the Sales Procedures Order, this is not an appropriate objection.  *See* ECF No. 1103, PageID.33660 (limiting objections to those contending that "the Sale Process was not conducted in accordance with this Order").  Nevertheless, Michigan law does envision a role for courts in assessing the price obtained at a judicial sale.  The Michigan Supreme Court has recognized that "as a rule" that "when [] gross inadequacy [of price] is accompanied with any other circumstances showing fraud, irregularities or unfairness, the sale may be set aside."  *Greenberg v. Kaplan*, 277 Mich. 1, 7-8, 268 N.W. 788, 791 (1936).  However, the "mere inadequacy of price . . . is not sufficient to set aside a [j]udicial sale."  *Ibid.*  But Michigan courts also have framed the inquiry to focus on price alone — without any additional showing of misconduct — if the price is so inadequate "as to shock the conscience of the court."  *In re Newbrough*, 254 Mich. 170, 176, 236 N.W. 233, 236 (1931); *Michigan Tr. Co. v. Cody*, 264 Mich. 258, 263, 249 N.W. 844, 845 (1933) (observing, in the context of a mortgage foreclosure sale, that the court may decline confirmation "if the amount bid is inadequate to the extent that it shocks the conscience of the court"); *see also Carpenter v. Smith*, 147 Mich. App.

560, 569, 383 N.W.2d 248, 252 (1985) (stating that a trial court "court may exercise its discretion to decline confirmation of a foreclosure sale if the amount bid is so inadequate as to shock the conscience of the court."). The circumstances surrounding the sale are relevant to determining whether a sales price shocks the conscience. *See In re Hudson*, 258 Mich. 176, 183, 241 N.W. 868, 870 (1932) (considering a "lull" in the real estate market and that the property originally had been purchased for a "high price" in affirming a trial court's order overruling objections to a sale of property by a receiver); *In re Newbrough*, 254 Mich. at 176, 236 N.W. at 236 (similar).

Determining that a price is so inadequate as to "shock the conscience" necessarily requires making a comparison: the contested sale price must shock the conscience in relation to some other reliable measure of the asset's value. The burden is on the party challenging the sale to submit "real evidence of the property's value." *Carpenter*, 147 Mich. App. at 570, 383 N.W.2d at 252; *Detroit Tr. Co. v. Hart*, 274 Mich. 144, 146, 264 N.W. 321, 322 (1936) (affirming trial court's refusal to confirm a sale where a bid price was substantially below the property's "fair value"). It is well-recognized, however, that judicial sales do not fully replicate market conditions, and "due to the forced nature of the sale, . . . rarely bring a price that approximates the market value of the property." William H. Brown, Lawrence R. Ahern, III & Francesco G. Mazzotta, 1 The Law of Debtors and Creditors § 6:64 (database updated Aug. 2025); *see also United Growth Corp. v. Kelly Mortg. & Inv. Co.*, 86 Mich. App. 82, 86, 272 N.W.2d 340, 343 (1978) ("The element of compulsion reduces the value of property. . . . Reality requires that the court make some concession to the forced nature of the sale."). "Mere estimates of value cannot prevail against the facts of the situation." *In re Newbrough*, 254 Mich. at 176, 236 N.W. at 236.

The Agent offers an "estimate" that the assets put up for auction "conservatively" are worth $350 million. It does not offer much support for that surmise, however — certainly not enough

evidence to carry its burden.  It relies on two data points about PIM, taken from its 2023 balance sheet: its reported assets of nearly $378 million and its retained earnings of approximately $365 million.  The Agent also highlights that PIM's wholly-owned subsidiary Venture Holdings B.V. reported total assets of more than $79 million in 2023.   These are large sums, but flagging large numbers on a company's financial statements is no substitute for a rigorous assessment of the value a company's shares could fetch at market.  It ignores, for instance, that PIM also reported a meager 2023 income of $563,528, all from dividends, and reported only $1 in cash on hand.  PIM 2023 Tax Return, ECF No. 1205-3, PageID.35169-70.

The Agent's focus on PIM's retained earnings likewise is misleading; that figure does not necessarily translate into the market value of its shares.  As the defendants point out, the retained earnings figure, although a large line item, represents more of an accounting convention than a reflection of real worth.   Retained earnings are a subset of a company's equity and reflect a company's accumulated net income reduced by its distributions to shareholders.  *See* Charles H. Meyer, Accounting and Finance for Lawyers in a Nutshell 359-60 (7th ed. 2020).  They are not assets.  They appear as shareholder equity on a company's balance sheet as a means to reconcile any remaining undistributed income from each reporting period.  It is not necessarily the case that a company that reports substantial retained earnings necessarily has assets that could be monetized to support a similar valuation.  And the Agent has not offered any evidence to support a contrary conclusion.

