UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALTER DOMUS, LLC,

               Plaintiff and Counter-Defendant,          Case Number 08-13845

v.                                             Honorable David M. Lawson

LARRY J. WINGET and the LARRY J.
WINGET LIVING TRUST,

               Defendants and Counter-Plaintiffs,

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO VACATE JUDGMENT AND GRANTING PLAINTIFF'S MOTION TO RENEW JUDGMENT

On June 1, 2021, the Court entered a judgment against defendants Larry J. Winget and the Larry J. Winget Living Trust in favor of plaintiff Alter Domus, LLC on its claim that Winget was unjustly enriched by Winget's retention of certain assets from the Trust after he revoked it and subsequently rescinded the revocation. In 2015, this Court's predecessor, the Honorable Avern Cohn, entered a judgment against the Trust after the court of appeals reversed his reformation decision. That judgment was amended by a Second Amended Judgment that was entered in 2018. The defendants now move to vacate the 2021 judgment, arguing that Alter Domus lacked standing to litigate the claims that were reduced to judgment in 2021 and to enforce that judgment. As for the 2015 judgment, the plaintiff fears that absent renewal by this Court, the judgment will expire this year due to Michigan's statutory limitations period, unless a 2018 Second Amended Judgment established the controlling date, and Alter Domus asks the Court to renew the judgment in its favor as successor to the original judgment creditor, JPMorgan Chase. The defendants oppose that motion on the same lack-of-standing grounds. Both sides agree that the resolution of the standing issue will be dispositive of both motions. Because the standing issue is governed by the Supreme Court's decision in *Sprint Communications Co. v. L.P. v. APCC Services, Inc.*, 554 U.S. 269

(2008), which the defendants have not distinguished persuasively, the motion to vacate the 2021 judgment will be denied and the motion to renew the 2015 judgment will be granted.

I.

The background facts of this long-running dispute have been recited *ad nauseum* in numerous opinions filed by this Court and the court of appeals, but a further recitation is necessary to illuminate the issues in the present motions.

In this litigation, the plaintiff — an administrative agent for a consortium of lenders — seeks to collect on a substantial judgment it obtained in 2015. The dispute traces its origins at least to 1999, when Venture Holdings Company, LLC, an entity controlled by defendant Larry J. Winget, sought financing to aid in the acquisition of another company. A group of lenders extended credit to Venture and designated an administrative agent to manage the loan. Venture's acquisition plans fell through, and in an effort to avoid default, Winget, the lenders, and the administrative agent negotiated an amendment to the credit agreement in October of 2002. As part of the amendment, the parties executed a guaranty agreement by which Winget and his Trust collectively agreed that they would satisfy Venture's obligations. The reach of that guaranty would come to be a primary issue of the first phase of this litigation.

For present purposes, however, the provisions that were disputed are of less importance than its basic structure: Winget, the Trust, and the administrative agent (and not the lenders themselves) were the parties to the guaranty agreement, which was made "for the benefit of [the Agent] and the Lenders, under the Credit Agreement . . . ." Guaranty, ECF No. 1-3, PageID.19. It specified that Winget and the Trust, on Venture's default, would "pay to the Administrative Agent for the benefit of the Lenders . . . the amount not so paid" on the credit agreement. *Id.* at PageID.20. In addition, the agreement stated that it "is a guaranty of payment and not of

- 2 -

collection." *Ibid.* And the agreement mentions that the administrative agent has the right "to pursue its remedies against the Guarantor. . . ." *Id.* at PageID.27. The "Administrative Agent" at the time was Bank One, a national banking association, *id.* at PageID.19, but the parties agree that through various mergers, acquisitions, and by operation of law, JPMorgan Chase had succeeded to that role by 2008 when this case began.

The Guaranty and the October 2002 amendment to the Credit Agreement both contemplate that the administrative agent might not be one of the original lenders — or even a lender at all — and could change. For instance, the Credit Agreement includes a provision governing the administrative agent's rights "[i]n the event" it also is a Lender. ECF No. 23-2, PageID.742. Per the Credit Agreement, the administrative agent "may resign at any time," with the resignation "effective upon the appointment of a successor Administrative Agent." *Id.* at PageID.743.