The Agent offers a rather complicated argument in its reply brief relying on certain testimony elicited by the defendants in the related 2023 case.  One of the issues in that matter is whether another entity controlled by the Trust, JVIS-USA, LLC, was solvent on the date it issued certain promissory notes.  JVIS was comprised of two operating divisions and a wholly-owned

subsidiary, JVIS Manufacturing, LLC.  In that case, the defendants offered the testimony of Gregory Light, a specialist in business valuation.  Light testified that JVIS was insolvent on the date it issued the notes.  He reached this conclusion by combining the equity values of JVIS's two operating divisions as derived from their balance sheets with his estimate of the fair market value of JVIS-USA's 100% interest of JVIS Manufacturing.  *See* ECF No. 1227, PageID.35845 (citing Trial Tr. Vol. III, ECF No. 270, PageID.4562-65, *Alter Domus v. Winget*, No. 23-10458 (E.D. Mich.)).  The Agent finds inconsistency in the defendants' argument that shareholder equity was of consequence to JVIS's value on one hand, and its position here that PIM's substantial retained earnings are irrelevant.  This argument conflates distinct inquiries and misses the mark.

Start with Mr. Light's actual analysis: he netted the assets and liabilities of JVIS's operating entities to arrive at JVIS's equity value, which happened to be negative.  The Agent tries to follow that logic here and suggests that the fact that PIM holds substantial retained earnings (and therefore presumably has a substantial equity value) means its assets far exceed its liabilities and that it is worth a great deal.  But this logic advances a flawed premise: that a company's shareholder equity or book value is equivalent to its fair market value.  Fair market value is the relevant benchmark here that must be compared to the high bid price.

Book value is the net of a company's assets and its liabilities.  Commentators have explained that a company's book value is conceptually distinct from its market value.  *See* Shannon P. Pratt, *Valuing a Business* 362-63 (6th ed. 2022).  In fact, "[t]here is no theoretical support, conceptual reasoning, or empirical data to suggest that the value of a business enterprise (under any standard of value) will necessarily equal the company's accounting book value."  *Id.* at 363.  That is because book value measures "the historical cost of all the company assets that meet accounting requirements to be included on the balance sheet — less total accumulated depreciation

or amortization and any impairment amounts," and these values "are usually not representative of a current economic value business valuation purposes." *Ibid.* There also may be intangible assets or contingent liabilities that are relevant but are not depicted on a typical balance sheet. *Ibid.* That last point is particularly relevant here because PIM's assets consist almost entirely of its ownership interests in various other companies whose value is an open question. Therefore, the Agent is incorrect to conclude that PIM's retained earnings figure, from which it derives a large book value, is any reflection of its market value.

The Agent also references PIM's reported assets on its balance sheet totaling some $378 million. But relying on this figure is problematic for the same reasons. The tax forms made part of the record do not provide much indication of what PIM's "assets" are, but it appears that they reflect its ownership interest in a company called Venture Holdings B.V. and its 100% interest in Mayco Holdings. *See* ECF No. 1206-5, PageID.35273 (displaying PIM's legal structure). The defendants represent that this entry reflects the "cumulative investment interests PIM has held in *other* companies since its formation in *1992*" and faults the Agent for failing to consider the present fair market value of those interests. ECF No. 1220, PageID.35608. The Agent has not offered a cogent response to that criticism.

Approximately $377 million of PIM's reported assets are listed as "Other Investments" on its corporate tax return. This likely represents a value of PIM's interests in other companies, but there is no evidence that it represents fair market value of those interests as of 2023. The defendants explain that fair market value changes over time and is not required to be booked by closely-held companies like PIM. They seem to assert that a fair market valuation of PIM's investments only must be calculated if it engages in a transaction of tax consequence with respect to those investments; because no such transaction recently has occurred, the numbers reported on

the entity's IRS Form 1120 as investment assets do not necessarily reflect a *current* fair market value for PIM's holdings.  Moreover, even if PIM's report was accurate at the time, two years now have passed, and the value of PIM's holdings may have decreased.