In 2008, JPMorgan Chase filed this lawsuit in its capacity as administrative agent to enforce the Guaranty Agreement. Compl. ¶1, ECF No. 1, PageID.1 ("These Claims are brought by the Agent against Winget and the Winget Trust for enforcement of a guaranty and two pledge agreements entered into by Winget and the Winget Trust in 2002."). The parties' dispute over the meaning of the agreement, particularly the extent of the Agent's recourse against the assets of the Trust, fueled the first seven years of this litigation. Eventually, after a bench trial on that issue, Judge Cohn issued a decision reforming the Guaranty Agreement, which was reversed by the court of appeals. *JPMorgan Chase Bank, N.A. v. Winget*, 602 F. App'x 246 (6th Cir. 2015). In July of 2015, the Court entered an amended final judgment establishing that the defendants owed the Agent approximately $425 million dollars, which represented the unpaid principal "plus all interest, fees and costs . . . in amounts to be determined at a later date." ECF No. 568, PageID.24047. The Agent's recourse as to Winget personally was limited to $50 million, and he

paid this portion of the judgment, but the appellate court held that the Trust's exposure was not similarly limited.   In 2018, adopting a stipulation of the parties, Judge Cohn entered a second amended judgment, which added roughly $368 million in pre-judgment interest and adjusted the unpaid principal figure to about $410 million.  *See* ECF No. 823.

Unbeknownst to JP Morgan Chase, however, Winget in 2014 had revoked the Trust and removed all of its assets.   Winget revealed the revocation in October of 2015 when he sought a declaratory judgment, filed as a separate action, that would establish that, with the revocation, Chase had no further recourse against him or the assets that were once held in the Trust.   That lawsuit was assigned case number 15-13469 (E.D. Mich.).   Chase filed counterclaims alleging that the revocation was a constructively fraudulent transfer under the Michigan Uniform Fraudulent Transfer Act (MUFTA) and that Winget was unjustly enriched by the revocation.   Because the Court concluded that the relief sought in Chase's counterclaims was the "functional equivalent of post-judgment proceedings" in the 2008 case, it consolidated the cases.  ECF No. 686.   The parties and the Court frequently have referred to the claims and counterclaims in the 2015 case number as the "Avoidance Action."   Chase then moved for judgment on the pleadings on its fraudulent transfer claim.  ECF No. 699.  The Court agreed with Chase and granted its motion as to liability only.  ECF No. 732.  Winget did not immediately appeal that ruling.  Rather, he rescinded his revocation and retitled to the Trust all property that it held at the time of the revocation.

After Winget reinstated the Trust, Chase requested entry of Charging Orders with respect to membership interests in certain limited liability companies (LLCs) held by the Trust.  The Court issued the requested Charging Orders on August 15, 2019, and the Sixth Circuit affirmed. *JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d 748, 750 (6th Cir. 2019).   During the interregnum, however, one of the companies formerly owned by the Trust, JVIS-USA, LLC,

distributed millions of dollars in cash and promissory notes to Winget. Two of the notes were issued by JVIS on June 29, 2017, one to a new grantor retained annuity trust (the "GRAT") for $135 million, and one to Winget personally for $15 million. *Ibid.* When Winget reinstated the Trust, he did not retitle the promissory notes to the Trust but rather assigned the $135 million note to himself. However, he did retitle the LLC's membership interests to make the Trust, again, the sole member of JVIS.

Chase then moved for partial summary judgment on its unjust enrichment counterclaim in the avoidance action and sought a constructive trust over all of the distributions made during the period after Winget revoked the Trust but before he rescinded the revocation. ECF No. 926. The Court granted Chase summary judgment and ordered the imposition of a constructive trust over the distributions, including the $150 million in promissory notes. ECF No. 986. It also ordered Winget immediately to assign the promissory notes to the Agent and pay to Chase "the amounts paid on the promissory notes, including the $22.5 million payment" that JVIS had made. *JPMorgan Chase Bank, N.A. v. Winget*, No. 08-13845, 2021 WL 37479, at *11 (E.D. Mich. Jan. 5, 2021).