The Agent also points out that Venture Holdings BV, one of PIM's holdings, reported $79,742,000 in assets on its balance sheet as of December 31, 2023.  *See* Venture Holdings B.V. Consolidated Balance Sheet, ECF No. 1205-4, PageID.35173.  For the reasons explained above, this figure is entirely irrelevant to the fair market value of PIM.  For one, PIM owns Venture's shares, not its assets.  For similar reasons, the Agent's concern about a 2016 valuation of the BMJD shares also is irrelevant, and that entity is an additional step removed from PIM in the ownership chain.  More to the point, identifying a company's reported assets is not a recognized method for assessing a company's value.  The Agent entirely ignores Venture B.V.'s reported $38 million in liabilities reflected on the same balance sheet on which it locates the assets.  *Ibid.*

PIM itself also reported $12 million in liabilities that year.  ECF No. 1205-3, PageID.35170.  The defendants highlight that if one takes the Agent's approach and considers Venture B.V.'s assets as reachable, the value of the assets obtainable by the winning bidder only totals approximately $29 million ($79 million in Venture's assets minus its $38 million in liabilities, minus PIM's own $12 million in liabilities).  Compared to the proposed $19 million sale price, this figure simply is not conscience-shocking.  *See United Growth Corp.*, 86 Mich. App. at 86, 272 N.W.2d at 343 (stating that property sold via judicial sale inherently will be discounted due to the nature of the sale).  The defendants' back-of-the-envelope math helps illustrate the problems with the Agent's argument, although it neglects PIM's other assets and the assets of any potential assets of the other entities subject to the sale.  But the Agent's objection largely ignores those other entities too.

In the final analysis, one must remember that it is the Agent's burden to marshal evidence of the assets' fair market value to compare to the bid price. Its problem is that it has failed to produce a cogent valuation for the sale assets that reflects a realistic appraisal of what might otherwise have been attainable at the sale. This failure is not for lack of know-how. Valuation was perhaps the most central issue in the February bench trial in the related 2023 case, and the parties both retained skilled expert witnesses on that topic. The Agent was capable of producing an estimate of the assets subject to sale that was more than just a few numbers pulled from a balance sheet. Here, however, the Agent offers nothing more than a drive-by appraisal, and certainly no hard evidence. Actually, it did not seek to present any evidence at all at the August 27 hearing. That is not sufficient to establish that the bid price shocks the conscience.

The Agent also complains once again that the sale will foreclose its opportunity to bring a claim based on its view that the defendants unlawfully restructured Mayco and the BMJD entities in a way that reduced their value. However, it has not explained why an unjust enrichment claim would not remain available or why it could not offer evidence of an alleged diminution of value in the sales price obtained here as part of its proofs in the unadjudicated damages component of its fraudulent transfer claim. In any event, the Agent has not produced any valuation that suggests that unwinding the restructuring would increase the value of the entities so substantially as to render the price obtained here conscience shocking.

It is not entirely surprising that the assets here — which largely are holding companies for businesses whose future is tied up with the rest of the Winget family of entities — would fail to generate substantial interest, much less a substantial price, at a judicial sale. Perhaps that is why the Agent chose not to offer its own valuation analysis or share what it would have bid had it not been foreclosed by the Court's credit bidding limitations. The judicial sale was held on a timetable

that the Agent pressed, using a procedure that was developed with substantial input from the Agent itself. That the results were disappointing to it is no reason to cancel the sale and start again from scratch.

III.

The Agent has not established that the defendants violated any material provisions of the Sale Procedures Order or that the bid price for the assets shocks the conscience.

Accordingly, it is **ORDERED** that the plaintiff's motion to set aside the judicial sale (ECF No. 1206) is **DENIED** and its objections to the judicial sale are **OVERRULED**.

It is further **ORDERED** that the sale of the corporate stock owned by the Winget Trust in the following entities: Golf Course Corporation 1, Golf Course Development Co., Oakland Land Company, PIM Management Company, Venture Sales & Engineering Corp., and VIMCO Corporation, is confirmed for the price reported by the marketing agent.

It is further **ORDERED** that the sale to Larry J. Winget was conducted in accordance with the Sale Procedures Order; that the sale to Larry J. Winget constitutes the highest bid for the Sale Assets; that Larry J. Winget forthwith shall transfer to the Agent the amount of the bid price in cash, by cashier's check, or in other immediately available funds; that thereafter Larry J. Winget is entitled to all the protections afforded to a good faith purchaser purchasing assets at a judicially supervised sale; that the Sale Assets shall be transferred and conveyed free and clear of any liens, claims, interests or encumbrances; and that upon receipt of the bid price payment the Agent immediately shall execute all documents necessary to effectuate the sale of the Sale Assets to Larry J. Winget, including any share transfer agreements.

s/David M. Lawson
DAVID M. LAWSON
Dated:   September 9, 2025            United States District Judge