On January 12, 2021, after the Court ordered the imposition of a constructive trust but before it entered judgment on Chase's claims, Chase filed a motion to substitute Alter Domus, LLC as the plaintiff in the case. ECF No. 989. Chase's motion recited the terms of the Credit Agreement, discussed above, dealing with successors to its role as administrative agent and stated that it had entered into an Agency Transfer Agreement ("ATA") with Alter Domus to designate it as the successor. *Id.* at PageID.31907. Under the ATA, which Chase provided to the defendants before filing the motion, Chase stated that it had "assign[ed]" and Alter Domus had "assume[d] all of [Chase's] rights, duties and obligations as non-recourse borrower under the Initial Litigation

Credit Agreement, together with the agreements, documents and instruments delivered under or in connection with the foregoing. . . ." Agency Transfer Agreement, ECF No. 1212-2, PageID.35378. Alter Domus was "vested with all the rights, powers, privileges and duties of the Administrative Agent under the Primary Credit Agreement and the Loan Documents . . . ." *Id.* at 35379. The ATA also stated that "all references to 'Administrative Agent' in any of the Primary Credit Agreement, the other Loan Documents, the Initial Litigation Credit Agreement or any other documents related thereto or delivered in connection therewith, shall mean and refer to Alter Domus." *Id.* at PageID.35379-80. Chase's motion also invoked Federal Rule of Civil Procedure 25(c). The defendants did not oppose the request, and the Court entered an order to reflect the change on January 14, 2021. ECF No. 990.

On June 1, 2021, the Court entered a final judgment on the fraudulent-transfer claim and the unjust-enrichment claim in favor of Alter Domus. *See* ECF No. 1017. Winget placed the cash and promissory notes in escrow while he appealed the rulings.

The Sixth Circuit affirmed in part. *JPMorgan Chase v. Winget*, No. 21-1568, 2022 WL 2389287, at *11 (6th Cir. July 1, 2022). It agreed that Winget's revocation of the Trust constituted a fraudulent transfer executed to put the Trust's assets beyond the reach of the Agent, and that Winget was unjustly enriched by the LLC distributions he received during the revocation period, including the promissory notes issued by JVIS. *Id.* at *5-9. The court found that, but for the fraudulent revocation, the Trust — not Winget — would have been the member of JVIS, and thus the Trust would have loaned JVIS cash by leaving the distributions in the company and received the promissory notes in return. *Id.* at *7. The court concluded that the notes belonged to the Trust and that the Agent therefore was entitled to them. *Ibid.* However, the court reversed a portion of

the ruling as to $79 million in cash distributions that Winget contended were used to pay the LLC's tax obligations. *Id.* at *8-9.

After the court of appeals issued its ruling, the Agent obtained the promissory notes and the $22.5 million from escrow, only to discover that Winget and JVIS had amended the terms of the notes on June 30, 2020. Those amendments are the subject of another lawsuit, in which the Agent has asserted claims against Winget and the Agent for payment on the notes, which now are in default, as well as claims under Michigan's Uniform Voidable Transfer Act (MUVTA) and for unjust enrichment. *See Alter Domus v. JVIS, LLC*, No. 23-10458 (E.D. Mich.). JVIS filed a counterclaim in that lawsuit seeking to invalidate the notes and asserting that it has the right to recover any payments it made, including the $22.5 million payment now in the possession of the Agent. The Court granted in part Alter Domus's motion to dismiss the counterclaim, holding that JVIS could maintain a claim to invalidate the notes but could not assert a claim to recover the $22.5 million. *See Alter Domus, LLC v. Winget*, No. 23-10458, 2024 WL 1287612, at *10 (E.D. Mich. March 26, 2024). That matter proceeded to a bench trial in February of 2025 and a decision is pending.

At that bench trial, the defendants called Alter Domus employee Joanna Anderson, who managed Alter Domus's role as administrative agent for the "group of lenders under [the] credit agreement." Trial Tr. Vol. I, ECF No. 267, PageID.4065, *Alter Domus v. Larry J. Winget*, No. 23-10458 (E.D. Mich.). Anderson explained that as administrative agent, Alter Domus tracks the amounts that are outstanding on the debt, maintains the "lender register," and controls the litigation. *Id.* at PageID.4079. These tasks were part of Alter Domus's "job" for which it invoiced the lenders. *Id.* at 4069-70. Anderson also stated her belief that Alter Domus is the "only entity that has the right to file the lawsuit," but that it does not "have a financial stake" in the outcome

and that if there was a judgment in its favor, it would not "get the money." *Id.* at PageID.4079, 4081-82.

That acknowledgement provoked the defendants' argument that Alter Domus has no standing to pursue collection of the judgment in the present case, a position they also take in the 2023 lawsuit. Alter Domus rejects that idea, and it asks the Court to renew the 2015 judgment in this case, which may expire by operation of law if the Second Amended Judgment entered in 2018 is not deemed to be the operative instrument.

II.

A.

The defendants bring their motion to vacate the 2021 judgment under Civil Rule 60(b)(4), which authorizes the Court to "relieve a party . . . from a final judgment" if "the judgment is void." Fed. R. Civ. P. 60(b)(4). A judgment may be considered void "in the rare instance where [it] is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010). One example of a void judgment is the circumstance cited by the defendants here: where the issuing court lacked subject matter jurisdiction. *See Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 903 (6th Cir. 2006) ("The validity of a court order depends on the court having jurisdiction over the subject matter and the parties."). However, the Sixth Circuit, and other federal courts, have held that a motion invoking the rule "will succeed only if the lack of subject matter jurisdiction was so glaring as to constitute a total want of jurisdiction or no arguable basis for jurisdiction existed." *In re G.A.D., Inc.*, 340 F.3d 331, 336 (6th Cir. 2003) (cleaned up); *Espinosa*, 559 U.S. at 271; *Salem Pointe Cap., LLC v. BEP Rarity Bay, LLC*, 854 F.

- 8 -

App'x 688, 702 (6th Cir. 2021).   "The burden is on the movant to bring herself within the provisions of Rule 60(b)."  *In re G.A.D.*, 340 F.3d at 334.

Moreover, a party invoking Rule 60(b)(4) must make its motion "within a reasonable time." Fed. R. Civ. P. 60(c)(1).  In this circuit, that requirement extends even to challenges that a judgment is void for want of subject matter jurisdiction.  *See In re Vista-Pro Auto., LLC*, 109 F.4th 438, 442 (6th Cir. 2024) (citing *United States v. Dailide*, 316 F.3d 611 (6th Cir. 2003)).  That approach, however, conflicts with the approach taken by other courts that have considered the question.  *Id.* at 448 (McKeague, J, dissenting) ("Courts widely agree that the timeliness requirement in the text of Rule 60(c)(1) does not apply to a motion seeking vacatur of an allegedly void judgment for the simple fact that a legal nullity must necessarily be vulnerable to vacatur at any time.").  Perhaps for that reason, the Supreme Court granted the *Vista-Pro Auto* appellants' petition for a writ of *certiorari*.  *See Coney Island Auto Parts Unlimited, Inc. v. Burton*, No. 24-808, 2025 WL 1603597, at *1 (U.S. June 6, 2025).  The Court need not dwell on the timeliness of the defendants' motion, however, because their argument on the merits does not persuade.

## B.

The defendants contend that the 2021 judgment on the fraudulent-transfer and the unjust-enrichment claims is void because Alter Domus had no standing to pursue them, and therefore the Court lacked subject matter jurisdiction to award it relief.

It is well settled that Article III of the U.S. Constitution, which sets out the authority of the federal courts, allows those courts to adjudicate only actual "Cases" and "Controversies." U.S. Const. Art. III, § 2.  "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case — in other words, standing."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Without proof of actual skin in the game, the lawsuit is no more than "a vehicle

for the vindication of the value interests of concerned bystanders." *United States v. SCRAP*, 412 U.S. 669, 687 (1973).  The Supreme Court has characterized the standing doctrine as "part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787," and has said it promotes the separation of powers.  *United States v. Texas*, 599 U.S. 670, 675 (2023) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 476 (1982)).  To establish standing, a plaintiff must demonstrate that it has suffered an actual or imminent, concrete and particularized injury; that injury must be fairly traceable to the conduct of the defendants; and it must be likely that a favorable judicial decision would offer relief.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  "The plaintiff 'bears the burden of establishing standing as of the time [it] brought th[e] lawsuit and maintaining it thereafter.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)).

The defendants emphasize Joanna Anderson's trial testimony that Alter Donus does not "have a financial stake" in the dispute with the defendants.  Trial Tr. Vol. I, ECF No. 267, PageID.4079, *Alter Domus v. Larry J. Winget*, No. 23-10456 (E.D. Mich.).  They take this statement to mean that Alter Domus ultimately will not benefit from any judgment in its favor and argue, therefore, that Alter Domus has no "personal stake" necessary to invoke the Court's jurisdiction under Article III.

Ms. Anderson's testimony — especially when read in isolation — is somewhat perplexing. But it bears emphasis that she did not testify that Alter Domus lacks a financial stake in the outcome of this litigation.  The relevant exchange is reproduced below:

> Q. Ms. Anderson, could you just take a moment, please, and describe for the Court what is an administrative agent?
>
> A. So we're a third-party administrative agent, meaning that we don't have a financial stake.  We're acting as administrative agent under a credit agreement where there is a group of lenders where the named party that has the leads on the collateral.  We track the lender register.  We track any amounts that are due and

outstanding.  We calculate the interest due.  And then we manage the litigation, if that's part of what's happening in the — under the credit agreement.

*Id.* at PageID.4078-79.

In context, she is explaining the role of an administrative agent, not disclaiming all interest in this litigation.  The only other instance the words "financial stake" came up during her testimony was when Winget's attorney, somewhat confusingly, inquired whether the 2023 lawsuit was a "lawyer lawsuit."  *Id.* at 4076.  Anderson responded that Alter Domus was directed to bring the lawsuit by "lenders who have a financial stake."  *Ibid.*  Her testimony did not disclaim any financial interest for Alter Domus, so much as state that the lenders have the ultimate financial interest. That fact was not particularly surprising or revelatory.  Alter Domus, like Chase before it, would not keep for itself any funds recovered in its capacity as administrative agent.  Instead, it was serving as administrative agent for the "group of lenders under [the] credit agreement," which included invoiceable tasks like tracking the amounts outstanding on the debt, maintaining the "lender register," and controlling the litigation.  Trial Tr. Vol. I, ECF No. 267, PageID.4065, 4069-70, 4079, *Alter Domus v. Larry J. Winget*, No. 23-10458 (E.D. Mich.).  It was and is acting under the authority of the Credit Agreement, which provides reimbursement for certain costs and permits the Agent to assess a fee, *see* ECF No. 23-2, PageID.742-43, although a different financial arrangement now may govern, *see* ATA, ECF No. 1212-2, PageID.35378 (referring to an "Initial Litigation Credit Agreement").

Alter Domus compares its role to that of the aggregators in *Sprint Communications Co. v. L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008).  In that case, plaintiff APCC Services brought suit on behalf of hundreds of pay telephone operators against long distance carriers to collect unpaid charges that the payphone operators had assigned to it.  554 U.S. at 272.  APCC aggregated the multiple small value claims assigned to it and sued to collect in a single action, remitting any

proceeds derived from judgment or settlement to the payphone operators and taking a fee for its services. *Ibid.* Petitioner Sprint argued that because the aggregator was suing on behalf of others and suffered no injury of its own — a fact confirmed by the reality that all proceeds derived from the litigation would be passed through to the payphone operators — APCC could not establish standing under Article III. *Id.* at 272-73. After conducting a thorough review of historical practice regarding suits by assignees and the Court's precedents, the Supreme Court concluded that "[l]awsuits by assignees, including assignees for collection only" qualify for federal jurisdiction under Article III. *Id.* at 285. The Court rejected the view that the assignees had not suffered an injury-in-fact, reasoning that the assignment transferred the claim for payphone charges "lock, stock, and barrel." *Id.* at 286. The Court also rejected the contention that the aggregator's agreement to remit all of the proceeds to the assignors harmed its ability to demonstrate redressability. Because "a legal victory would unquestionably redress the *injuries* for which the aggregator[] bring[s] suit," the aggregator's ultimate disposition of the proceeds — "whether the aggregator[] remit[s] the litigation proceeds . . ., donate[s] them to charity, or use[s] them to build new corporate headquarters" — was irrelevant. *Id.* at 287.

Alter Domus contends that the status of Chase as the administrative agent when it initiated this lawsuit was identical to that of the aggregator in *Sprint*, and that Alter Domus stepped into Chase's shoes via the Agency Transfer Agreement (ATA), executed in December of 2020, which vested Alter Domus "with all the rights, powers, privileges and duties of the Administrative Agent under the Primary Credit Agreement and the Loan Documents. . . ." ECF No. 1212-2, PageID.35379. And because the ATA specified that "all references to 'Administrative Agent'" in the credit agreement and Guaranty "shall mean and refer to Alter Domus," Alter Domus became the counterparty to the Guaranty Agreement. *Id.* at PageID.35379-80.

The defendants contend that Alter Domus's status is different from Chase's because Chase was not merely the administrative agent, it also was a lender in its own right and therefore had a personal stake in the Trust's guarantee obligation.  The defendants also argue that the ATA was not sufficient to assign the lenders' claims to Alter Domus, since it only granted Alter Domus the "rights, powers, privileges and duties of the Administrative Agent under the Primary Credit Agreement and Loan Documents" and those duties were limited to those of a "contractual representative" of the lenders.  ECF No. 1215, PageID.35947 (citing ECF No. 1212-2, PageID.35364; ECF No. 23-2, PageID.740-41).  They take this to mean that Alter Domus was attempting to assert the collection rights of the lenders when it secured the 2021 judgment, but the lenders kept all rights, title, and interest in the claims themselves.

The defendants are wrong on both counts.  First, when Chase filed this lawsuit in 2008, it acted in its capacity as the administrative agent with the purpose of enforcing the Winget and the Trust's guaranty.  It did not sue as a lender; it asserted its rights under the Guaranty Agreement because it was the counterparty on the agreement.  *See* Guaranty Agreement, ECF No. 1-3, PageID.19 ("THIS GUARANTY . . . is made as of the 21st day of October, 2002, by Larry Winget and the Larry J. Winget Living Trust (collectively, the 'Guarantor') in favor of . . . [the] *Administrative Agent* (the 'Administrative Agent'), for the benefit of itself and the Lenders, under the Credit Agreement referred to below." (emphasis added)).  Additionally, the Guaranty was signed by the First Vice President of the bank acting "as Administrative Agent." *Id.* at PageID.30.  The lenders had no obvious right to enforce the Guaranty, except perhaps on a third-party beneficiary theory.  Any assignment from the lenders is not of import here.  The pertinent assignment is the one from Chase to Alter Domus, that is, the ATA.

- 13 -

Second, the defendants say that the ATA does not transfer Chase's interests to Alter Domus sufficiently to support constitutional standing, but the language of that instrument undercuts the defendants' position. The defendants devote considerable attention to *Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411 (2d Cir. 2015). In that case, the plaintiff brought claims based on its purported assignment of a debt that was in default, claiming a right to payment. 790 F.3d at 415. The district court dismissed the action for want of subject matter jurisdiction after it concluded that the plaintiff had failed to adequately establish title to its claims on the debt and therefore standing. *Id.* at 416. On appeal, the plaintiff contended that *Sprint* controlled and clearly permitted lawsuits by assignees. Neither the defendants nor the court of appeals disagreed with that point; instead, the court pointed out that the alleged assignment cited by the plaintiff only granted it a right to collect on the notes instead of complete ownership of the claims. *Id.* at 419 ("The language of the assignment confirms that Cortlandt was authorized to collect payment on behalf of the noteholders, but it does not so much as hint that title to the claims at issue was being transferred.").

The defendants also point to *FTUTB, Inc. v. Wisconsin Surgery Ctr. LLC*, No. 20-706, 2020 WL 5645690 (E.D. Wis. Sept. 22, 2020). There, the plaintiff was the "administrative agent" for a group of secured lenders of a pain management company who hoped to bring various state law claims against the company's competitor. *See* 2020 WL 5645690, at *1. The defendants moved to dismiss the case on the ground that the plaintiff was not the real party in interest and for lack of proper diversity jurisdiction. Just as in *Cortlandt*, the court found the plaintiff's rights somewhat unclear. Notably, the plaintiff had pleaded that it possessed "first-priority security interests in all the collateral and [was] required to take all necessary steps to preserve and protect the collateral during the period of the loan," but it also stated "that it was the secured lenders who

- 14 -

were injured." *Id.* at *4.  To address this confusion, the court directed the plaintiff to file an amended complaint clarifying its status.  However, it did not — as Winget and the Trust seem to suggest — hold that "an administrative agent for a syndicate of lenders must have title to the underlying debt to have standing."  ECF No. 1215, PageID.35499.  Instead, the court merely observed that "the precise nature of the relationship between the lenders and the administrative agent [is] significant" to the inquiry of what entity properly is the real party in interest. *FTUTB, Inc.*, 2020 WL 5645690, at *5.  In fact, the court cited cases where courts had concluded that an administrative agent was the proper party based on how each loan agreement was structured. *Ibid.* Here, as explained above, the Guaranty identifies the Agent as the counterparty to whom the guarantors — the defendants — owe payment.

It is quite clear that the guaranty agreement here places the administrative agent in the same position as the aggregator in *Sprint*.  Although that agreement is not an assignment *per se*, it plainly sets out the administrative agent's contractual right to demand and receive payment on behalf of the lenders from the guarantors, that is, the defendants here.  That right led to the entry of the 2015 money judgment — unchallenged from a jurisdictional standpoint — in favor of Chase.  But the defendants contend that the next level assignment — the ATA — did not give Alter Domus a stake in that judgment, and since it was the basis of the fraudulent transfer and unjust enrichment claims in the Avoidance Action that ultimately were reduced to the 2021 judgment, it cannot enforce the 2021 judgment that derived from the collection efforts on the 2015 judgment.

Did the ATA transfer Chase's interest in the 2015 judgment "lock, stock, and barrel," à la *Sprint*? *See* 554 U.S. at 286.  The language of that instrument is sufficient to effectuate such an assignment.  "Assignment agreements are considered contracts, and must be interpreted as such." *Emerzian v. N. Bros Ford Inc.*, No. 365100, 2024 WL 1221551, at *7 (Mich. Ct. App. Mar. 21,

2024).  The ATA is worded broadly.  Notably, the document makes clear that Chase "assigns" to Alter Domus all of JPMorgan's "rights, duties and obligations as non-recourse borrower . . . together with the agreements, documents and instruments delivered under or in connection with the foregoing."  ECF No. 1212-2, PageID.35378.  The 2015 judgment can be understood to be a "document" or "instrument," and the ATA, with reasonable clarity, assigns Chase's interest in it to Alter Domus.

The defendants do not develop any compelling argument why this language is insufficient.  They state that the ATA refers to "further instruments" that Chase was to "execute and deliver" to Alter Domus and speculate that Chase, perhaps, needed to convey a "portion" of its interest as a lender under the original credit agreement.  ECF No. 1215, PageID.35500 (quoting ATA, ECF No. 1212-2, PageID.35379).  But nothing about this text suggests that the ATA itself did not transfer Chase's interest in the 2015 judgment.  The defendants also gesture toward language in the credit agreement that the administrative agent is the "contractual representative" of the lenders and suggest this makes the situation look more like the facts in *Cortlandt*.  But this point is a *non sequitur* if their concern is that the 2015 judgment was not properly assigned.  That judgment was entered in favor of Chase because of its status as administrative agent, not as a lender.  Alter Domus can be both the contractual representative of lenders, and, because of the Guaranty, the holder of a judgment in its own right, by which it ultimately will furnish funds to the lenders.  There is no reason it needs to be a lender itself.  None of this should be surprising to the defendants at this point in the litigation.   Lest they forget, the 2015 judgment mentioned Chase's status as the Administrative Agent, *see* Am. J., ECF No. 568, PageID.24046; it did not describe Chase as having some free-standing interest in the litigation apart from that status.

Nor are the defendants correct that the Agent's standing to pursue its counterclaims in the Avoidance Action is dependent on the 2015 judgment, at least for its fraudulent transfer theory. Certainly, the judgment is mentioned in the Agent's counter-complaint and undoubtedly strengthened the claims. *See* Counterclaims ¶ 22, ECF No. 688. However, the Agent's fraudulent conveyance counterclaim proceeded on the theory that Winget's revocation of the Trust in 2014 placed Trust assets beyond its reach. *Id.* ¶¶ 32-37. When the court of appeals affirmed the Court's grant of judgment on the pleadings to the Agent on this claim, it explained that the Agent's right to payment from the Trust *dated to 2003*, when the Venture company defaulted on the credit agreement. *See Winget*, 2022 WL 2389287, at *4. The court did not describe the 2015 judgment as a necessary predicate to this claim.

The only plausible reason the defendants offer why Alter Domus lacks standing to enforce the 2021 judgment is that it was not assigned Chase's 2015 Judgment, but they fail to offer a cogent explanation for why the ATA was insufficient. They have not shown that "no arguable basis for jurisdiction existed." *In re G.A.D., Inc.*, 340 F.3d at 336. They are not entitled to relief from the 2021 judgment under Civil Rule 60(b)(4).

III.

It follows that Alter Domus has the right to seek renewal of the 2015 judgment. Under Michigan law, the period of limitations on a judgment is ten years. Mich. Comp. Laws § 600.5809(3). Alter Domus suggests that it may not be necessary to pursue such relief at this time, because the 2018 Second Amendment Judgment may be the operative instrument. But there is no authority that requires a judgment creditor to wait until the last minute before seeking to renew its judgment.

- 17 -

Generally, federal judgments are effective when entered. *Atlantic Richfield Co. v. Monarch Leasing Co.*, 84 F.3d 204, 208 (6th Cir. 1996). Congress never established a limitations period governing the duration of a federal judgment's lifespan; instead, federal courts borrow the forum state's procedures for enforcing judgments. Fed. R. Civ. P. 69(a). Michigan law states that "an action founded upon a judgment or decree rendered in a court of record of this state, or in a court of record of the United States," must be brought within ten years. Mich. Comp. Laws § 600.5809(3). A judgment creditor may bring an action to renew a judgment, but it must do so "[w]ithin the applicable period of limitations" set forth in the statute, that is, within ten years. *Ibid.* A motion such as this qualifies as "an action" under this statute. *Van Reken v. Darden, Neef & Heitsch*, 259 Mich. App. 454, 458, 674 N.W.2d 731, 734 (2003). Assuming the judgment holder appropriately renews its judgment, Michigan law contemplates indefinite extension. *Consol. Rail Corp. v. Yashinsky*, 170 F.3d 591, 595 (6th Cir. 1999).

The 2015 judgment specified that the defendants were liable for "$425,113,115.59, which is the unpaid principal amount owed . . ., plus all interest, fees, and costs . . . in amounts to be determined at a later date." 2015 J., ECF No. 568, PageID.24047. That judgment was amended in 2018 to add an additional amount from a "calculation of prejudgment interest" based on a rare stipulation of the parties. ECF No. 822, PageID.27645. The amended judgment also reduced the amount of principal outstanding on the judgment from approximately $425 million to $410,148,384.04 and added prejudgment interest of $368,128,545.19. ECF No. 823, PageID.27653. The plaintiff is entitled to renewal of its judgment, Mich. Comp. Laws § 600.5809(3), but the amount of the judgment should reflect any additional amount of interest due and deduct amounts for payments and collections through the current date. The parties may submit a stipulation indicating the correct amount.

- 18 -

IV.

The defendants have not shown that they are entitled to relief from the 2021 judgment entered in favor of Alter Domus in this action.  Nor have they offered any good reason why the Court should not grant the Agent's request to renew its 2015 judgment.

Accordingly, it is **ORDERED** that the defendants' motion to vacate the judgment (ECF No. 1202) is **DENIED**.

It is further **ORDERED** that the Agent's motion to renew its judgment (ECF No. 1213) is **GRANTED**.

It is further **ORDERED** that the parties promptly must meet and confer to attempt to draft a stipulation on the amount presently owing on the 2015 judgment as amended and may thereafter lodge with the Court in chambers a form of judgment that reflects Alter Domus as the plaintiff in this action.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 25, 2025

- 19 -